# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
### ROCK HILL DIVISION

_____

UNITED STATES OF AMERICA,                    )
the States of CALIFORNIA,                    )
DELAWARE, FLORIDA, HAWAII, ILLINOIS          )
INDIANA, MASSACHUSETTS, MINNESOTA            )
MONTANA, NEVADA, NEW JERSEY                  )
NEW MEXICO, NEW YORK                         )
NORTH CAROLINA,                              )
RHODE ISLAND, VIRGINIA,                      )
the DISTRICT OF COLUMBIA,                    )
the CITY of CHICAGO, and                     )
the CITY of NEW YORK                         )
                                             )
        **Plaintiffs**,                      )
        *Ex rel.*                            )
                                             )
LYNN E. SZYMONIAK,                           )        C.A. No. 10-cv-01465-JFA
                                             )
        **Plaintiff-Relator**,               )
                                             )
v.                                           )
                                             )
AMERICAN HOME MORTGAGE                       )
SERVICING, INC.;                             )
SAXON MORTGAGE SERVICES, INC.;               )
LENDER PROCESSING SERVICES, INC.;            )
DOCX, LLC;                                   )
CITIMORTGAGE, INC., as successor-in-interest )
to CITI RESIDENTIAL LENDING, INC., as        )
successor-in-interest to AMC MORTGAGE        )
SERVICES, INC.;                              )
WELLS FARGO HOME MORTGAGE d/b/a              )
AMERICA'S SERVICING COMPANY;                 )
BANK OF AMERICA CORPORATION,                 )
as successor-in-interest to LASALLE BANK     )
CORPORATION; THE BANK OF NEW                 )
YORK MELLON CORPORATION;                     )
CITIBANK, NATIONAL ASSOCIATION;              )
DEUTSCHE BANK NATIONAL TRUST                 )
COMPANY;                                     )
DEUTSCHE BANK TRUST COMPANY                  )
AMERICAS;                                    )
HSBC USA, NATIONAL ASSOCIATION;              )

J.P. MORGAN CHASE BANK, NATIONAL )
ASSOCIATION; )
U.S. BANK, NATIONAL ASSOCIATION; and )
WELLS FARGO BANK, NATIONAL )
ASSOCIATION, )
)
**Defendants**. )
_____)
UNITED STATES OF AMERICA, the )
States of CALIFORNIA, )
DELAWARE, FLORIDA, HAWAII, ILLINOIS )
INDIANA, MASSACHUSETTS, MINNESOTA )
MONTANA, NEVADA, NEW JERSEY )
NEW MEXICO, NEW YORK )
NORTH CAROLINA, )
RHODE ISLAND, VIRGINIA, )
the DISTRICT OF COLUMBIA, )
the CITY of CHICAGO, and )
the CITY of New York )
)
**Plaintiffs**, )
*Ex rel.* )
)
LYNN E. SZYMONIAK, )        C.A. No. 0:13-cv-00464-JFA
)
**Plaintiff-Relator**, )        **CONSOLIDATED THIRD**
v. )        **AMENDED COMPLAINT**
)
AURORA LOAN SERVICES LLC; )
BANK OF AMERICA CORPORATION as )
successor-in-interest to COUNTRYWIDE )
FINANCIAL CORPORATION; )
BANK OF AMERICA N.A. as successor-in-interest)
to BAC HOME LOANS SERVICING, LP, )
f/k/a COUNTRYWIDE HOME LOANS )
SERVICING LP; BANC OF )
AMERICA MORTGAGE SECURITIES )
INC.; BAYVIEW LOAN SERVICING, LLC; )
CALIBER HOME LOANS, INC. f/k/a )
VERICREST FINANCIAL INC.; )
CALIFORNIA RECONVEYANCE COMPANY; )
CARRINGTON MORTGAGE SERVICES; )
CHASE HOME FINANCE LLC; )
CITIMORTGAGE INC. as successor-in-interest to )
CITI RESIDENTIAL LENDING, INC. as )
successor-in-interest to AMC MORTGAGE )

SERVICES INC.; DOCX, LLC;                          )
HOMEQ SERVICING CORPORATION d/b/a                  )
BARCLAYS CAPITAL REAL ESTATE, INC.;                )
HSBC MORTGAGE SERVICES INC.;                       )
LENDER PROCESSING SERVICES, INC.;                  )
LITTON LOAN SERVICING LP;                          )
NATIONWIDE TITLE CLEARING INC.;                    )
OCWEN LOAN SERVICING;                              )
ONEWEST BANK;                                      )
ORION FINANCIAL GROUP, INC.;                       )
SECURITIES CONNECTION, INC.;                       )
SELECT PORTFOLIO SERVICES, INC.;                   )
WELLS FARGO HOME MORTGAGE d/b/a                    )
AMERICA'S SERVICING COMPANY;                       )
JOHN DOE CORPORATIONS 1 THROUGH 100; )
All whose true names are unknown,                  )
                                                   )
                    **Defendants.**                )
_____)

| | |
|---|---|
| **RICHARD A. HARPOOTLIAN P.A.** | **GRANT & EISENHOFER P.A.** |
| **Richard A. Harpootlian, Esq.** | **Reuben A. Guttman, Esq.** |
| **1410 Laurel Street** | **1747 Pennsylvania Avenue, N.W.** |
| **Post Office Box 1090** | **Suite 875** |
| **Columbia, SC 29202** | **Washington, D.C.  20006** |
| **Telephone:    (803) 252-4848** | **Telephone:    (202) 386-9500** |
| **Facsimile:    (803) 252-4810** | **Facsimile:    (202) 350-5908** |
| | |
| **GRANT & EISENHOFER P.A.** | **GRANT & EISENHOFER P.A.** |
| **Jennifer A. Williams, Esq.** | **Jay W. Eisenhofer, Esq.** |
| **123 Justison Street** | **James J. Sabella, Esq.** |
| **Wilmington, DE  19801** | **Elizabeth H. Shofner, Esq.** |
| **Telephone:    (302) 622-7000** | **485 Lexington Avenue** |
| **Facsimile:    (302) 622-7100** | **New York, NY 10017** |
| | **Telephone:    (646) 722-8500** |
| | **Facsimile:    (646) 722-8501** |

## TABLE OF CONTENTS

Page

I.  INTRODUCTION...................................................................................................1

II. JURISDICTION AND VENUE..................................................................................6

III. PARTIES

    A.    Relator.................................................................................................. 6

    B.    Defendants ........................................................................................... 7

IV. BACKGROUND...................................................................................................14

    A.    Real Estate Sale, Mortgage Finance and Foreclosure Procedures ....................... 14

    B.    Relator's Mortgage ............................................................................. 15

    C.    Foreclosure Proceedings Against Relator ......................................... 16

    D.    Relator Discovers a Forged Mortgage Assignment Filed in Her Foreclosure by DBNTC ................................................................................................ 18

    E.    Relator Reports Discovery of Mortgage Assignment Fraud to Authorities ......... 26

V. THE MORTGAGE-BACKED SECURITIES MARKET....................................................27

    A.    Types of MBS ..................................................................................... 27

    B.    Mortgage-backed Securities Trusts and the Trustees' Role ................................. 27

    C.    MBS Trusts, Controlled by the Defendants, Allegedly Purchased Notes and Mortgages on Homes in South Carolina and Across the United States................ 29

    D.    The Foreclosure Problem in South Carolina and the United States..................... 31

    E.    Defendants' Role in the Foreclosure Actions in the South Carolina Courts and Defendants' Filing of Forged Mortgage Assignments in South Carolina and Across the United States Worsen the Foreclosure Problem ................................. 32

VI. DEFENDANTS' ACTS VIOLATE THE FALSE CLAIMS ACT....................................34

        (a)    DOCX ...................................................................... 36

        (b)    LPS............................................................................. 46

        (c)    WELLS/ASC ............................................................. 56

        (d)    AHMS ....................................................................... 59

i

(e)  AMC/CITI.............................................................................................. 60

(f)  AURORA............................................................................................... 60

(g)  BAC ...................................................................................................... 60

(h)  BARCLAYS .......................................................................................... 61

(i)  BAYVIEW ............................................................................................. 62

(j)  CARRINGTON ..................................................................................... 63

(k)  CHASE HOME...................................................................................... 64

(l)  HSBC MORTGAGE ............................................................................. 65

(m)  LITTON ................................................................................................. 66

(n)  NCI........................................................................................................ 66

(o)  OCWEN................................................................................................. 67

(p)  ONEWEST ............................................................................................ 68

(q)  ORION................................................................................................... 69

(r)  SAXON.................................................................................................. 70

(s)  SCI ........................................................................................................ 70

(t)  SELECT PORTFOLIO.......................................................................... 71

(u)  US BANK .............................................................................................. 72

(v)  VERICREST.......................................................................................... 72

(w)  Defendants Paid Law Firms To Create Fraudulent Documents .............. 74

(x)  Mortgage Assignments Were Signed By Officers Of The Grantee
     Fraudulently Identifying Themselves As Officers Of The Grantor.......... 76

A.  Defendants' False Statements To The Investors, Including The Government
    Plaintiffs.............................................................................................................. 78

(a)  False Statements In MBS Trust Prospectuses and Related Transaction
     Documents ............................................................................................ 79

(b)  False Statements In Certifications Filed Pursuant to SEC Regulations.... 86

B.  Defendants Submitted False Claims To Investors For Services That Were Not
    Provided Or Were Provided Fraudulently ........................................................ 103

VII.  THE U.S. GOVERNMENT PURCHASED MORTGAGE-BACKED SECURITIES
      MADE UP OF MORTGAGES WITH MISSING OR FORGED ASSIGNMENTS
      FROM ORIGINATING BANKS TO THE SECURITIES TRUSTS SUFFERING
      SUBSTANTIAL FINANCIAL HARM.........................................................................108

A.  MBS Purchases by Federal Reserve Funding of Maiden Lane Transactions ..... 108

B.  MBS Purchases by Treasury Financing of Public-Private Partnership Funds.... 121

C.    Direct Purchases of securities in MBS Trusts by Federal Reserve and Treasury124

D.    Damages to the U.S. Government...................................................................... 124

    (a)    Impaired Value of MBS.......................................................................... 124

    (b)    Overcharges for fraudulent services and services not provided ............. 125

    (c)    Fannie Mae and Freddie Mac ................................................................. 126

    (d)    Federal Taxes From Trusts' Loss of Tax Status due to Assignments Made After the Date of Trust Formation ........................................................... 128

VIII.  **THE STATES OF CALIFORNIA, DELAWARE, FLORIDA, HAWAII, ILLINOIS, INDIANA, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, AND RHODE ISLAND, THE COMMONWEALTHS OF MASSACHUSETTS AND VIRGINIA, THE DISTRICT OF COLUMBIA, THE CITY OF CHICAGO, AND THE CITY OF NEW YORK PURCHASED MORTGAGE-BACKED SECURITIES MADE UP OF MORTGAGES WITH MISSING OR FORGED ASSIGNMENTS FROM ORIGINATING BANKS TO THE SECURITIES TRUSTS SUFFERING SUBSTANTIAL FINANCIAL HARM**.......................................................................129

IX. **DEFENDANTS FILED FALSE CLAIMS FOR PAYMENT OF FEDERAL MORTGAGE GUARANTEES**................................................................. 132

X.  **CAUSES OF ACTION**.........................................................................................137

COUNT I Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A) ................................... 137

COUNT II Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B) ................................. 139

COUNT III Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(D)................................ 141

COUNT X Hawaii False Claims Act, Haw. Rev. Stat. §§ 661-21(a)(1)-(a)(4), 661-21(a)(7)-(a)(8) .................................................................................................. 160

COUNT XII Indiana False Claims and Whistleblower Protection Act,  Ind. Code §§ 5-11-5.5-2(b)(1)-(b)(4), 5-11-5.5-2(b)(7).............................................................. 166

COUNT XIII Massachusetts False Claims Act,  Mass. Ann. Laws Ch. 12, §§ 5(B)(1)-(B)(4),5(B)(8)....................................................................................................... 169

COUNT XIV Minnesota False Claims Act,  Minn. Stat. §§ 15C.02(a)(1)-(a)(4),15C.02(a)(7).............................................................................................. 172

COUNT XV Montana False Claims Act,  Mont. Code Ann. §§ 17-8-403(1)(a)-(1)(d), 17-8-403(1)(g)-(h) ........................................................................................... 175

COUNT XVI Nevada False Claims Act,  Nev. Rev. Stat. §§ 357.040 (1)(a)-(1)(d),357.040 (1)(g)-(1)(h) ............................................................. 178

COUNT XVII New Jersey False Claims Act,  N.J. Stat. §§ 2A:32 C-3(a)- (d); 2A:32 C-3(g) ..................................................................................... 181

COUNT XVIII New Mexico False Claims Act,  N.M. Stat. Ann. §§ 44-9-1 – 44-9-14 ......................................................................... 184

COUNT XIX New York False Claims Act,  N.Y. State Fin. L. §§ 189.1.(a)-1.(d), 189.1.(g) ................................................................................... 187

COUNT XX North Carolina False Claims Act, N.C. Gen. Stat. §§ 1-607(a)(1)-(a)(4),1-607 (a)(7) ......................................................................... 190

COUNT XXI Rhode Island False Claims Act,  R.I. Gen. Laws§§ 9-1.1-3(a)(1)-(a)(4), 9-1.1-3(a)(7) ................................................................................. 193

COUNT XXII Virginia Fraud Against Taxpayers Act,  Va. Code Ann. §§ 8.01-216.3 (A)(1)- (A-4), 8.01-216.3 (A)(7)........................................................ 196

COUNT XXIII City of Chicago False Claims Act,  Chicago Code of Ordinances §§ 1-22-020(1)-(4), 1-22-020(7)....................................................... 199

COUNT XXIV New York City False Claims Act,  NYC Admin. Code §§ 7-803 (a)(1)-(a)(4), 7-803 (a)(7) ............................................................. 202

XI. PRAYER FOR RELIEF.................................................................205

XII.    REQUEST FOR A TRIAL BY JURY........................................................206

Plaintiff/Relator Lynn E. Szymoniak ("Relator"), by and through her attorneys Richard A. Harpootlian P.A. and Grant & Eisenhofer P.A., files this Consolidated Third Amended Complaint against Defendants and alleges as follows:

## I.    INTRODUCTION

1.    This action is brought to recover damages and penalties from conduct by the Defendants in creating and using fraudulent mortgage assignments and mortgage note endorsements.

2.    Through an extensive investigation, one which required particular skills, including handwriting analysis, the Relator in this case, Lynn E. Szymoniak, discovered that mortgage documents were regularly being used in foreclosures across the country that, among other defects, were backdated, had falsely stated dates of transfer, had fraudulent notarizations, had forged signatures, were signed by employees of the servicers or document preparers who often falsely claimed to be officers of the originating banks and other entities up the chain of assignments, and were "robosigned" (*i.e.*, signed in bulk).

3.    Such fraudulent assignments and note endorsements formed the basis for the submission of at least tens of thousands of false claims to the U.S. Department of Housing and Urban Development ("HUD") for payments pursuant to the mortgage insurance program administered by the Federal Housing Administration ("FHA").  To add insult to injury, not only did Defendants use the fraudulent assignments and endorsements to procure insurance payments from HUD, they also charged HUD for the cost of filing the fraudulent documents in the foreclosure proceedings.

4.    In addition to seeking damages for the false claims submitted to HUD, this action is also brought to recover damages and penalties arising from the purchase by the

1

United States ("U.S.") government, the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Rhode Island, and Virginia, the District of Columbia, the City of Chicago, and the City of New York (the "Government Plaintiffs") of securities in some of the 3,550 private-label residential mortgage-backed securities trusts that used the fraudulent mortgage assignments and note endorsements in most of the foreclosures they pursued after 2008 and in bankruptcies, where the trusts sought relief from the automatic bankruptcy stay in order to foreclose on trust assets (the "MBS Trusts").[1]

5.    The notes and other mortgage documents, including lawfully executed mortgage assignments, were required to have been delivered at the inception of the MBS Trust, and Defendants repeatedly certified that the MBS Trusts complied with that requirement.

6.    When the trustee and custodian banks and servicers discovered that the mortgage assignments were missing, they, together with the default management and/or mortgage loan documentation companies, devised and operated a scheme to replace the missing assignments with fraudulent, fabricated assignments. Likewise, to conceal that the MBS Trusts were never assigned the notes, the trustee and custodian banks, in concert with the mortgage servicing companies (which needed possession of the note to

---

[1] The MBS Trusts are listed in Exhibit A hereto, organized for convenience by trustee. According to the U.S. Securities and Exchange Commission ("SEC"): "Mortgage-backed securities are debt obligations that represent claims to the cash flows from pools of mortgage loans, most commonly on residential property. Mortgage loans are purchased from banks, mortgage companies, and other originators and then assembled into pools by a governmental, quasi-governmental, or private entity. The entity then issues securities that represent claims on the principal and interest payments made by borrowers on the loans in the pool, a process known as securitization." SEC, "Mortgage-Backed Securities" (June 25, 2007) (http://www.sec.gov/answers/mortgagesecurities.htm).

foreclose), prepared and filed thousands of affidavits falsely representing that the MBS Trusts had possession of the note and that the note was lost in unknown circumstances.

7.     These fraudulent documents—usually assignments of the mortgage—were then filed in court to persuade the court that the trust was the proper party to foreclose on the mortgage.

8.     The Defendants concealed that the notes and assignments were never delivered to the MBS Trusts, and disseminated false and misleading statements to the investors, including the Government Plaintiffs, to obtain the payment of fees for services that were not performed or were performed fraudulently.

9.     The Government Plaintiffs that purchased securities issued by the MBS Trusts have been harmed by: (i) the resulting impaired value of the purchased securities; (ii) overcharges for fraudulent services and expenses and for services not provided, imposed by the Defendant trustees, custodians, mortgage servicers, and default management and/or mortgage loan documentation companies, as well as by law firms; and (iii) the increased costs to prove good title to the mortgages purportedly in the MBS Trust asset pools, since the supporting documents are missing or forged.

10.     Relator's claims are brought pursuant to the federal False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "FCA") and similar provisions in the state and municipal False Claims Act indicated herein.  On behalf of the Government Plaintiffs, Relator seeks to recover damages and civil penalties arising from the false claims and false statements made by the Defendants.

11.    Relator's efforts have already led to the recovery of $95 million for the federal government, for which she was recognized by the federal government as a relator under the False Claims Act in that her information enabled the recovery of funds.

12.    The Defendants named herein are (i) the trustees that control the MBS Trusts whose assets consist of pools of residential mortgages in South Carolina and throughout the United States; (ii) the custodians that, as agents of the trustees, are charged with safeguarding the mortgage assets and related documents of the MBS Trusts; (iii) the mortgage servicing companies that manage the day-to-day operations of the payment processing and foreclosure proceedings for the MBS Trusts at the direction of the trustee banks; and (iv) the default management and/or mortgage loan documentation companies that assisted with foreclosures for the MBS Trusts and mortgage guarantee claims submitted to HUD.

13.    The fraud carried out by the Defendants in this case includes, *inter alia*:

- Mortgage assignments with forged signatures of the individuals signing on behalf of the grantors, and forged signatures of the witnesses and the notaries;

- Mortgage assignments with signatures of individuals signing as corporate officers for banks and mortgage companies that never employed them;

- Mortgage assignments prepared and signed by individuals as corporate officers of mortgage companies that had been dissolved by bankruptcy years prior to the assignment;

- Mortgage assignments with purported effective dates unrelated to the date of any actual or attempted transfer (and in the case of trusts, years after the closing date of the trusts);

- Mortgage assignments prepared on behalf of grantors who had never themselves acquired ownership of the mortgages and notes by a valid transfer, including numerous such assignments where the grantor was identified as "Bogus Assignee for Intervening Assignments"; and

- Mortgage assignments notarized by notaries who never witnessed the signatures that they notarized.

14. The Defendants may have used these fraudulent assignments and note endorsements because the original loan documents were never delivered to the MBS Trusts; or because the original loan documents were defective; or because the original loan documents were delivered but subsequently destroyed; or because the servicers used fraudulent document production as a revenue source; or because of ineptitude. Regardless of any justification or excuse, a multitude of fraudulent documents were used in foreclosure proceedings on MBS Trust assets and formed the basis for false claims on mortgage guarantees from HUD.

## II.    JURISDICTION AND VENUE

15. The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732 and supplemental jurisdiction over the counts related to the state and municipal False Claims Acts pursuant to 28 U.S.C. § 1367.

16. This Court has personal jurisdiction over the Defendants pursuant to subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) because Defendants transact the business that is the subject matter of this lawsuit in South Carolina and numerous acts proscribed by 31 U.S.C. § 3729 occurred in South Carolina.

17. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact the business that is the subject matter of this lawsuit in the District of South Carolina and numerous acts proscribed by 31 U.S.C. § 3729 occurred in the District South Carolina.

### III. PARTIES

#### A. Relator

18.    Relator LYNN E. SZYMONIAK brings this action on behalf of herself and the federal government pursuant to 31 U.S.C. §§ 3729-3733, on behalf of the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Rhode Island, and Virginia pursuant to the respective state False Claims Acts as indicated herein, and the District of Columbia, City of Chicago and City of New York pursuant to the municipal False Claims Acts as indicated herein.

19.    Relator's extensive involvement in investigating and putting together fraud cases dates back to her work as senior counsel for the National Council on Compensation Insurance from 1989 to 1991.  Once her experience in this area developed, Relator helped insurance professionals present a three-day seminar on organized fraud at the FBI offices in Quantico, Virginia and became a member of the National Association of Certified Fraud Examiners.   As a member of the National Association of Certified Fraud Examiners, Relator bolstered her expertise by attending seminars and trainings on fraud issues, including a training on document examination.

20.    Relator's training in insurance fraud led her to work regularly with the Insurance Fraud Bureau of Massachusetts and the Florida Division of Insurance Fraud. Relator served as the head of the Premium Fraud Subcommittee of the Florida Task Force on Insurance Fraud and helped establish the South Carolina Task Force on Insurance Fraud.

21.    Relator has served as an expert witness on insurance fraud and regulatory insurance matters in multiple cases, including *United States v. King*, Case No. 3:05-cr-52-

6

J-99MMH (M.D. Fla. filed Feb. 17, 2005), *United States v. Kernan*, No. 5:08-cr-61 (N.D.N.Y. filed Jan. 30, 2008), *United States v. Zapetis*, Case No. 8:06-cr-26 (M.D. Fla. filed Jan. 17, 2006), and *United States v. Kohn*, Case No. 2:09-cr-1127 (D.S.C. filed Oct. 21, 2009).

22.    Beginning in January 2010, Relator began writing and publishing articles on mortgage foreclosures and residential mortgage-backed securitized trust on her online magazine, Fraud Digest.    Her findings regarding forged and fabricated mortgage documents were also reported on the television program "60 Minutes," which first aired on April 3, 2011.[2]

23.    Relator is an attorney specializing in white collar fraud in Palm Beach County, Florida.  Relator resides and works in Palm Beach Gardens, Florida.  Relator has direct and personal knowledge of the fraudulent scheme described herein.

### B.    Defendants

24.    Defendant AMC MORTGAGE SERVICES, INC., is a corporation formed under the laws of the State of Delaware.  Prior to August 31, 2007, AMC MORTGAGE SERVICES was a subsidiary of ACC Capital Holdings Corporation, based in Orange, California, but on that date was sold to CITIGROUP, INC. and became part of CITI RESIDENTIAL LENDING, INC., a corporation formed under the laws of the State of Delaware.  In 2009 and 2010, CITI RESIDENTIAL LENDING, INC. was merged into CITIMORTGAGE, INC. ("AMC/CITI"), a corporation formed under the laws of the State of New York.    Defendants CITI RESIDENTIAL LENDING, INC. and CITIMORTGAGE, INC. are both subsidiaries of CITIGROUP, INC., based in New

---

[2] The video of this segment is available at: http://www.cbsnews.com/videos/the-next-housing-shock/.  (last accessed on Feb. 1, 2014)

York, New York.  AMC/CITI's corporate headquarters are located at 1000 Technology Drive, O'Fallon, Missouri.

25.    Defendant AMERICAN HOME MORTGAGE SERVICING, INC. ("AHMS") is a corporation formed under the laws of the State of Delaware.  AHMS operates service centers in Irvine, California, Jacksonville, Florida, and Pune, India.  AHMS' corporate headquarters are located at 1525 South Beltline Road, Coppell, Texas.  AHMS changed its name to Homeward Residential, Inc. in February 2012 and was acquired by Defendant OCWEN October 2012.

26.    Defendant AURORA LOAN SERVICES, LLC ("AURORA") is a corporation formed under the laws of the State of Delaware.  AURORA's corporate headquarters are located at 10350 Park Meadows Drive, Littleton, Colorado.

27.    Defendant BAC HOME LOANS SERVICING, LP ("BAC") is a partnership formed under the laws of the State of Texas.   It was formerly known as COUNTRYWIDE HOME LOANS SERVICING LP and, in 2011, was succeeded by merger by BANK OF AMERICA, N.A., a subsidiary of Defendant BA.  BAC operates from Arizona and Texas and is based in 4500 Park Granada, Calabasas, California.

28.    Defendant BANC OF AMERICA MORTGAGE SECURITIES, INC. ("BAMS") is a corporation formed under the laws of the State of Delaware.  BAMS' headquarters are located at 214 North Tryon Street, Charlotte North Carolina.

29.    Defendant BANK OF AMERICA CORPORATION ("BA") is a corporation formed under the laws of the State of Delaware.  BA's corporate headquarters are located at Bank of America Corporate Center, 100 North Tryon Street, Charlotte, North Carolina.

BA is successor-in-interest to COUNTRYWIDE FINANCIAL CORPORATION and LASALLE BANK CORPORATION.

30.   Defendant THE BANK OF NEW YORK MELLON CORPORATION ("BONY") is a national bank.  BONY's corporate headquarters are located at One Wall Street, New York, New York.

31.   Defendant BAYVIEW LOAN SERVICING, LLC ("BAYVIEW") is a corporation formed under the laws of the State of Delaware. BAYVIEW's headquarters are located at 4425 Ponce de Leon Blvd., 4th floor, Coral Gables, Florida.

32.   Defendant CALIBER HOME LOANS, INC. f/k/a VERICREST FINANCIAL, INC. ("VERICREST") is a corporation formed under the laws of Delaware.   VERICREST's corporate headquarters are located at 715 S Metropolitan Avenue, Oklahoma City, Oklahoma.   In 2009, Lone Star Funds acquired the home lending business platform of CIT Group Inc., including The CIT Group/Sales Financing, Inc., a Delaware corporation.   Following the acquisition, the name of The CIT Group/Sales Financing, Inc. was changed to Vericrest Financial, Inc., which was subsequently changed to Caliber Home Loans, Inc.

33.   Defendant CALIFORNIA RECONVEYANCE COMPANY ("CRC") is a corporation formed under the laws of the State of California. CRC's corporate headquarters are located at 9200 Oakdale Ave, Ste. 100, Chatsworth, California.   It operates as a subsidiary of Defendant CHASE.  In December 2013, CHASE sold many of CRC's assets to ALAW.

34.   Defendant CARRINGTON MORTGAGE SERVICES ("CARRINGTON") is a corporation formed under the laws of the State of California. CARRINGTON's

corporate headquarters are located at 1610 E. Saint Andrew Place, Suite B-150, Santa Ana, California.

35.     Defendant CHASE HOME FINANCE LLC ("CHASE HOME") is a corporation formed under the laws of the State of Delaware. CHASE HOME's corporate headquarters are located at 1211 Avenue of the Americas, New York, New York. CHASE HOME is a wholly-owned subsidiary of Defendant CHASE.

36.     Defendant CITIBANK NATIONAL ASSOCIATION ("CITIBANK") is a national bank.  CITIBANK is a subsidiary of CITIGROUP, INC., based in New York, New York.  CITIBANK's corporate headquarters are located at 388 Greenwich Street, 14th Floor, New York, New York.

37.     Defendant DEUTSCHE BANK NATIONAL TRUST COMPANY ("DBNTC") is a trust company.  DBNTC is a subsidiary of DEUTSCHE BANK AG, with a corporate headquarters in Frankfurt, Germany.  DBNTC's corporate headquarters are located at 60 Wall Street, New York, New York.

38.     Defendant DEUTSCHE BANK TRUST COMPANY AMERICAS ("DBTCA") is a trust company.  DBTCA is a subsidiary of DEUTSCHE BANK AG, with a corporate headquarters in Frankfurt, Germany.  DBTCA's corporate headquarters are located at 60 Wall Street, New York, New York.

39.     Defendant DOCX, LLC ("DOCX") is a limited liability company formed under the laws of the State of Georgia.  DOCX is a subsidiary of Defendant LPS. DOCX's principal place of business is located at 601 Riverside Avenue, Jacksonville, Florida.

40. Defendant HOMEQ SERVICING CORPORATION d/b/a/ BARCLAYS CAPITAL REAL ESTATE, INC. ("BARCLAYS") is a corporation formed under the laws of the State of Delaware. BARCLAYS is a subsidiary of Barclays PLC based in London, England. BARCLAYS' corporate headquarters are located at 4837 Watt Avenue, North Highlands, California. BARCLAYS operates from 301 S. College Street, Charlotte, North Carolina. In 2010, Barclays PLC sold BARCLAYS (*i.e.*, HOMEQ SERVICING CORPORATION) to Defendant OCWEN for $1.3 billion.

41. Defendant HSBC BANK USA, NATIONAL ASSOCIATION ("HSBC"), is a national bank. HSBC is a subsidiary of HSBC USA, INC., which, in turn, is a subsidiary of HSBC NORTH AMERICA HOLDINGS, INC. HSBC HOLDINGS PLC, based in London, England, is the parent company of HSBC NORTH AMERICA HOLDINGS, INC. HSBC's corporate headquarters are located at 1800 Tysons Boulevard, McLean, Virginia.

42. Defendant HSBC MORTGAGE SERVICES INC. ("HSBC MORTGAGE") is a corporation formed under the laws of the State of Delaware. HSBC MORTGAGE's principal place of business is 636 Grand Regency Blvd., Brandon, Florida.

43. Defendant JP MORGAN CHASE BANK, NATIONAL ASSOCIATION ("CHASE") is a national bank. CHASE is a subsidiary of JP Morgan Chase & Co. CHASE's headquarters are located at 270 Park Avenue, New York, New York. On May 30, 2008, CHASE parent JP Morgan Chase & Co. acquired The Bear Stearns Companies, Inc., now The Bear Stearns Companies, LLC. On September 25, 2008, CHASE purchased the assets and assumed certain liabilities of Washington Mutual Bank.

44.     Defendant LENDER PROCESSING SERVICES, INC. ("LPS") is a corporation formed under the laws of the State of Delaware.  LPS's corporate headquarters are located at 601 Riverside Avenue, Jacksonville, Florida.  In May, 2013, Lender Processing Services announced its acquisition by Fidelity National Financial, Inc., the nation's largest title insurance company. Lender Processing Services was reorganized into Black Knight Financial Services, Inc. and ServiceLink Holdings, LLC.

45.     Defendant LITTON LOAN SERVICING LP ("LITTON") is a corporation formed under the laws of Texas. LITTON's corporate headquarters are located at 4828 Loop Central DR, Houston Texas.  In June 2003, Goldman Sachs Group, the parent of LITTON, sold LITTON to Defendant OCWEN.  At that time, LITTON was servicing mortgage loans with an aggregate principal balance of $41.2 billion.

46.     Defendant NATIONWIDE TITLE CLEARING INC. ("NTC") is a corporation formed under the laws of Florida. NTC's corporate headquarters are located at 2100 ALTERNATE US 19 N, North Palm Harbor, Florida.

47.     Defendant OCWEN LOAN SERVICING, LLC ("OCWEN") is a corporation formed under the laws of Florida. OCWEN's corporate headquarters are located at 1661 Worthington Road, Suite 100, West Palm Beach, Florida.

48.     Defendant ONEWEST BANK ("ONEWEST") is a corporation formed under the laws of California.  ONEWEST's corporate headquarters are located at 888 East Walnut Street, Pasadena, California.  IndyMac Mortgage Services operates as a division of ONEWEST.  In June 2013 ONEWEST sold $78 billion in mortgage servicing rights to OCWEN.

49. Defendant ORION FINANCIAL GROUP, INC. ("ORION") is a corporation formed under the laws of Colorado. ORION's corporate headquarters are located at 8533 Church Ranch Blvd, #150, Bromfield, Colorado.

50. Defendant SAXON MORTGAGE SERVICES, INC. ("SAXON") is a corporation formed under the laws of the State of Delaware. SAXON's corporate headquarters are located at 4708 Mercantile Drive, Fort Worth, Texas.

51. Defendant SECURITIES CONNECTION INC. ("SCI") is a corporation formed under the laws of Idaho. SCI's headquarters are located in Boise, Idaho.

52. Defendant SELECT PORTFOLIO SERVICES INC ("SELECT PORTFOLIO") is a corporation formed under the laws of Utah. SELECT PORTFOLIO's headquarters are located at 3815 S. West Temple, Salt Lake City, Utah.

53. Defendant U.S. BANK NATIONAL ASSOCIATION ("U.S. BANK") is a national bank. U.S. BANK is a subsidiary of U.S. BANCORP. U.S. BANK's corporate headquarters are located at U.S. Bancorp Center, 800 Nicollet Mall, Minneapolis, Minnesota.

54. Defendant WELLS FARGO BANK, NATIONAL ASSOCIATION ("WELLS FARGO") is a national bank. WELLS FARGO is a subsidiary of WELLS FARGO & COMPANY, with corporate headquarters in San Francisco, California. WELLS FARGO's corporate headquarters is located at 101 North Phillips Avenue, Sioux Falls, South Dakota.

55. Defendant WELLS FARGO HOME MORTGAGE d/b/a AMERICA'S SERVICING COMPANY ("WELLS/ASC") is a corporation formed under the laws of the State of Delaware. WELLS/ASC is a division of Defendant WELLS FARGO

BANK, NATIONAL ASSOCIATION, which is a subsidiary of WELLS FARGO & COMPANY, with a corporate headquarters in San Francisco, California. WELLS/ASC's corporate headquarters are located at 3476 Stateview Boulevard, Fort Mill, South Carolina.

56.    Upon information and belief, Defendants John Doe Corporations 1 through 100 are corporations the names and addresses of which are unknown. Defendants John Doe Corporations include mortgage foreclosure servicing companies and servicers, custodians, and trustees of MBS Trusts.

## IV.    BACKGROUND

### A.    Real Estate Sale, Mortgage Finance and Foreclosure Procedures

57.    This case began with Relator's purchase of a home in Florida financed with a mortgage followed by a subsequent foreclosure case based on forged documents. Relator's investigations revealed that Defendants' practices in this specific case occurred in numerous other cases, tainting foreclosures nationwide.

58.    Generally, to finance the purchase and sale of real estate, the buyer borrows money from a bank or mortgage company. The borrower signs a promissory note secured by a mortgage on the property, which is recorded as a lien against the home. The note and mortgage are signed by the borrower and by an officer of the bank or mortgage company which originates the loan, *i.e.*, the lender.

59.    The lender records the mortgage as a lien against the property by filing a copy with the county recorder's office in the county in which the property is located. Any transfer of a note and mortgage to a subsequent purchaser is accomplished by the endorsement of the note and the assignment of the mortgage.

60.    The note is endorsed on the last page if space permits or, if there is insufficient space, on the back page or by a separate endorsement page, known in the mortgage industry as an allonge, permanently secured to the note.  The mortgage is assigned according to the laws of each state, which often require that the document have the title "Mortgage Assignment."  Some states limit the ability of a corporation to assign a mortgage to certain officers of that corporation.  Mortgage assignments are signed by the grantor/assignor, whose signature is almost always witnessed and notarized.

61.    A subsequent purchaser traditionally records its ownership of the note and mortgage by filing the assignment with the county recorder's office.  But in the case of the mortgage-backed securities trusts, recording of the assignments rarely occurred.

62.    If the borrower defaults on the payments, the lender, or a new owner of the note and mortgage, can bring a foreclosure action in state court[3] to obtain a court order for the auction of the property, and in this manner can receive payment on the loan by sale of the asset.  In a foreclosure lawsuit, the plaintiff must prove that the property is subject to a note and mortgage, that the plaintiff is the entity that lawfully owns the note and mortgage, and that a default by non-payment has occurred.

**B.    Relator's Mortgage**

63.    On or about April 30, 1998, Relator acquired a home on real property located at the address of 8268 Man-O-War Road, Palm Beach Gardens, Florida (the "Property").    On February 3, 2006, Relator refinanced her mortgage ("Relator's Mortgage").  The lender was Option One.

---

[3] In some states, foreclosures are allowed without a court order (*i.e.*, a non-judicial foreclosure), although special notice to the borrower is required.

64.   In accordance with the terms of the note, Relator made monthly mortgage payments of Four thousand eight hundred two and 59/100 dollars ($4,802.59) to Option One from February 2006 through April 2008.

65.   Relator's Mortgage was an adjustable rate mortgage.  In May 2008, because of a dispute with Option One regarding the adjustable rate payment amount, Relator defaulted on her payments.

### C.    Foreclosure Proceedings Against Relator

66.   In July 2008, without any prior notice, a real property foreclosure action was filed against Relator, titled, *Deutsche Bank National Trust Company, as Trustee for the Certificateholders of Soundview Home Loan Trust 2006-OPT2, Asset-backed Certificates, Series 2006-OPT2 v. Lynn Szymoniak*, case number 50-2008-ca-022258 (Circuit Court, Palm Beach County, Florida) ("Relator's Foreclosure"), to foreclose on the Property.

67.   The complaint alleged that DBNTC owned the note originally made to Option One on February 3, 2006, for $780,000; that it had possession of the note at some time, but that the original note was lost or destroyed, "the exact time and manner of said loss or destruction being unknown" but that it was entitled to enforce the original note; and that Relator was in default.

68.   In Relator's Foreclosure, DBNTC attached to the complaint a copy of the original mortgage to Option One, but did not attach any documents that proved that a mortgage-backed securities trust had acquired Relator's Mortgage.  The complaint did not make any specific allegations regarding the acquisition of the note and mortgage by DBNTC.  The Relator first learned that Relator's Mortgage had allegedly been acquired by the Soundview Home Loan Trust 2006-OPT2 (the "Soundview Trust") when she was

served with the complaint for foreclosure. DBNTC's complaint alleged that DBNTC acted as the trustee for the Soundview Trust.

69. The Soundview Trust's prospectus and related documents, disseminated to its investors, represented that it held good title to all the mortgages bundled into the mortgage-backed securities, including Relator's Mortgage, and that it possessed the executed assignments transferring the notes and mortgages from the originating lender to the Soundview Trust.

70. Further, the Soundview Trust prospectus and related documents assured investors that either Defendant DBNTC, as Trustee of the Soundview Trust, or Defendant WELLS FARGO, as the Custodian of the trust and on behalf of DBNTC, would review each and every mortgage file within 45 days of the closing of the Soundview Trust and would sign a certification attesting that all the documents were in the possession of Soundview Trust or had been properly accounted for. Specifically, the Pooling and Servicing Agreement ("PSA") for the Soundview Trust, dated April 1, 2006 and incorporated by reference into the Soundview Trust Prospectus, provided:

> The Trustee agrees that it (or a Custodian will agree on its behalf) shall, for the benefit of the Certificateholders, review, or that it or a Custodian on its behalf has reviewed pursuant to Section 2.01 each Mortgage File on or prior to the Closing Date, with respect to each Mortgage Loan . . . . The Trustee further agrees that it or a Custodian on its behalf shall, for the benefit of the Certificateholders, certify to the Depositor and the Servicer (with a copy to the NIMS Insurer) in substantially the form attached hereto as Exhibit F-1, within 45 days after the Closing Date, with respect to each Mortgage Loan . . . that, as to each Mortgage Loan listed in the respective Mortgage Loan Schedule (other than any Mortgage Loan paid in full or any Mortgage Loan specifically identified in the exception report annexed thereto as not being covered by such certification), (i) all documents required to be delivered to it (or the Custodian on its behalf) pursuant to Section 2.01 of this Agreement are in its possession, (ii) such documents have been reviewed by it (or the Custodian on its behalf) . . . .

Soundview Home Loan Trust 2006-OPT2 Pooling and Service Agreement, dated April 1, 2006, § 2.02.

71.    Further, the custodian of the Soundview Trust, Defendant WELLS FARGO, represented and warranted that there were no material misrepresentations or omissions in the following statement from the Soundview Prospectus:

> The Custodian will review each mortgage file in accordance with the review criteria specified in the Pooling Agreement and deliver a certification to the effect that, except as noted in the certification, all required documents have been executed and received.

Soundview Prospectus Dated March 30, 2006, at 56; *see* Exhibit G to PSA, "FORM OF CUSTODIAL AGREEMENT" ("The Custodian hereby represents and warrants that the information set forth in the Prospectus Supplement under the caption 'Pooling and Servicing Agreement—The Custodian' (the 'Custodian Disclosure') does not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.").

72.    In fact, Wells Fargo boasted that "the Custodian's proprietary document tracking system will show the location within the Custodian's facilities of each mortgage file and will show that the mortgage loan documents are held by the Custodian on behalf of the Trust."  Soundview Prospectus at 56.

73.    In reality, the Soundview Trust did not hold all the original assignments and other related documents of the notes and mortgages purportedly transferred to it.

**D.    Relator Discovers a Forged Mortgage Assignment Filed in Her Foreclosure by DBNTC**

74.    In August 2008, Relator's attorney in Relator's Foreclosure filed a Motion to Dismiss asserting that DBNTC lacked standing because DBNTC did not possess any title to Relator's note or mortgage.  No assignment was produced, or filed and recorded. Indeed, DBNTC alleged that the mortgage and promissory note had been lost or destroyed in an unknown manner.

75.   To cure the deficiencies of its initial allegations, in December 2009, DBNTC, through its attorneys, the Law Offices of Marshall C. Watson, P.A., filed a Notice of Filing in Relator's Foreclosure, attaching copies of three allegedly *bona fide* documents, as follows: (1) a copy of the note (previously alleged to have been lost or destroyed); (2) an allonge;[4] and (3) a mortgage assignment.  The mortgage assignment document DBNTC filed with the Circuit Court was fraudulent.

76.   Relator, based on her expertise in detecting fraudulent documents, discovered the forgery upon inspection and analysis and through her own investigations. First, the document, entitled, "Assignment of Mortgage," bears an execution date of October 28, 2008, months after the filing of Relator's Foreclosure.  The grantor is stated to be "American Home Mortgage Servicing Inc. as successor-in-interest to Option One Mortgage Corporation," and the grantee is stated to be "Deutsche Bank National Trust Company as Trustee for the Certificateholders of Soundview Home Loan Trust 2006-OPT2, Asset-backed Certificates, Series 2006-OPT2."  Two individuals, Linda Green and Jessica Ohde, purportedly signed as "vice president" of "American Home Mortgage Servicing Inc. as successor-in-interest to Option One Mortgage Corporation."  Two individuals, Korell Harp and Christina Huang, purportedly signed as witnesses.  As described below, Relator's investigation showed that Linda Green and Jessica Ohde were not employed by American Home Mortgage Servicing, Inc. and did not have any authority whatsoever to sign the document.  Instead, they were employees of the servicing company Lender Processing Services ("LPS"), or its subsidiary, DOCX, and

---

[4] An "allonge" is defined as "[a] piece of paper annexed to a bill of exchange or promissory note, on which to write endorsements for which there is no room on the instrument itself." BLACK'S LAW DICTIONARY 70 (5th ed. 1979).

were part of a larger team that was producing a vast number of forged mortgage assignments for use in foreclosure cases across the United States. The purported signatures of Linda Green and Jessica Ohde on the mortgage assignment submitted in Relator's Foreclosure likely were made by various other people, as Relator's comparison of their various forged mortgage assignments made clear. The purported witness signatures were also forged, Relator's analysis showed.

77.     Affixing or submitting false signatures on a mortgage document is a violation of federal and state law, and those signatures are without authority to complete the transaction. According to a mortgage fraud notice prepared jointly by the Federal Bureau of Investigation and the Mortgage Bankers Association, mortgage fraud potentially violates at least eight federal criminal statutes. Specifically:

> (1) 18 U.S.C. § 1001 - Statements or entries generally;
>
> (2) 18 U.S.C. § 1010 - HUD and Federal Housing Administration transactions;
>
> (3) 18 U.S.C. § 1014 - Loan and credit applications generally;
>
> (4) 18 U.S.C. § 1028 - Fraud and related activity in connection with identification documents;
>
> (5) 18 U.S.C. § 1341 - Frauds and swindles by mail;
>
> (6) 18 U.S.C. § 1342 - Fictitious name or address;
>
> (7) 18 U.S.C. § 1343 - Fraud by wire; and
>
> (8) 18 U.S.C. § 1344 - Bank Fraud.

*See* FBI Mortgage Fraud Notice (*available at* http://www.mbaa.org/FBIMortgageFraudWarning.htm); s*ee also* Truth in Lending Act, title I of the Consumer Credit Protection Act, as amended, 15 U.S.C. § 1601 *et seq.*; Florida Statutes 817.545, Mortgage fraud (penalty is a felony of the third degree).

78.    False or fraudulent notary acknowledgements are also a violation of Florida law, and the underlying signature is void.   Fla. Stat. § 117.05, False or fraudulent acknowledgements (penalty is a felony of the third degree).

79.    Because the signatures contained on the assignments filed in Relator's Foreclosure were fraudulent, in violation of federal and Florida law, they did not operate to assign the note and mortgage to DBNTC.   Therefore, DBNTC lacked any authority to act on Relator's note and mortgage, was not a true party in interest in Relator's Foreclosure, and could not prosecute the foreclosure. Following a protracted litigation concerning the rightful owner of Relator's mortgage, Relator ultimately paid the full amount of principal and interest demanded by DBNTC in May 2013 and the foreclosure action was dismissed by a Joint Stipulation for Dismissal with Prejudice.

80.    DBNTC expended significant funds in an effort to prove its allegations that it is the lawful owner of Relator's Mortgage since DBNTC lacked any supporting documents.   The amount DBNTC expended to prove its ownership was materially more than DBNTC would have spent if it had complied with the procedures described in the Soundview Trust prospectus and related documents and had presented truthful documents to the Circuit Court in Relator's Foreclosure.

81.    The cost for DBNTC to establish it is the owner of Relator's Mortgage is a financial harm for the owners of the Soundview Trust securities.   So, too, more widely, in foreclosure cases in South Carolina and around the United States the costs to foreclose are higher without the proper supporting documents.   Thus, the Government Plaintiffs as purchasers of MBS Trusts that are missing or have forged assignments are financially harmed by the impaired value of the securities that they purchased, the fees they pay for

services that are not provided or are provided fraudulently, and by the Defendants' inability, or excessive expenditures, to prove good title to the mortgages purportedly in their MBS asset pools.

82.    Prompted by her own foreclosure action, Relator began searching the Palm Beach County official records online for other mortgage assignments from Option One Mortgage Company to AHMS and for mortgage assignments that, like her own mortgage assignment, bore the stamp in the upper left hand corner indicating that the document should be returned to DOCX.  She quickly expanded her search to other Florida counties that had records available online and discovered several hundred mortgage assignments prepared by DOCX.  These mortgage assignments demonstrated a widespread pattern and practice of forging documents.

83.    Relator then searched the official records to see whether these assignments appeared in cases where foreclosures had also been filed.  By comparing the date of the foreclosure filing and the date on the mortgage assignment, Relator determined that in many cases the assignment either was made within a few weeks of the filing of the foreclosure or was dated after the foreclosure case was filed.  In many cases, these assignments were made to the trustees of RMBS trusts.

84.    Relator then expanded her research to official records in California, Colorado, Georgia, Illinois, Massachusetts, New Jersey, New York, North Carolina, South Carolina, and Washington.  She pulled the mortgage assignments, Lost Note Affidavits, Mortgage Releases, and Lis Pendens from online record databases where they were available and received others from homeowners who sent their documents to her in response to the articles she began publishing in January 2010 on Fraud Digest.

85.   By calling on the telephone the DOCX office in Georgia and entering the first few letters of the last names of individuals that signed some of the mortgage assignments she had found, Relator was able to confirm that a number of these individuals were employees of DOCX, a fact they did not disclose when signing the assignments.

86.   Relator then expanded her investigation to determine which trusts used the fraudulent documents she discovered.  She identified more than 2,000 trusts that used these documents (*i.e.*, the MBS Trusts listed in Exhibt A).

87.   For example, Relator learned that there were 36 Soundview Trusts registered with the Securities and Exchange Commission ("SEC") from 2004 through 2007, which had a combined initial offering amount of $34,877,128,000.  DBNTC was the trustee for 30 of these 36 trusts.

88.   The documents governing these trusts were all similar to each other regarding transfer of the loan documents in that they required delivery of an assignment of mortgage and an endorsed note for each loan in the mortgage loan pool.  There was no requirement that the assignments actually be filed, but the assignments were required to be in recordable form in blank or to the Trustee on the closing date of the trust.

89.   Relator discovered in reviewing the mortgage assignments assigning mortgages to the Soundview trusts as to which DBNTC was trustee from July 1, 2008 through December 31, 2009, that the majority of such assignments were executed several years after the trust closing dates and showed these trusts acquiring mortgages after the loans were in default and close in time to the filing of a foreclosure action.

90.    The "default-dated assignments" described in the above paragraph were prepared primarily by Defendant DOCX, but also by Defendants WELLS/ASC, BARCLAYS, LPS, LITTON, OCWEN, and others.

91.    These assignments systematically and falsely stated the dates on which the trusts acquired the loans and were used to conceal the fact that the trusts had not acquired the loan documents as promised.

92.    The trusts were all charged a fee for the preparation and filing of the fraudulent cover-up mortgage assignments.

93.    The involvement of Defendant DBNTC and DBTCA with mortgage-backed trusts extended far beyond the Soundview trusts.  From 2005 through 2008, DBNTC and DBTCA were involved in approximately $84 billion of non-agency MBS, that is, mortgage-backed securities not guaranteed by an agency of the U.S. government.

94.    In particular, Deutsche Bank played a major role in the overall private-label securitization of U.S. subprime mortgages, particularly from 2004 to 2007, when more than 3,700 non-agency MBS were created and sold with loans valued at over $3 trillion.

95.    Of these, DBNTC and DBTCA were the trustees to at least 958 of the MBS Trusts (*i.e.*, MBS that were missing relevant mortgage documents for which forged documents were substituted), as set forth in Exhibit A.

96.    These MBS Trusts were created by the following groups:  Aames Mortgage Investment Trusts, ABFC Trusts, Accredited Home Lenders Mortgage Loan Trusts, Accredited Mortgage Loan Trusts, American Home Mortgage Assets Trusts, American Home Mortgage Investment Trusts, Ameriquest Mortgage Securities Trusts, Argent Securities Trusts, BCAP LLC Trusts, Carrington Mortgage Loan Trusts, Citigroup

Mortgage Loan Trusts, DSLA Mortgage Loan Trusts, Equifirst Mortgage Loan Trusts, First Franklin Mortgage Loan Trusts, Fremont Home Loan Trusts, GMACM Mortgage Loan Trusts, Greenpoint Mortgage Funding Trusts, GSAA Trusts, GSAMP Trusts, GSR Mortgage Loan Trusts, Harborview Trusts, HASCO Trusts, Home Equity Mortgage Loan Trusts, HSI Asset Securitization Corporation Trusts, IMH Assets Corp. Trusts, IMPAC CMB Trusts,  IMPAC Secured Assets Corp. Trusts, IndyMac Trusts, IXIS Trusts, JP Morgan Mortgage Acquisition Trusts, Long Beach Mortgage Loan Trusts, Meritage Mortgage Loan Trusts, Merrill Lynch Mortgage Investors Trusts, Morgan Stanley ABS Capital 1, Inc. Trusts, Morgan Stanley Home Equity Loan Trusts, New Century Home Equity Loan Trusts, Novastar Home Equity Loan Trusts, Novastar Mortgage Lending Trusts, Quest Trusts, RALI Trusts, RAMP Trusts, Residential Asset Securitization Trusts, Saxon Asset Securities Trusts, Securitized Asset-Backed Receivables Trusts, and WaMu Mortgage Pass Through Certificates Trusts.

97.    Relator learned that most of the forged documents used in these 985 MBS Trusts were created by Defendants DOCX, LPS, AHMS, BAC, CARRINGTON, CHASE HOME, AMC/CITI, BARCLAYS, LITTON, NTC, OCWEN, ONEWEST, ORION, SAXON, SCI, SELECT PORTFOLIO, and VERICREST.

98.    Since at least 2007, these Defendants and the others discussed in this Consolidated Third Amended Complaint have known of the significant and serious problems with respect to the lack of proper documentation of MBS assets, but have failed to disclose these problems and, instead, have actively concealed these issues from the SEC and the MBS Trusts' investors, including the Government Plaintiffs.

**E.    Relator Reports Discovery of Mortgage Assignment Fraud to Authorities**

99.    On December 27, 2009, Relator contacted an Assistant U.S. Attorney in the Jacksonville, Florida, United States Attorney's Office regarding possible mortgage fraud by DOCX based on her initial searches of mortgage assignments, explicitly stating her concern about the variety of signatures signed for individuals represented to be bank officers.    Relator's concern specifically was about possible fraudulent "replacement" documents and she sent hundreds of pages of documents and research to this attorney over the next few weeks.

100.  Shortly thereafter, in mid-January, Relator was contacted by the FBI, which began investigating DOCX and LPS.    She also began reporting her findings of widespread fabricated mortgage assignments used by the MBS Trusts to the: (1) Federal Deposit Insurance Corporation; (2) U.S. House of Representatives, Financial Oversight Committee, and its Housing and Community Opportunity Subcommittee; (3) Financial Crisis Oversight Commission; (4) U.S. Attorney for the Middle District of Florida; (5) State Attorney for Palm Beach County, Florida; and (6) various Florida Court Clerks, among others.

101.    Relator's findings communicated to the FBI Special Agent in Jacksonville, Florida resulted in an investigation.    This investigation resulted in a guilty plea by Lorraine Brown, an employee of LPS, who was sentenced on June 25, 2013 to serve five years in prison for her participation in mortgage-related document fraud.  She pled guilty to conspiracy to commit mail and wire fraud.    The government entered into a non-prosecution agreement with LPS, which included $45 million in criminal penalties and

forfeitures.  LPS also entered into a $127 million settlement in January 2013 with 49 attorneys general.

## V.    THE MORTGAGE-BACKED SECURITIES MARKET

### A.    Types of MBS

102.  There are two types of mortgage-backed securities: (1) residential MBS ("RMBS"), which are composed of home mortgages, such as Relator's Mortgage and ones described herein; and (2) commercial MBS ("CMBS"), which are composed of mortgages for retail space, office buildings and warehouses, which are not at issue in this suit.  The present case is concerned solely with RMBS.

103.  RMBS are categorized as "agency" or "non-agency," which refers to the involvement of government-sponsored entities, *e.g.*, Freddie Mac, Fannie Mae and Ginnie Mae.  Non-agency RMBS are residential mortgage-backed securities that are not issued or guaranteed by a U.S. government agency.

### B.    Mortgage-backed Securities Trusts and the Trustees' Role

104.  Although relatively unknown and unused prior to 2004, MBS trusts held approximately one-third of all residential mortgages in the United States by the end of 2009.

105.  Most trusts comprise between 2,000 and 5,000 residential mortgages, with notes, with an aggregate value between $500 million and $2 billion.

106.   These trusts are each governed by Pooling and Service Agreement ("PSAs") and other documents.  The PSA establishes most of the duties of various entities involved in the creation and operation of the trust.

107.   Each trust has a Master Servicer and most trusts also have several sub-servicers.  The servicing of the loans in the trust includes billing for and collecting the

monthly mortgage payments, and managing defaults in the loan pool when they occur. These duties were very lucrative, thus many of the loan originators also had a mortgage servicing division or subsidiary. Option One Mortgage Corporation, for example, had a servicing division so that even after the company sold the loans to the depositors to be pooled and securitized, it could keep the servicing rights to those loans. This is what it did with respect to the Soundview and Option One trusts.

108. Because trusts are often comprised of loans from several different mortgage company/originators, they can have several sub-servicers.

109. Every mortgage servicing company included as a defendant herein, AHMS, AURORA, BAC, BAYVIEW, VERICREST, CRC, CARRINGTON, CHASE HOME, BARCLAYS, HSBC MORTGAGE, LITTON, NTC, OCWEN, ONEWEST, ORION, SAXON, SCI, SELECT PORTFOLIO, VERICREST, and WELLS/ASC, utilized fraudulent mortgage assignments to trusts that included homes in South Carolina in their loan pools.

110. Every trust, of course, has a trustee as well. These trustees are usually among the largest banks in the world, such as Defendants BA, BONY, CHASE, CITIBANK, HSBC, DBNTC, DBTCA, US BANK, and WELLS FARGO. One of the most significant duties of the trustee is to ensure the conveyance of the mortgages and notes from the depositor to the trust. This conveyance is done via mortgage assignments.

111. The trusts represent to purchasers of their securities that the notes and mortgages (bundled to form the asset pool of the trust) will be delivered with assignments to the trust in recordable form, so that they will be able to foreclose on the assets in the event of default. As was the case with the Soundview Trust, each PSA contains the

representation that the trustee and/or custodian on behalf of the trustee will review all the mortgage files and certify that all of the documents, including each mortgage assignment, are accounted for.

112. Despite the trusts' representations, many of the mortgage documents were not delivered at all to the trustee or, if delivered, were allegedly lost or misplaced.

113. Nevertheless, the trustees, custodians, depositors, and servicers of the MBS Trusts routinely provided certifications of compliance, falsely asserting that they had fulfilled their obligations as mandated by the Securities and Exchange Commission ("SEC") Regulation AB as well as the prospectuses and PSAs.

114. Without the valid mortgage assignments and properly endorsed notes, the value of the assets in the trust are severely diminished because the trustee is unable to establish clear chain-of-title to pursue a foreclosure action, and establishing entitlement to foreclose becomes more complex and, therefore, more costly. Rather than disclosing the missing loan documentation problem to homeowners and courts, the Defendants filed fraudulent mortgage notes and assignments in court to support their foreclosure cases.

**C.    MBS Trusts, Controlled by the Defendants, Allegedly Purchased Notes and Mortgages on Homes in South Carolina and Across the United States**

115. The MBS trusts, controlled by the Defendants, were created, packaged and sold between 2004 and 2009, during the rapid expansion of the MBS industry.

116. Relator's investigations revealed that between 2004 and 2009, the MBS trusts, controlled by the Trustee Bank Defendants, allegedly acquired notes and mortgages for homes in South Carolina, and across the United States.

117. Notes and mortgages on homes located in South Carolina are identified as assets in the prospectuses of the MBS trusts controlled by the Defendants that have used

fabricated mortgage assignments.  The prospectus specifies the location by state of the homes subject to the notes and mortgages acquired by the trusts and includes properties for which foreclosures with forged assignments are pending.  For example, South Carolina properties are included in an MBS Trust created in 2004, entitled "American Home Mortgage Investment Trust 2004-4," as to which Relator found forged assignments.  Defendant BONY was the trustee and Defendant DBNTC was the custodian.  The predecessor to Defendant AHMS and GMAC Mortgage Corporation were the servicers.  A review of the prospectus further shows that this MBS contains a total of 341 South Carolina homes, with a principal aggregate value of $52 million, as illustrated in Table 1, below.  All of these filings, including the forging of mortgage assignments to the American Home Mortgage Investment Trust 2004-4, show that Defendants' fraudulent practices spread widely in South Carolina.

Table 1.    South Carolina Homes in the American Home Mortgage Investment Trust
            2004-4 Controlled by Defendants BONY and DBNTC.

| Group No. | No. Mortgages in S.C. | Principal Value |
|---|---|---|
| Group I | 27 | $6,925,746.82 |
| Group II | 56 | $8,264,377.00 |
| Group III | 12 | $8,802,181.56 |
| Group IV | 91 | $12,874,666.42 |
| Group V | 6 | $2,984,900.00 |
| Group VI | 77 | $9,159,103.53 |
| Group VII | 72 | $3,249,689.06 |
| **TOTAL** | **341** | **$52,260,664.39** |

*Source*: Prospectus of American Home Mortgage Investment Trust 2004-4, Prospectus Supplement dated December 17, 2004, tables entitled, "Geographic distribution of the mortgage properties," entries for S.C.: Group I, at 4; Group II, at 12; Group III, at 23; Group IV, at 32; Group V, at 42; Group VI, at 64; and Group VII, at 72, SEC Form 424B5 (filed Dec. 22, 2004).

**D.     The Foreclosure Problem in South Carolina and the United States**

118.    The foreclosure problem has been substantial in South Carolina and throughout the United States.  As of June 30, 2012, South Carolina had 3.24% of its so-called "prime mortgages" in foreclosure, ranking 11th nationally, according to figures compiled by the Richmond office of the Federal Reserve Bank.  Among riskier, subprime mortgages in South Carolina, 12.46% were in foreclosure, which ranked 14th nationally. Jamie Feik, *et al*., "Quarterly Update:  Housing Market and Mortgage Performance in South Carolina. 3rd Quarter, 2012." The Federal Reserve Bank of Richmond, at 7 (*available                                                                                                                                      at* http://www.richmondfed.org/community_development/resource_centers/foreclosure/research_and_pubs/mortgage_performance_summaries/sc/pdf/mortgage_performance_sc_20122q.pdf).

119.  According to data compiled by the Federal Reserve Bank of Richmond, in the second quarter of 2012 subprime mortgages continued to make up 27.9 percent of the foreclosure inventory in South Carolina.  South Carolina is ranked 19th in the nation in its share of subprime loans.  *Id.* at 1.

120.  The problems in South Carolina reflect a national trend.  As of June 2012, 3.12% of prime mortgages and 13.63% of subprime mortgages in the United States were in foreclosure.  *Id.* at 7.

**E.    Defendants' Role in the Foreclosure Actions in the South Carolina Courts and Defendants' Filing of Forged Mortgage Assignments in South Carolina and Across the United States Worsen the Foreclosure Problem**

121. The Defendants' illegal activities, conducted in South Carolina and elsewhere, play a significant role in exacerbating the foreclosure problem in South Carolina and the rest of the country.

122.    The Defendants are significant participants in foreclosure actions in the South Carolina courts.  For example, Defendant WELLS/ASC was one of the most prolific producers of fraudulent mortgage assignments from 2008 through 2011 and operated out of offices in Ft. Mill, South Carolina, sending mortgage documents to be used in foreclosures throughout the United States.  WELLS/ASC primarily serviced loans for investors, including loans that were packaged into RMBS.  These loans often had Defendant WELLS FARGO as the trustee.  The activity of WELLS/ASC in South Carolina residential foreclosures was so intense that "Wells Fargo Home Mortgage" was named as a party in approximately 700 bankruptcy cases filed in South Carolina as of April 25, 2010, according to court dockets.

123.  Similarly, Defendant AHMS primarily serviced loans that are packaged into MBS trusts and have defendant DBNTC as the trustee.  Defendant DBNTC is also an active plaintiff in foreclosure cases in South Carolina, and throughout the United States.  Defendant DBNTC had such a large presence in the South Carolina mortgage market that it was named as a party in approximately 400 bankruptcy cases filed in South Carolina as of April 25, 2010, according to court dockets.

124.  Additionally, foreclosures in South Carolina were affected by the activities of Saxon Mortgage Servicing, the mortgage servicing division of defendant SAXON.

Saxon Mortgage was such a large presence in the South Carolina mortgage market that it was named as a party in approximately 500 bankruptcy cases filed in South Carolina as of April 25, 2010, according to court dockets.

125. Defendant AMC/CITI was the primary loan servicer for the now defunct Ameriquest Mortgage, Inc. There are more than 17 MBS trusts in the U.S. that are primarily comprised of mortgages made by Ameriquest Mortgage, and that have defendant DBNTC as the trustee. Both Ameriquest and AMC/CITI were such a large presence in the South Carolina mortgage market that Ameriquest was named as a party in approximately 200 bankruptcy cases, and AMC/CITI is named in approximately 140 bankruptcy cases, filed in South Carolina as of April 25, 2010, according to court dockets.

126. Furthermore, many Defendants used the default management services provided by defendant LPS and its subsidiary Defendant DOCX to manage loan defaults. When a homeowner defaulted on his or her mortgage, and that mortgage loan had been acquired by an MBS Trust, the servicing company, acting as an agent of the trustee, used LPS to retain counsel and oversee litigation and to provide the documents necessary for foreclosing. Defendant LPS retained attorneys to file foreclosures in the South Carolina courts, and in courts nationwide, and directed their attorneys to file forged documents in those foreclosure cases. More than 100 forged mortgage assignments were prepared by LPS and recorded in South Carolina for the purposes of foreclosure.

127. In the 2009 Annual Report, Form 10-K filed with the SEC on February 23, 2010, LPS represented that its services were used by a majority of the 50 largest banks in the United States. Its technology solutions included its mortgage processing system

which processed over 50% of all residential mortgages by dollar volume. Its outsourcing services included the "default management services which are used by mortgage lenders and servicers to reduce the expense of managing defaulted loans." LPS Annual Report for 2009, SEC Form 10-K (filed Feb. 23, 2010), at 5 (*available at* http://www.sec.gov/Archives/edgar/data/1429775/000095012310015599/g22183e10vk.ht m).

128. LPS further stated that in 2009, its two largest customers, defendants WELLS FARGO and CHASE, each accounted for more than 10% of LPS' aggregate revenue and more than 10% of the revenue from each of the Technology, Data and Analytics, and Loan Transaction Services segments. *Id.*

## VI. DEFENDANTS' ACTS VIOLATE THE FALSE CLAIMS ACT

129. Defendants created mortgage-backed securities that lacked lawful assignments and other documents of the mortgages underlying. Defendants then created – or had created – fraudulent mortgage assignments and note endorsements to use in foreclosures and submissions to HUD. The MBS Trusts paid for these fraudulent documents with trust revenues that would otherwise have been distributed to the investors, including the Government Plaintiffs. Similarly, Defendants charged HUD for fraudulent documents used in connection with claims on mortgage guarantees. Defendants HSBC, US BANK, and BONY also used fraudulent documents in cases where the loans had not been securitized, but had been purchased by these banks from other originators.

130. By 2008, at the latest, the Defendants knew that documents were often not delivered to the trusts as promised by the originators. This occurred so commonly that the industry coined a term, exception reports, to describe documents missing from loan

pools. These exception reports were simply a listing, by trust, of all of the documents missing from each trust.

131.    Thus, when American Home Mortgage in Melville, New York, filed for bankruptcy (Case No. 07-11047 (CSS)), Defendant DBNTC filed a proof of claim, dated January 11, 2008, in the case, claiming that the trusts it administered would need to be compensated billions of dollars because of missing loan documents. Paragraph 16 of that proof of claim states:

> The Trustee or other document custodian has furnished Debtors, on an ongoing basis, document exception reports with respect to missing or defective loan file documents. A copy of the Exception Report Summary for some of the Trusts is attached hereto as Schedule A-4. The Trustee is informed and believes that Debtors are in possession of additional document exception reports from other document custodians. As of the most recent reports, there exist missing or defective loan file documents for several billion dollars in original principal amount of loans….

132.    Defendants manufactured, caused to be manufactured, or purchased and used fraudulent mortgage assignments, notes, and note endorsements in hundreds of thousands of foreclosure and bankruptcy cases throughout the country.

133.    Defendants used the fraudulent documents to conceal from the MBS Trust investors, including the Government Plaintiffs, courts, homeowners, and HUD the enormity of the problem of missing loan documents.

134.    After discovering the forged mortgage assignment in Relator's Foreclosure, Relator investigated thousands of mortgage assignments prepared by the mortgage foreclosure/document preparer Defendant DOCX and others and found the same forged assignments in all of these cases.

135.    Relator's investigation uncovered the following:

(a)    **DOCX**

136.  Relator reviewed mortgage assignments that were prepared by DOCX and notarized during a single day, July 30, 2009, from 13 Florida counties ((1) Broward, (2) Escambia, (3) Hillsborough, (4) Lake, (5) Lee, (6) Marion, (7) Martin, (8) Miami-Dade, (9) Nassau, (10) Osceola, (11) Palm Beach, (12) Sarasota, and (13) St. Lucie).  Her analysis showed that DOCX prepared a high volume of mortgage assignments for trusts that used AHMS as the mortgage servicer and LPS as the default management company. The grantees on most of the assignments prepared on July 30, 2009, and reviewed by the Relator were MBS Trusts that used Defendants DBNTC, U.S. BANK, or WELLS FARGO as trustees and AHMS as servicer.

137.  The assignments were prepared and filed only in those cases where foreclosure was likely, due to the default in payments by the borrower/homeowners. When the loans went into default, AHMS hired LPS, which in turn retained and supervised the law firms that filed most of the foreclosure actions on behalf of the trusts and used the forged LPS documentation, or assignments fabricated at their own law firms, to pursue these foreclosures.

138.  Each of the thousands of assignments from July 30, 2009 had the purported signatures Linda Green and Tywanna Thomas, two employees from DOCX's Georgia office, as officers of the bank or corporation identified on the assignment as the grantor.

139.  On each assignment from July 30, 2009, the signature of Linda Green was witnessed by Dawn Williams and the signature of Tywanna Thomas was witnessed by Christina Huang.

140.  With one exception, each of the assignments prepared on July 30, 2009 was notarized by the same notary, Chris Ivey, in Fulton County, Georgia.

36

141. Using her handwriting analysis skills, Relator was able to identify three distinct variations of the Linda Green signature on the assignments prepared on July 30, 2009. In Version 1 of the Linda Green signature, the signature is characterized by a lower case "L" and no discernible "A" in Linda. In Version 2 of the Linda Green signature, the signature is characterized by traditional cursive letters. In Version 3 of the Linda Green signature, the signature is characterized by a large loopy "D" in Linda as the largest letter in the signature and a lower case "L."

142. Likewise, there are two distinct versions of the Tywanna Thomas signature on the assignments prepared on July 30, 2009. In Version 1 of the Tywanna Thomas signature, the letters are written in lower-case cursive, with a distinct backhand, and only the first letter or the first two letters, "T" or "Th," of the last name are written. In Version 2, the signature has a distinct slant to the right and the Ts resemble printed capital Ts. Only the first letters of each word are written so that "Tywanna" is written as "Ty" and "Thomas" is written as "T."

143. The different signature versions correspond to different batch numbers located in the upper left hand corner of the assignments. All of the assignments with Green Signature Version 1 were used on assignments with Batch Number 6647; all of the assignments with Green Signature Version 2 were used on assignments with Batch Number 6643; the assignment, with Linda Green Signature Version 3, had a different Batch Number: 6633.

144. An examination by Relator of the batch numbers and signing dates shows that Defendant DOCX produced nearly 1,000 "batches" of mortgage assignments in 2008 and 2009. Examples of dates corresponding to Batch Numbers include the following:

37

*Date    /   Batch         /  Name / County /  State*

4-1-2008, Batch 1337 Fray, Broward Co, FL
8-13-2008, Batch 1737 Santiago, St. Lucie Co, FL
12-2-2008, Batch 3434 Shrock, Osceola Co, FL
12-29-2008, Batch 3908 Ortiz, South Essex Co, MA
1-14-2009, Batch 4122 Boylan, South Essex Co, MA
1-21-2009, Batch 4220 Pelosi, South Essex Co, MA
2-6-2009, Batch 4434 Clemons, South Essex Co, MA
2-11-2009, Batch 4483 Sorrentino, South Essex Co, MA
2-17-2009, Batch 4553 Vey, Lee Co, FL
3-16-2009, Batch 4919 Banks, South Essex Co, MA
4-23-2009, Batch 5430 Vioria, South Essex Co, MA
5-15-2009, Batch 5707 Dennis, Queens Co, NY
7-16-2009, Batch 6458 Russoniello, Broward Co, FL
7-24-2009, Batch 6572 Cruz, Clay Co, FL
7-24-2009, Batch 6572 Scheetz, Clay Co, FL
7-24-2009, Batch 6572 Curren, Clay Co, FL
8-12-2009, Batch 6842 Ashton, South Essex Co, MA
8-24-2009, Batch 7131 Quintero, Palm Beach Co, FL
11-13-2009, Batch 9140 Dandreo, South Essex Co, MA
12-1-2009, Batch 9416 Velazquez, Lee Co, FL

145.  Relator's investigation revealed that the same names (Green, Thomas) and others discussed below (Harp, Thoresen, and Ohde) were used on thousands of forged assignments filed in North Carolina, South Carolina, Arizona, California, Florida, Illinois, Massachusetts, Mississippi, New York, and other states in 2008 and 2009.  Each of those signatures is likely forged or fraudulent, and the assignments to which they were affixed are also fraudulent and legally invalid.  The trustees of the MBS Trusts, which claim ownership of each of these mortgages, will incur significantly higher costs of foreclosure in proving lawful title to the subject property, or will never be able to prove ownership, based on forged signatures on assignments to their respective MBS Trusts. The resulting financial harm to the investors of the MBS Trusts, including the Government Plaintiffs, is substantial.

146. The nearly 1,000 batches of assignments prepared and filed by DOCX in 2008 and 2009 had approximately 1,000 assignments apiece, for a total of nearly one million such assignments. DOCX used numerous DOCX employees to sign these names and paid notaries to falsely notarize the signatures. DOCX knew, or reasonably should have known, that the notaries had not witnessed the signatures, that various individuals were all claiming to be the same person, and also that the titles that appeared next to the names used by the purported signatories were false. The notarizations of those signatures were each false and fraudulent, and the assignments to which they were affixed are also fraudulent and legally invalid.

147. As noted above, the name "Linda Green" appears on thousands of mortgage assignments prepared by DOCX and filed throughout the United States, including South Carolina. On these assignments, Green is identified as an officer of the grantor but she was, in reality, just an employee of DOCX.

148. On DOCX-prepared mortgage assignments, at least 18 different job titles are listed for Linda Green, with different titles assigned to Green even on the same day. Titles attributed to Green include the following:

- Vice President, Loan Documentation, Wells Fargo Bank, N.A., successor by merger to Wells Fargo Home Mortgage, Inc.;

- Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for American Home Mortgage Acceptance, Inc.;

- Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for American Home Mortgage;

- Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for American Brokers Conduit;

- Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for HLB Mortgage;

- Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for Family Lending Services, Inc.;

- Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for AIIM Mortgage;

- Vice President, American Home Mortgage Servicing, Inc. as successor-in-interest to Option One Mortgage Corporation;

- Vice President & Asst. Secretary, American Home Mortgage Servicing, Inc., as servicer for Ameriquest Mortgage Corporation;

- Vice President, Option One Mortgage Corporation;

- Vice President, American Home Mortgage Servicing, Inc.;

- Vice President, American Home Mortgage Servicing, Inc. as successor-in-interest to Option One Mortgage Corporation;

- Vice President, Argent Mortgage Company, LLC by Citi Residential Lending Inc., attorney-in-fact;

- Vice President, Sand Canyon Corporation f/k/a Option One Mortgage Corporation;

- Vice President of Optimum Mortgage Group LLC by Sand Canyon Corporation f/k/a Option One Mortgage Corporation as Attorney-in-Fact;

- Vice President of Deutsche Bank National Trust Company, as Trustee for the Certificateholders of Soundview Home Loan Trust 2006-OPT1, Asset-Backed Certificates, Series 2006-OPTI;

- Vice President, Amtrust Funsing (sic) Services, Inc., by American Home Mortgage Servicing, Inc. as Attorney-in-fact; and

- Vice President, Seattle Mortgage Company.

149. The use of so many different corporate titles for Linda Green shows it is unlikely that she was actually the officer of any of the named companies; Linda Green lacked corporate authority to sign the documents of behalf of these companies.

40

150.  Further, Linda Green did not sign all of the documents to which her name is affixed.  Relator's analysis shows that at least eight different persons have signed on the DOCX-prepared assignments as "Linda Green."  Because so many people signed mortgage assignment documents using the name Linda Green, the notarization of those signatures is clearly unreliable and fraudulent.

151.  The name "Korell Harp" appears on more than 100 mortgage assignments prepared by DOCX.  On these assignments, Harp is identified as an officer of the grantor.

152.  On DOCX-prepared mortgage assignments, at least 14 different job titles are listed for Korell Harp, with different titles assigned to Harp on the same day.  Titles attributed to Harp include the following:

- Vice President, American Brokers Conduit;

- Vice President, American Home Mortgage Acceptance, Inc.;

- Vice President, American Home Mortgage Servicing, Inc.;

- Vice President, American Home Mortgage Servicing, Inc. as successor-in-interest to Option One Mortgage Corporation;

- Vice President, American Home Mortgage Servicing, Inc. as successor-in-interest to Option One Mortgage Corporation;

- Vice President, Option One Mortgage Corporation;

- Vice President & Asst. Secretary, Argent Mortgage Company, LLC by Citi Residential Lending, Inc., as Attorney in Fact;

- Vice President, J.S. Shirk and Associates, Inc. by American Home Mortgage Servicing, Inc., as Attorney-In-Fact;

- Vice President, Mortgage Electronic Registration Systems, Inc.;

- Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for American Brokers Conduit;

41

- Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for American Home Mortgage Acceptance, Inc.;

- Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for American Home Mortgage;

- Vice President, Mortgage Electronic Registration Systems, Inc., acting solely as a nominee for HLB Mortgage; and

- Vice President, Sand Canyon Corporation, f/k/a Option One Mortgage.

153. The use of so many different corporate titles for Korell Harp shows it is unlikely that he was actually the officer of any of the named companies; Korell Harp lacked corporate authority to sign the documents on behalf of the companies.

154. Further, Korell Harp did not sign all of the documents to which his name is affixed. Relator's analysis shows that at least five different persons have signed the name Korell Harp on DOCX-prepared assignments. Because so many people signed mortgage assignment documents using the name Korell Harp, the notarization of those signatures is clearly unreliable and fraudulent.

155. The name "Linda Thoresen" appears on more than 100 mortgage assignments prepared by DOCX. On these assignments, Thoresen is identified as an officer of the grantor.

156. On DOCX-prepared mortgage assignments, at least six different job titles are listed for Linda Thoresen, with different titles assigned to Thoresen on the same day. Titles attributed to Thoresen include the following:

- Asst. Vice President, American Home Mortgage Acceptance, Inc.;

- Asst. Vice President, American Home Mortgage Servicing, Inc. as successor-in-interest to Option One Mortgage Corporation;

- Asst. Secretary, Mortgage Electronic Registration Systems, Inc.;

42

- Asst. Secretary, Mortgage Electronic Registration Systems, Inc. as nominee for American Brokers Conduit;

- Asst. Secretary, Mortgage Electronic Registration Systems, Inc. as nominee for American Home Mortgage Acceptance, Inc.; and

- Asst. Vice President, Mortgage Electronic Registration Systems, Inc. acting solely as a nominee for Lenders Direct Capital Corporation.

157.  The use of so many different corporate titles for Linda Thoresen shows it is unlikely that she was actually the officer of any of the named companies; Linda Thoresen lacked corporate authority to sign the documents of behalf of these companies.

158.  Further, Linda Thoresen did not sign all of the documents to which her name is affixed.  Relator's analysis shows that at least three different persons have signed the name Linda Thoresen on the DOCX-prepared assignments.  Because so many people signed mortgage assignment documents using the name Linda Thoresen, the notarization of those signatures is clearly unreliable and fraudulent.

159.  The name "Tywarna Thomas" appears on more than 100 mortgage assignments prepared by DOCX.  On these assignments, Thomas is identified as an officer of the grantor.

160.  On DOCX-prepared mortgage assignments, at least 21 different job titles are listed for Tywanna Thomas, with different titles assigned to Thomas even on the same day.  Titles attributed to Thomas include the following:

- Assistant Vice President, American Home Mortgage;

- Assistant Vice President, American Home Mortgage Acceptance, Inc.;

- Assistant Vice President, American Home Mortgage Servicing, Inc.;

- Vice President & Assistant Secretary, American Home Mortgage Servicing, Inc., as servicer for Ameriquest Mortgage Company;

- Vice President & Assistant Secretary, American Home Mortgage Servicing, Inc., as servicer for Argent Mortgage Company, LLC;

- Assistant Vice President, American Home Mortgage Servicing, Inc as successor-in-interest to Option One Mortgage Corporation;

- Vice President & Assistant Secretary, Argent Mortgage Corporation, LLC by Citi Residential Lending, Inc., as Attorney in Fact;

- Assistant Vice President, Deutsche Bank National Trust Company as Indenture Trustee for American Home Mortgage Investment Trust 2005-2 Mortgage-Backed Notes, Series 2005-2 by American Home Mortgage Servicing, Inc, as Attorney-in Fact;

- Vice President & Assistant Secretary, Inc., as servicer for Deutsche Bank National Trust Company, as trustee for, Ameriquest Mortgage Securities, Inc., asset-backed pass-through certificates, series 2004-R7, under the pooling and servicing agreement dated July 1, 2004;

- Assistant Secretary, Mortgage Electronic Registration Systems, Inc.;

- Assistant Secretary, Mortgage Electronic Registration Systems, Inc., as nominee for American Brokers Conduit;

- Assistant Secretary, Mortgage Electronic Registration Systems, Inc., acting solely as nominee for American Home Mortgage;

- Assistant Secretary, Mortgage Electronic Registration Systems, Inc., as nominee for American Home Mortgage Acceptance, Inc.;

- Assistant Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for Family Lending Services, Inc.;

- Assistant Secretary, Mortgage Electronic Registration Systems, Inc., acting solely as a nominee for HLB Mortgage;

- Assistant Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for Homestar Mortgage Lending Corp.;

- Assistant Vice President, Mortgage Electronic Registration Systems, Inc., A Separate Corporation that is acting solely as Nominee for Lender and Lender's successors and assigns [Beckman Mortgage Corporation];

- Assistant Vice President, Nationwide Home Loans, Inc, by American Home Mortgage Servicing, Inc., as Attorney-In-Fact;

- Assistant Vice President, Option One Mortgage Corporation;

- Assistant Vice President, Sand Canyon Corporation f/k/a Option One Mortgage Corporation; and

- Assistant Vice President, Wells Fargo Bank, N.A., as Trustee for First Franklin Mortgage Loan Trust 2002-FF1, Asset-Backed Certs., Series 2002-FF1.

161. The use of so many different corporate titles for Tywanna Thomas shows it is unlikely that she was actually the officer of any of the named companies; Tywanna Thomas lacked corporate authority to sign the documents of behalf of these companies.

162. Further, Tywanna Thomas did not sign all of the documents to which her name is affixed. Relator's analysis shows that at least three different persons have signed the name Tywanna Thomas on the DOCX-prepared assignments. Because so many people signed mortgage assignment documents using the name Tywanna Thomas, the notarization of those signatures is clearly unreliable and fraudulent.

163. The name "Jessica Ohde" appears on more than 100 mortgage assignments prepared by DOCX. On these assignments, Ohde is identified as an officer of the grantor.

164. On DOCX-prepared mortgage assignments, at least six different job titles are listed for Jessica Ohde, with different titles assigned to Ohde even on the same day. Titles attributed to Ohde include the following:

- Assistant Vice President, American Home Mortgage Servicing, Inc.;

- Assistant Vice President, American Home Mortgage Servicing, Inc., as successor-in-interest to Option One Mortgage Corporation;

- Assistant Secretary, Mortgage Electronic Registration Systems, Inc., as nominee for American Brokers Conduit;

- Assistant Secretary, Mortgage Electronic Registration Systems, Inc., acting solely as nominees for American Home Mortgage;

- Assistant Secretary, Mortgage Electronic Registration Systems, Inc., acting solely as nominees for American Home Mortgage Acceptance, Inc.; and

- Vice President, Seattle Mortgage.

165. The use of so many different corporate titles for Jessica Ohde shows it is unlikely that she was actually the officer of any of the named companies; Jessica Ohde lacked corporate authority to sign the documents of behalf of these companies.

166. Further, Jessica Ohde did not sign all of the documents to which her name is affixed. Relator's analysis shows that at least three different persons have signed the name Jessica Ohde on the DOCX-prepared assignments. Because so many people signed mortgage assignment documents using the name Jessica Ohde, the notarization of those signatures is clearly unreliable and fraudulent.

167. Other individuals in Georgia who misrepresented themselves to be bank officers or mortgage company officers on mortgage assignments prepared by DOCX, but who were actually clerical employees of DOCX, include: Brent Bagley, Christie Baldwin, Christina Huang, and Shelly Scheffey. There are such significant variations in the signatures of these individuals that it is very likely that some or all of these signatures were also forged. Because so many people signed mortgage assignment documents using those names, the notarization of those signatures is unreliable and fraudulent.

### (b)     LPS

168. In her investigation, Relator examined similar assignments prepared by DOCX's parent, Defendant LPS, and filed throughout the United States, including South Carolina. Relator found that the forgeries were also created in LPS's offices in Dakota

County, Minnesota. Ironically, LPS claimed on its web site: "Our full service, integrated solution eliminates errors and delays that can come from employing multiple title companies, while providing seamless service and consistent quality control throughout the entire default cycle."   LPS continued to produce these fraudulent documents until 2011.

169.   The employees and agents of LPS that participated in preparing fraudulent documents were Christina Allen, Greg Allen, Liquenda Allotey, Alfonzo Greene, Topako Love, John Cody, Laura Hescott, Eric Tate, Bethany Hood, Cecilia Knox, Becky North, Jodi Sobotta, Rick Wilken, and others in Minnesota, as detailed below.

170.   MBS Trusts that used the mortgage assignments fraudulently produced by both LPS and DOCX included Homebanc Mortgage Trusts, SAMI Bear Stearns Trusts, NovaStar Mortgage Funding Trusts, Saxon Asset Securities Trusts, Bear Stearns Asset-Backed Securities Trusts, Morgan Stanley Home Equity Loan Trusts, IXIS Real Estate Capital Trusts, Long Beach Mortgage Loan Trusts, Terwin Mortgage Trusts, Morgan Stanley ABS Capital 1, Inc. Tr       usts, Meritage Mortgage Loan Trusts, NATIXIS Real Estate Capital Trusts, and GSAMP Trusts.

171. The assignments prepared in the Dakota County, Minnesota offices of LPS followed the same pattern as the DOCX assignments prepared in Alpharetta, Georgia. LPS employees were identified as officers of banks and mortgage companies when they were not. The "signatures" were often just a loop, exaggerated check, or squiggle, not recognizable as letters of the alphabet and more easily forged by other employees. The notaries often forgot to complete the notary's attestation and often also signed with loops, checks or squiggles, unrecognizable as alphabet letters.

172. LPS employee Greg Allen was identified on mortgage assignments with at least 10 different job titles, as follows:

- Vice President of Mortgage Electronic Registration systems, Inc, solely as nominee for American Brokers Conduit;

- Vice President of Mortgage Electronic Registration systems, Inc, as nominee for American Home Mortgage Acceptance, Inc.;

- Vice President, Mortgage Electronic  Registration Systems, as nominee for Bayrock Mortgage Corporation;

- Vice President, Mortgage Electronic Registration Systems, Inc. as Nominee for First Guaranty Mortgage Corporation;

- Vice President, Mortgage Electronic Registration Systems, Inc. as nominee for Taylor, Bean & Whitaker Mortgage Corp.;

- Vice President, Mortgage Electronic Registration Systems, Inc. as nominee for Market Street Mortgage Corporation;

- Vice President, Mortgage Electronic Registration Systems, Inc. as nominee for Maitland Mortgage Lending Company;

- Vice President, Mortgage Electronic Registration Systems, Inc. as nominee for American Home Mortgage Acceptance, Inc.;

- Vice President, Mortgage Electronic Registration Systems, Inc. as nominee for PMC Lending; and

- Vice President, Mortgage Electronic Registration Systems, Inc. as nominee for Southstar Funding, LLC.

173. LPS employee Liquenda Allotey in Dakota County, Minnesota, was identified on mortgage assignments with numerous job titles, as follows:

- Attorney In Fact for Novastar Mortgage;

- Vice President of Mortgage Electronic Registration systems, Inc, as nominee for American Home Mortgage Acceptance, Inc.;

- Vice President of Mortgage Electronic Registration systems, Inc, as nominee for Decision One Mortgage Company, LLC;

48

- Vice President of Mortgage Electronic Registration systems, Inc, as nominee for Freemont Investment & Loan; and

- Attorney in Fact, JP Morgan Chase Bank, National Association, as Successor-in-Interest to Washington Mutual Bank, as Successor-in-Interest to Long Beach Mortgage Company.

- Attorney-in-fact, JPMorgan Chase Bank N.A. as successor in interest to Washington Mutual Bank;

- Vice President, MERS[5] as Nominee for Allied Home Mortgage Capital Corp.;

- Vice President, MERS as Nominee for Ampro Mortgage, a division of United Financial Mortgage Corp.;

- Vice President, MERS as Nominee for Colorado Federal Savings Bank;

- Vice President, MERS as Nominee for CTX Mortgage Company, LLC;

- Vice President, MERS as Nominee for Entrust Mortgage Inc.;

- Vice President, MERS, as Nominee for EquiFirst Corp;

- Vice President, MERS as Nominee for Fairfield Financial Mortgage Corp. Inc.;

- Vice President, MERS as Nominee for First Guaranty Mortgage Corp;

- Vice President, MERS as Nominee for First Horizon Home Loan Corp.;

- Vice President, MERS, First NLC Financial Services LLC;

- Vice President MERS as Nominee for First Residential Mortgage Services Corp.;

- Vice President MERS as Nominee for GreenPoint Mortgage Funding Inc.;

- Vice President MERS as Nominee for Homequest Capital Funding;

- Vice President MERS as Nominee for Ivanhoe Financial Inc.;

---

[5] Mortgage Electronic Registration Systems, Inc. ("MERS") is an industry database operates a computer registry designed to track servicing and ownership rights of mortgage loans in the United States. *See* "Foreclosure, Subprime Mortgage Lending, and the Mortgage Electronic System" by Christopher L. Peterson, University of Cincinnati Law Review, vol. 78, No.4, Summer 2010.  MERS is a registry only and does not hold physical copies of the notes and mortgages.

- Vice President MERS, MERS as Nominee for Lending First Mortgage;

- Vice President MERS as Nominee for Market Street Corp.;

- Vice President, MERS, as Nominee for Meritage Mortgage Corp.;

- Vice President, MERS as Nominee for Metrocities Mortgage LLC;

- Vice President, MERS as Nominee for Mortgage Network, Inc.;

- Vice President MERS as Nominee for Pinnacle Mortgage Inc.;

- Vice President MERS as Nominee for SouthStar Funding LLC.

174.  In particular, Allotey was the purported signer of documents used by Defendant BA in foreclosures during a three-month period using the following titles:

- Vice President, MERS as Nominee for Bear Sterns Residential Mortgage Corporation;

- Vice President, MERS as Nominee for Ppeples (sic) Choice Home Loan Inc.;

- Vice President MERS as Nominee for First Bank d/b/a First Bank Mortgage;

- Vice President, MERS, as Nominee for EMC Mortgage Corporation;

- Vice President, MERS as Nominee for Mortgage Works Unlimited Inc., d/b/a The Mortgage Works;

- Vice President, MERS as Nominee for Encore Credit Corp. d/b/a ECC Credit Corporation;

- Vice President, MERS.

175. LPS employee Alfonzo Greene was identified on mortgage assignments with at least three different job titles, as follows:

- Vice President of Mortgage Electronic Registration systems, Inc, solely as nominee for American Brokers Conduit;

- Vice President of Mortgage Electronic Registration Systems, Inc. as nominee for First NLC Financial Services, LLC; and

50

- Vice President of Mortgage Electronic Registration Systems, Inc. as nominee for Homeowners Friend Mortgage Company, Inc.

176. LPS employee Rick Wilken was identified on mortgage assignments with at least five different job titles, as follows:

- Attorney in Fact of JP Morgan Chase Bank, National Association as successor in interest to Washington Mutual Bank as successor in interest to Long Beach Mortgage Company;

- Attorney in Fact of JP Morgan Chase Bank, National Association as successor in interest to Washington Mutual Bank as successor in interest to Long Beach Mortgage Company

- Officer of Washington Mutual Bank as successor in interest to Long Beach Mortgage Company
- Attorney in Fact of Washington Mutual Bank; and

- Vice President of Mortgage Electronic Registration Systems Inc. as nominee for Premier Mortgage Funding, Inc.

177. LPS employee Cecilia Knox in Dakota County, Minnesota, was identified on mortgage assignments as having at least two different job titles, as follows:

- Vice President of Mortgage Electronic Registration Systems, Inc. as nominee for J&S Holdings of Greenville Inc.

- Vice President of Mortgage Electronic Registration Systems, Inc. as nominee for NovaStar Mortgage Inc.

178. LPS employee Bethany Hood was identified on mortgage assignments as having at least four different job titles, as follows:

- Vice President of Mortgage Electronic Registration Systems, Inc. as nominee for NovaStar Mortgage Inc.;

- Vice President of Mortgage Electronic Registration Systems, Inc. as nominee for Pinnacle Mortgage Inc.;

- Vice President of Mortgage Electronic Registration Systems, Inc. as nominee for Lime Financial Services, LTD.; and

51

- Assistant Vice President of Deutsche Bank National Trust Company, as Trustee for Saxon Asset Securities Trust 2007-1, by Saxon Mortgage Services, Inc.

179.  LPS employee Topako Love in Dakota County, Minnesota, was identified on mortgage assignments as having at least four different job titles, as follows:

- Assistant Secretary of Option One Mortgage Corp., Attorney in Fact for H&R Block Mortgage;

- Officer of Mortgage Electronic Registration Systems Inc. as nominee for Gateway Funding Diversified Mortgage Services LP;

- Vice-President of Saxon Mortgage Services, Inc., Attorney In Fact for Novastar Mortgage; and

- Vice President, MERS, as nominee for Mortgage Lenders Network USA, Inc.

180.  In one instance, a forged "Assignment of Mortgage" purportedly signed by Topako Love is dated February 9, 2009, which was after the foreclosure was completed. The assignment to DBNTC is signed by Topako Love on behalf of SAXON, as attorney in fact for Novastar Mortgage.  The assignment was prepared by Karen A. Thompson, Esq., of the Law Office of Marshall C. Watson.  A typewritten note on the right-hand side of the document states: "This Assignment of Mortgage was inadvertently not recorded prior to the Final Judgment of Foreclosure in Case #56-2008-CA-002423, but is now being recorded to clear title."  The docket for the St. Lucie County Clerk of the Court shows the case number corresponds to *DEUTSCHE BANK v. CHRISTY WATTS*, filed March 19, 2008.  On January 23, 2009, a final judgment of foreclosure was entered by default in this case.  On January 28, 2009, the plaintiff made a motion for substitution of party plaintiff, to "Deutsche Bank National Trust Co. as trustee from Novastar," which the court approved on the same day, the docket shows.  On February 9, 2009, eleven days later, the purported assignment of mortgage from Novastar to DBNTC was signed, and it

was recorded on February 24, 2009.  According to the calendar in the docket, during this foreclosure, DBNTC did not hold title to the mortgage, contrary to its representations to the court.  The Assignment of Mortgage, filed well after the judgment of foreclosure was entered, was forged.

181.  LPS employee Christina Allen in Dakota County, Minnesota, was identified on mortgage assignments as having at least three different job titles, as follows:

- Attorney In fact, JP Morgan Chase Bank Attorney In fact for Deutsche Bank National Trust Company, as Trustee Beach Mortgage Loan Trust (sic);

- Vice President, MERS, as nominee for First National Bank of Arizona; and

- Vice President, MERS, as nominee for Mortgage Lenders Network USA, Inc.

182.  LPS employee Eric Tate in Dakota County, Minnesota, was identified on mortgage assignments with at least six different job titles, as follows:

- Attorney In fact, JP Morgan Chase Bank Attorney In fact for Deutsche Bank National Trust Company, as Trustee Beach Mortgage Loan Trust (sic);

- Attorney In fact, JP Morgan Chase Bank as successor in interest to Washington Mutual Bank formerly known as Washington Mutual Bank;

- Vice President of Mortgage Electronic Registration systems, Inc, solely as nominee for American Brokers Conduit;

- Vice President of Mortgage Electronic Registration Systems, Inc. as nominee for First NLC Financial Services, LLC;

- Vice President of Mortgage Electronic Registration Systems, Inc. as nominee for Homeowners Friend Mortgage Company, Inc.; and

- Assistant Vice President of The Coastal Bank.

183.  As mentioned above, the use of so many corporate titles shows it is unlikely that these LPS employees were actually the officers of any of the named companies; the

LPS employees lacked corporate authority to sign the documents on behalf of these companies.

184. In most cases, the assignments prepared by LPS employees benefited the Defendants acting as trustees on the relevant MBS Trust.

185. The assignments often were "made" by grantors who had not themselves been validly assigned the mortgage by the original lender, or by subsequent grantees of the original lender, and so had no actual title to transfer. The LPS employees most often represented, falsely, that MERS or a mortgage servicing company such as Defendants AHMS and SAXON had authority to assign the mortgage to the trust when an assignment from the original lender had never been validly made.

186. LPS employees, including Greg Allen, Liquenda Allotey, Christine Anderson, John Codi, John Sobotta, Eric Tate and Rick Wilken, signed thousands of documents each week, often for Defendant BA, with no review or any knowledge of their contents, creating forged assignments using fraudulent titles in order to proceed with foreclosures.

187. The assignments described above were prepared with disregard to the veracity of the stated information. In addition to the forgeries discussed above concerning the signers' identities and their authority to sign, further irregularities were found, namely: (1) the dates on which the properties became part of the trust were incorrectly stated; (2) the signers often signed as officers of mortgage companies that had filed for bankruptcy or no longer existed, and the signatures were affixed without authorization of the trustee for the estates in the bankruptcy courts or by an authorized party of a purchaser of the bankrupt companies or their assets; and (3) the grantor or

grantee was often incorrectly stated, with the grantor or grantee identified in at least 10 instances as "Bogus Assignee for Intervening ASMTS," and in several other cases identified as "A Bad Bene." In other cases, the mortgage company officer forgot to sign, but the empty line was nonetheless witnessed and notarized. In yet other cases, the original loan amount was misstated as $.00 or $.01.

188. In countless other mortgage foreclosure cases, LPS employees prepared affidavits that were filed with courts by the foreclosing law firms in support of summary judgment motions. In these affidavits, the employees again misrepresented their job titles and their personal knowledge of the facts set forth in the affidavits.

189. In December 2009, the Fulton County, Georgia, District Attorney's office conducted an investigation of complaints received regarding some of the documents produced by the Alpharetta, Georgia, office of LPS's subsidiary DOCX. While claiming to cooperate with the investigation, LPS made misleading statements and concealed the extent of the problems with the fraudulent documents it produced to facilitate mortgage foreclosures, while continuing many of the same practices in Minnesota.

190. Thousands of additional fraudulent assignments were prepared and filed by LPS employees in December 2009 and January and February 2010. Most of these "Remediation Assignments" bore the abbreviation "DXFX1 or DXFX2" in the client identification square, but no disclosures were made to investors, courts or mortgagees of the existence and scope of the fraudulent documents. In hundreds of other cases, after the "remediation," assignments were prepared, signed and notarized in the LPS offices in Dakota County, Minnesota, no information identifying the involvement of LPS was

included and, instead, a notation was included on these assignments that they were prepared by the "Law Offices of David Stern," or other law firms hired by LPS.

### (c)    WELLS/ASC

191.    Defendant WELLS/ASC, a division of Defendant WELLS FARGO, was also a prolific producer of fraudulent mortgage assignments from 2008 through 2011. It operated out of offices in Ft. Mill, South Carolina, sending mortgage documents to be used in foreclosures throughout the United States.

192.    Relator investigated mortgage assignments produced by Defendant WELLS/ASC in Ft. Mill, South Carolina and found that thousands of fraudulent mortgage assignments were produced from that office from 2008 through 2011 falsifying the dates that the mortgage and notes were acquired by the trusts and the assigning officers.    Like the DOCX assignments, these were mass-produced by employees of WELLS/ASC with total disregard for the accuracy of the information and notarization formalities.    As at DOCX, blank lines were sometimes witnessed and notarized and employees used dozens of job titles.

193.    The employees or agents of WELLS/ASC in Ft. Mill who participated in the fraudulent assignments on behalf of the other Defendants include Herman John Kennerty, Nicki Cureton, China Brown, Heather Carrico, Elizabeth Mathis, Anita Antonelli, and Natasha Clark.

194.    The name "John Kennerty" appears on more than 1,000 mortgage assignments prepared by Defendant WELLS/ASC, a mortgage servicing company in Fort Mill, South Carolina.    On these assignments, Kennerty is identified as an officer of the grantor, but he was, in reality, just an employee of WELLS/ASC, which was hired by one of the other Defendants on behalf of the grantee trusts.

56

195. On WELLS/ASC-prepared mortgage assignments, at least three different job titles are listed for John Kennerty, who also signs using the name "Herman John Kennerty." Titles attributed to Kennerty include the following:

- Assistant Secretary, Mortgage Electronic Registration Systems, Inc., acting solely as nominee for Mortgage Network, Inc.;

- VP of Loan Documentation, Wells Fargo Bank, NA Attorney-in-Fact-For-Home 123 Corporation; and

- VP of Loan Documentation, Wells Fargo Bank, NA Attorney-in-Fact-For-New Century Mortgage Corporation.

196. The use of so many different corporate titles for John Kennerty shows it is unlikely that he was actually the officer of any of the named companies; John Kennerty, therefore, lacked corporate authority to sign the documents of behalf of those companies.

197. The assignments signed by Kennerty also contain either false dates of assignment or dates long past when the mortgage was supposed to be assigned to the Defendant trustee bank. For example, on October 28, 2009, MERS purportedly assigned a mortgage executed by Augustin Cintron to Defendant U.S. BANK as trustee for the Structured Asset Investment Loan Trust, 2005-8. This was four years too late, as the Trust closed in 2005 and at that time was required to already have all of the mortgages transferred to it. Furthermore, the assignment by MERS was signed by Kennerty, who claimed that he was Assistant Secretary of MERS.

198. The name "Nicki Cureton" appears on more than 1,000 mortgage assignments prepared by WELLS/ASC. On these assignments, Cureton is identified as an officer of the grantor or as a MERS officer for at least 10 different mortgage companies, but Cureton instead worked for WELLS/ASC, on behalf of the grantee trusts.

199.    The use of so many different corporate titles for Nicki Cureton shows it is unlikely that she was actually the officer of any of the named companies and that she lacked corporate authority to sign the documents of behalf of those companies.

200.    The Assignments signed by Cureton also contain false dates of assignment.

201.    The names "China Brown," "Heather Carrico," "Elizabeth Mathis," and "Natasha Clark" appear on more than 1,000 mortgage assignments prepared by WELLS/ASC in Fort Mill, South Carolina.   On these assignments, Brown, Carrico, Mathis, or Clark is identified as an officer of the grantor or as a MERS officer for at least 10 different mortgage companies, but they all were actually employees of WELLS/ASC, on behalf of the grantee trusts.

202.    The use of so many different corporate titles for Brown, Carrico, Mathis, and Clark shows it is unlikely that they were actually the officer of any of the named companies; Brown, Carrico, Mathis, and Clark therefore lacked corporate authority to sign the documents on behalf of those companies.

203.    The Assignments signed by Brown, Carrico, Mathis, Clark, and others also contain false dates of assignment or dates long after the transfers were supposed to have taken place.   For example, on July 23, 2009, MERS purportedly assigned a mortgage executed by Eduardo Mendoza and Ana Mendoza to Defendant U.S. BANK as trustee for the Structured Asset Investment Loan Trust, 2005-8.   This was four years too late, as the Trust closed in 2005 and at that time was required to have all of the mortgages transferred to it.   Furthermore, the assignment by MERS was signed by Anita Antonelli,

who claimed that she was Assistant Secretary of MERS. She was, in actuality, an employee of Defendant WELLS/ASC.

204.    MBS Trusts that used the mortgage assignments fraudulently produced by WELLS/ASC in foreclosures and bankruptcies included Morgan Stanley ABS Capital I, Inc. trusts; SASCO Trusts, MASTR Trusts; HSI Asset Loan Obligation Trusts; Credit Suisse First Boston (CSFB) Trusts; Banc of America Funding Trusts; Bear Stearns Asset Backed Securities Trusts; GSR Mortgage Loan Trusts; FFMLT Trusts; Nomura Asset Acceptance Corp. Trusts; and Citigroup Mortgage Pass Through Trusts.

### (d)    AHMS

205.    Relator investigated mortgage assignments produced by Defendant AHMS in Jacksonville, Florida and found that hundreds of fraudulent mortgage assignments and other documents were produced from that office in 2010 falsifying the dates that the mortgage and notes were acquired by the trusts and the assigning officers. Like the DOCX assignments, these were mass-produced by employees of AHMS, with total disregard for the accuracy of the information and notarization formalities. As at DOCX, employees used dozens of job titles.

206.    AHMS employees in Jacksonville, Florida who signed the fraudulently produced mortgage assignments included Michele Halyard, Kathy Smith, Joseph Kaminski, and Cynthia Stevens.

207.    MBS Trusts that used the mortgage assignments fraudulently produced by AHMS included American Home Mortgage Assets Trusts, American Home Mortgage Investment Trusts, Option One Mortgage Loan Trusts, Structured Asset Mortgage Investment Trusts, Soundview Home Loan Trusts, and TBW Mortgage Backed Trusts.

**(e)    AMC/CITI**

208.    Relator investigated mortgage assignments produced by Defendant AMC/CITI in O'Fallon, Missouri and found that hundreds of fraudulent mortgage assignments were produced from that office from 2008 through 2011.  Like the Docx assignments, these were mass-produced by employees of AMC/CITI with total disregard for the accuracy of the information and notarization formalities.

209.    Employees of AMC/CITI who signed the fraudulently produced mortgage assignments included Nate Blackstun, Kim Krakoviak, and Scott Scheiner.

**(f)    AURORA**

210.    Relator investigated mortgage assignments produced by Defendant AURORA in Littleton, Colorado, and found that thousands of fraudulent mortgage assignments were produced from that office from 2008 through 2011.  Like the DOCX assignments, these were mass-produced by employees of AURORA with total disregard for the accuracy of the information and notarization formalities.

211.    Employees of AURORA who signed the fraudulently produced mortgage assignments included Lucy Lang, Susan Lindhorst, Joann Rein, and Theodore Schulz.

212.    Relator investigated mortgage assignments produced by Defendant BAYVIEW in Coral Gables, Florida and found that hundreds of fraudulent mortgage assignments were produced from that office from 2008 through 2011. Like the Docx assignments, these were mass-produced by employees of BAYVIEW with total disregard for the accuracy of the information and notarization formalities.

**(g)    BAC**

213.    Relator investigated mortgage assignments produced by Defendant BAC in Collin County, TX and found that thousands of fraudulent mortgage assignments were

produced from that office from 2008 through 2011 falsifying the dates that the mortgage and notes were acquired by the trusts and the assigning officers.  Like the DOCX assignments, these were mass-produced by employees of BAC, with total disregard for the accuracy of the information and notarization formalities.  As at DOCX, employees used dozens of job titles.

214.    The BAC employees in Collin County, TX who signed the fraudulently produced mortgage assignments included the following: Micall Bachman, Lance Bell, Mark Bishop, Kimberly Dawson, Selena Harmon, Renee Hertzler, Lancia Herzog, M. Kelly Michie, David Perez, Rhoena Rice, Keri Selman, Tiaquanda Turner, Melissa Viveros, and Sandra Williams.

215.  For example, on October 2, 2008, MERS purportedly assigned to the BCAP LLC Trust 2007-AA2, an MBS Trust, a mortgage that had been executed by Anthony A. Delgado.  This was a year after the trust closed.  Furthermore, the assignment by MERS was signed by Serena, who was an employee of BAC.

216.    MBS Trusts that used the mortgage assignments fraudulently produced by BAC in foreclosures and bankruptcies included Deutsche Alt-A Securities Trusts, CWABS Trusts, CWALT Trusts, Impac Secured Assets Corp. Trusts, JP Morgan Mortgage Acquisition Trusts, Morgan Stanley ABS Capital I, Inc. Trusts, Citigroup Mortgage Loan Trusts, and Ace Securities Corp. Home Equity Loan Trusts.

### (h)     BARCLAYS

217.    Relator investigated mortgage assignments produced by Defendant BARCLAYS in North Highlands, California and found that thousands of fraudulent mortgage assignments were produced from that office from 2008 through 2011 falsifying the dates that the mortgage and notes were acquired by the trusts and the assigning

61

officers.  Like the DOCX assignments, these were mass-produced by employees of BARCLAYS, with total disregard for the accuracy of the information and notarization formalities.  As at DOCX, employees used dozens of job titles.

218.    Employees of BARCLAYS who signed the fraudulently produced mortgage assignments included the following Tonya Blechinger, Noriko Colston, and Joyce Nelson.

219.  On November 7, 2008, for example, MERS purportedly assigned to the SG Mortgage Securities Trust 2007 NC1 a mortgage that had been executed by Arlan Beltran and Adelina Santana Beltran.  This was a year after the trust closed.  Furthermore, the assignment by MERS was signed by Joyce Nelson, who stated she was Assistant Secretary of MERS but who was actually an employee of Defendant BARCLAYS.

220.    MBS Trusts that used the mortgage assignments fraudulently produced by BARCLAYS included Securitized Asset Backed Receivables Trusts, RALI Trusts, Morgan Stanley Home Equity Loan Trusts, Morgan Stanley ABS Capital 1, Inc. Trusts, and MASTR Asset-Backed Securities Trusts.

### (i)    BAYVIEW

221.    Employees of BAYVIEW who signed the fraudulently produced mortgage assignments included Robert Hall and Peter Suarez.

222.    Relator investigated mortgage assignments produced by Defendant CRC in Chatsworth, California and found that hundreds of fraudulent mortgage assignments were produced from that office from 2008 through 2011.  Like the DOCX assignments, these were mass-produced by employees of CRC with total disregard for the accuracy of the information and notarization formalities.

223.    Employees of CRC who signed the fraudulently produced mortgage assignments included, for example, Deborah Brignac.

### (j)    CARRINGTON

224.    Relator investigated mortgage assignments produced by Defendant CARRINGTON in Orange County, California and found that thousands of fraudulent mortgage assignments were produced from that office from 2008 through 2011 falsifying the dates that the mortgage and notes were acquired by the trusts and the assigning officers.    Like the DOCX assignments, these were mass-produced by employees of CARRINGTON, with total disregard for the accuracy of the information and notarization formalities.    As at DOCX, employees used dozens of job titles.

225.    Employees of CARRINGTON in Orange County, California who signed the fraudulently produced mortgage assignments included, for example, Tom Croft.

226.  For example, on April 21, 2009, MERS purportedly assigned to Carrington Mortgage Loan Trust, Series 2005-FRE1 a mortgage that had been executed by Latdavanh Bozan.    This was four years after the trust closed.    Furthermore, the assignment by MERS was signed by Tom Croft, who was an Assistant Vice President CARRINGTON.

227.  On May 19, 2009, New Century Mortgage Corporation purportedly assigned to New Century Home Equity Loan Trust 2005-1 a mortgage that had been executed by Jose J. Valencia and Rosalba Valencia.    This was four years after the trust closed. Furthermore, the assignment by New Century Mortgage Corporation was also signed by CARRINGTON's Assistant Vice President Croft.

228.  On May 6, 2009, New Century Mortgage Corporation purportedly assigned to New Century Home Equity Loan Trust 2005-3 a mortgage that had been executed by

Alan J. Rodriguez. This was four years after the trust closed. This assignment too was signed by CARRINGTON's Croft.

229. On November 16, 2009, New Century Mortgage Corporation purportedly assigned to Carrington Mortgage Loan Trust, Series 2005-FRE1 a mortgage that had been executed by Stuart A. Potter and Jessica Potter. This was four years after the trust closed. CARRINGTON's Croft also signed this assignment.

230. On March 1, 2010, New Century Mortgage Corporation purportedly assigned to Carrington Mortgage Loan Trust, Series 2006-NC2 a mortgage that had been executed by Alina Cruz. This was four years after the trust closed. Furthermore, the assignment was signed by CARRINGTON's Croft.

231. MBS Trusts that used the mortgage assignments fraudulently produced by CARRINGTON included Carrington Mortgage Loan Trusts and New Century Home Equity Loan Trusts.

### (k)    CHASE HOME

232. Relator investigated mortgage assignments produced by Defendant CHASE HOME in Franklin County, Ohio, and found that thousands of fraudulent mortgage assignments were produced from that office from 2008 through 2011 falsifying the dates that the mortgage and notes were acquired by the trusts and the assigning officers. Like the DOCX assignments, these were mass-produced by employees of CHASE HOME, with total disregard for the accuracy of the information and notarization formalities. As at DOCX, employees used dozens of job titles.

233. Employees of CHASE HOME who signed the fraudulently produced mortgage assignments included Mary Cook, Whitney Cook, Beth Cottrell, Dana Heisel, Cindy Smith, Stacy Spohn, and Christina Trowbridge.

234. For example, On May 19, 2009, Whitney K. Cook, an employee of Defendant CHASE HOME, signed as "Attorney-in-Fact" and "Assistant Secretary" for New Century Mortgage Corporation on an assignment of the mortgage of Chris and Jacqueline Nenno to Defendant DBNTC as trustee for the HSI Asset Securitization Corporation 2005-NCI Mortgage Pass-Through Certificates, Series 2005-NC1.   Cook signed other assignments as assistant secretary of J.P. Morgan Chase Bank, N.A., or Chase Bank USA, N.A.

235. Also on May 19, 2009, Stacey E. Spohn, another employee of Defendant CHASE HOME, signed as "Vice President" of Chase Bank USA, N.A. Attorney-in-Fact" and "Assistant Secretary" for New Century Mortgage Corporation on an assignment of the mortgage Peter D. D'Hondt Defendant DBNTC as trustee for the J.P. Morgan Mortgage Acquisition Trust 2007-CH1, Asset Backed Pass-Through Certificates, Series 2007-CH1.

236.    MBS Trusts that used the mortgage assignments fraudulently produced by CHASE HOME included JP Morgan Acquisition Corp. Trusts, Structured Asset Investment Loan Trusts, HSI Asset Securities Corp. Trusts, CMFC Trusts, and JPM Alt Trusts.

### (l)     HSBC MORTGAGE

237.    Relator investigated mortgage assignments produced by Defendant HSBC MORTGAGE in Brandon, Florida, and found that hundreds of fraudulent mortgage assignments were produced from that office from 2008 through 2011.  Like the DOCX assignments, these were mass-produced by employees of HSBC MORTGAGE with total disregard for the accuracy of the information and notarization formalities.

238.    Employees of HSBC MORTGAGE who signed the fraudulently produced mortgage assignments included Kevin Elliott, Maria Vadney, and Robert Wright.

### (m)    LITTON

239.    Relator investigated mortgage assignments produced by Defendant LITTON in Houston, Texas and found that thousands of fraudulent mortgage assignments were produced from that office from 2008 through 2011 falsifying the dates that the mortgage and notes were acquired by the trusts and the assigning officers.  Like the DOCX assignments, these were mass-produced by employees of LITTON, with total disregard for the accuracy of the information and notarization formalities.  As at DOCX, employees used dozens of job titles.

240.    Employees of LITTON who signed the fraudulently produced mortgage assignments included Denise Bailey, Diane Dixon, Debra Lyman, and Marti Noriega.

241.    MBS Trusts that used the mortgage assignments fraudulently produced by LITTON Loan Servicing included First NLC Trusts, Popular Mortgage Trusts, Ace Securities Corp. Home Equity Loan Trusts, GSR Mortgage Loan Trusts, Fremont Home Loan Trusts, GSAA Home Equity Loan Trusts, GSAMP Trusts, and C-Bass Trusts.

### (n)    NCI

242.    Relator investigated mortgage assignments produced by Defendant NCI in Palm Harbor, Florida, and found that thousands of fraudulent mortgage assignments were produced from that office from 2008 through 2011 falsifying the dates that the mortgage and notes were acquired by the trusts and the assigning officers.  Like the DOCX assignments, these were mass-produced by employees of NCI, with total disregard for the accuracy of the information and notarization formalities.  As at DOCX, employees used dozens of job titles.

243.     Employees of NCI who signed the fraudulently produced mortgage assignments included Bryan Bly, Vilma Castro, Dhurato Doko, Christopher Jones, Else McKinnon, and Crystal Moore.

244.     MBS Trusts that used the mortgage assignments fraudulently produced by NCI included Argent and Ameriquest Trusts, as well as many trusts with Citibank, N.A. as trustee.

### (o)     OCWEN

245.     Relator investigated mortgage assignments produced by Defendant OCWEN in West Palm Beach, Florida and found that thousands of fraudulent mortgage assignments were produced from that office from 2008 through 2011 falsifying the dates that the mortgage and notes were acquired by the trusts and the assigning officers.  Like the DOCX assignments, these were mass-produced by employees of OCWEN, with total disregard for the accuracy of the information and notarization formalities.  As at DOCX, employees used dozens of job titles.

246.     Employees of OCWEN who signed the fraudulently produced mortgage assignments included Scott Anderson, Jonathan Burgess, Laura Buxton, Christina Carter, Nancy Eller, Michael Hanna, Kevin Jackson, Juan Pardo, and Oscar Taveras.

247.   On February 6, 2008, for example, MERS purportedly executed an allonge for a mortgage note executed by Luis A. Rodriguez, transferring said note to Defendant U.S. BANK as trustee for the Registered Holders of Home Equity Asset Trust 2004-8.  This was four years too late, as the Trust closed in 2004 and at that time was required to have all of the mortgage notes transferred to it.  Furthermore, the assignment by MERS was signed by Scott W. Anderson, who claimed that he was a Vice President of MERS.  He was, in actuality, an employee of OCWEN.

248.  On November 16, 2010, MERS purportedly assigned a mortgage executed by Carl J. Earley and Debra J. Earley to Defendant DBNTC as trustee for the Registered Holders of Morgan Stanley ABS Capital I Inc. Trust 2007-HE5 Mortgage Pass-Through Certificates, Series 2007-HE5.  This was three years too late, as the Trust closed in 2007 and at that time was required to already have all of the mortgages transferred to it. Furthermore, the assignment by MERS was signed by Scott W. Anderson, who claimed that he was a Vice President of MERS.  He was, in actuality, an employee of OCWEN. In addition, the document contained a false notarization: while Mr. Anderson signed the assignment on November 23, 2010, the notary stated that Mr. Anderson signed it on March 23, 2010.

249.  MBS Trusts that used the mortgage assignments fraudulently produced by OCWEN  included Soundview Home Loan Trusts, Bravo Mortgage Assets Trusts, Ace Securities Corp. Home Equity Loan Trusts, Renaissance Home Equity Loan Trusts, and Nomura Home Equity Loan Trusts.

### (p)     ONEWEST

250.  Relator investigated mortgage assignments produced by Defendant ORION in Southlake, Texas, and found that hundreds of fraudulent mortgage assignments were produced from that office from 2008 through 2011 falsifying the dates that the mortgage and notes were acquired by the trusts and the assigning officers.  Like the DOCX assignments, these were mass-produced by employees of ONEWEST, with total disregard for the accuracy of the information and notarization formalities.

251.  Employees of ONEWEST who signed the fraudulently produced mortgage assignments included Erica A. Johnson-Seck and Brian Burnett.

252. On May 29, 2009, for example, MERS as nominee for Amerimortgage Bankers LLC purportedly assigned a mortgage executed by Jose L. Melendez to the Defendant DBNTC as trustee of the IndyMac Index Mortgage Trust 2006-AR4. This was three years too late, as the Trust closed in 2006 and at that time was required to have all of the mortgages transferred to it. Furthermore, the assignment by MERS as nominee for Amerimortgage Bankers LLC was signed by Erica A. Johnson-Seck, who claimed that she was a Vice President of MERS. She was, in actuality, an employee of Defendant ONEWEST.

253. On August 6, 2010, MERS purportedly assigned a mortgage executed by Thomas N. Ryder and Tara Moldenhauer to the Defendant DBNTC as trustee of the Residential Asset Securitization Trust 2004-A10. This was six years too late, as the Trust closed in 2004 and at that time was required to have all of the mortgages transferred to it. Furthermore, the assignment by MERS was signed by Brian Burnett, who claimed that he was Assistant Vice President of MERS. He was, in actuality, an Assistant Vice President of Defendant ONEWEST.

### (q)    ORION

254. Relator investigated mortgage assignments produced by Defendant ORION in Southlake, Texas, and found that hundreds of fraudulent mortgage assignments were produced from that office from 2008 through 2011 falsifying the dates that the mortgage and notes were acquired by the trusts and the assigning officers. Like the DOCX assignments, these were mass-produced by employees of ORION, with total disregard for the accuracy of the information and notarization formalities. As at DOCX, employees used dozens of job titles.

255.    Employees of ORION who signed the fraudulently produced mortgage assignments included, for example,  M.E. Wileman.

256.    MBS Trusts that used the mortgage assignments fraudulently produced by ORION included Terwin Mortgage Trusts and many trusts with Citibank, N.A. as trustee.

### (r)    SAXON

257.    Relator investigated mortgage assignments produced by Defendant SAXON in Fort Worth, Texas, and found that hundreds of fraudulent mortgage assignments were produced from that office from 2008 through 2011 falsifying the dates that the mortgage and notes were acquired by the trusts and the assigning officers.  Like the DOCX assignments, these were mass-produced by employees of SAXON, with total disregard for the accuracy of the information and notarization formalities.  As at DOCX, employees used dozens of job titles.

258.     Employees of SAXON who signed the fraudulently produced mortgage assignments included Valerie Clark and John Cottrell.

259.    MBS Trusts that used the mortgage assignments fraudulently produced by SAXON included Saxon Asset Securities Trusts and IXIS Real Estate Capital Trusts.

### (s)    SCI

260.    Relator investigated mortgage assignments produced by Defendant SCI in Boise, Idaho, and found that thousands of fraudulent mortgage assignments were produced from that office from 2008 through 2011 falsifying the dates that the mortgage and notes were acquired by the trusts and the assigning officers.   Like the DOCX assignments, these were mass-produced by employees of SCI, with total disregard for the accuracy of the information and notarization formalities.  As at DOCX, employees used dozens of job titles.

70

261.    Employees of SCI who signed the fraudulently produced mortgage assignments included Melissa Hively and Vicki Sorg.

262.    MBS Trusts that used the mortgage assignments fraudulently produced by SCI included First Franklin Mortgage Loan Trusts, Merrill Lynch First Franklin Mortgage Loan Trusts, Ameriquest Trusts, and Argent Trusts.

### (t)    SELECT PORTFOLIO

263.    Relator investigated mortgage assignments produced by Defendant SELECT PORTFOLIO in Salt Lake City, Utah and found that thousands of fraudulent mortgage assignments were produced from that office from 2008 through 2011 falsifying the dates that the mortgage and notes were acquired by the trusts and the assigning officers.  Like the DOCX assignments, these were mass-produced by employees of SELECT PORTFOLIO, with total disregard for the accuracy of the information and notarization formalities.  As at DOCX, employees used dozens of job titles.

264.    Employees of SELECT PORTFOLIO who signed the fraudulently produced mortgage assignments included Luisa Alfonso and Bill Koch.

265.    On October 1, 2009, for example, AAMES Funding Corporation purportedly assigned to AAMES Mortgage Investment Trust 2005-4 a mortgage that had been executed by Jason Seguin and Hazel M. Seguin.  This was four years after the trust closed.  Furthermore, the assignment by AAMES Funding Corporation was signed by Bill Koch, who was an employee of SELECT PORTFOLIO.

266.  On January 29, 2010, AAMES Funding Corporation purportedly assigned to AAMES Mortgage Investment Trust 2006-1 a mortgage that had been executed by Sergio Torrez Ontivero and Marisol Lopez.  This was four years after the trust closed.

Furthermore, the assignment by AAMES Funding Corporation was also signed by SELECT PORTFOLIO employee Koch.

267.    MBS Trusts that used the mortgage assignments fraudulently produced by SELECT PORTFOLIO included Adjustable Rate Mortgage Trusts, CSMC Mortgage Trusts, Accredited Mortgage Loan Trusts, and Asset-Backed Securities Corp. Home Equity Loan Trusts.

### (u)     US BANK

268.    Relator investigated mortgage assignments produced by Defendant U.S. BANK in Owensboro, Kentucky, and found that thousands of fraudulent mortgage assignments were produced from that office from 2008 through 2011.  Like the DOCX assignments, these were mass-produced by employees of U.S. BANK Mortgage Services with total disregard for the accuracy of the information and notarization formalities.

269.  Employees of U.S. BANK who signed the fraudulently produced mortgage assignments included, for example, Gregg Speer.

### (v)     VERICREST

270.    Relator investigated mortgage assignments produced by Defendant VERICREST in Oklahoma City, Oklahoma and found that thousands of fraudulent mortgage assignments were produced from that office from 2008 through 2011 falsifying the dates that the mortgage and notes were acquired by the trusts and the assigning officers.  Like the DOCX assignments, these were mass-produced by employees of VERICREST, with total disregard for the accuracy of the information and notarization formalities.  As at DOCX, employees used dozens of job titles.

271.    Employees of VERICREST who signed the fraudulently produced mortgage assignments included Hal Bartow and Paul Laird.

272. The pervasiveness of the forgeries is seen in examining seven forged assignments created by Defendant VERICREST for the same trust – the CIT Mortgage Loan Trust 2007-1, many on the same day, and all within the same 40-day period. First, on December 18, 2008, MERS purportedly assigned to the CIT Mortgage Loan Trust 2007-1 a mortgage that had been executed by Amarilys Paralta and Benjamin Sanabria. This was a year after the trust closed. Furthermore, the assignment by MERS was signed by Hal Bartow, who stated that he was Assistant Secretary of MERS, but who was actually an employee of Defendant VERICREST.

273. Second, on December 17, 2008, MERS purportedly assigned to the CIT Mortgage Loan Trust 2007-1 a mortgage that had been executed by Ivan Moya and Luuisa Montano. This was a year after the trust closed. Furthermore, the assignment by MERS was signed by VERICREST's Hal Bartow as Assistant Secretary of MERS.

274. Third, on December 17, 2008, MERS purportedly assigned to CIT Mortgage Loan Trust 2007-1 a mortgage that had been executed by Colleen Cunningham. This was a year after the trust closed. Furthermore, the assignment by MERS was signed by VERICREST's Hal Bartow as Assistant Secretary of MERS.

275. Fourth, on November 17, 2008, MERS purportedly assigned to CIT Mortgage Loan Trust 2007-1 a mortgage that had been executed by Jayson Gonzalez and Kelly Montoya. This was a year after the trust closed. Furthermore, the assignment by MERS was signed by VERICREST's Hal Bartow as Assistant Secretary of MERS.

276. Fifth, on November 10, 2008, MERS purportedly assigned to CIT Mortgage Loan Trust 2007-1 a mortgage that had been executed by Guillermo Ernesto Rincon.

This was a year after the trust closed.  Furthermore, the assignment by MERS was again signed by VERICREST's Hal Bartow as Assistant Secretary of MERS.

277.  Sixth, on November 10, 2008, MERS purportedly assigned to CIT Mortgage Loan Trust 2007-1 a mortgage that had been executed by Henrry Guevara and Aida Guevara.  This was a year after the trust closed.  Furthermore, the assignment by MERS was signed by VERICREST's Hal Bartow as Assistant Secretary of MERS.

278. Seventh, on November 10, 2008, MERS purportedly assigned to CIT Mortgage Loan Trust 2007-1 a mortgage that had been executed by Daniel Montilla and Tara Montilla.  This was a year after the trust closed.  Furthermore, the assignment by MERS was also signed by VERICREST's Bartow as Assistant Secretary of MERS.

279.    MBS Trusts that used the mortgage assignments fraudulently produced by VERICREST included CIT Mortgage Loan Trusts and Deutsche Alt-A Securities Trusts.

### (w)    Defendants Paid Law Firms To Create Fraudulent Documents

280.    Relator further examined assignments prepared by certain of the law firms used by LPS in its default management processes and found that, in many cases, the law firm employees were signing as officers of grantors, without any authority or power of attorney, so that certain trusts could foreclose.  These assignments, as all the others that Relator had examined, had the same, or similar, false information regarding transfer of ownership to the trust as the assignments prepared in the other offices of LPS.  Moreover, Relator found that the law firm employees signed s officers of MERS, without disclosing that they were associated with a law firm.

281. Five of the largest foreclosure law firms in Florida – (1) Florida Default Law Group; (2) Law Offices of Marshall C. Watson, P.A.; (3) Law Offices of David J.

Stern, P.A.; (4) Shapiro & Fishman, LLP; and (5) Gladstone Law Group – were each retained by and acted under the direction of LPS. These law firms regularly submitted to the courts forged mortgage assignments prepared by employees at the LPS offices in Dakota County, Minnesota, and Alpharetta, Georgia.

282. Furthermore, in thousands of foreclosure cases, employees of the law firms hired by the Defendants to handle the foreclosures signed assignments and other related documents as MERS officers or as corporate officers of the grantors, despite lacking any authority to do so and without disclosing their affiliation with the law firms. Other law firm employees notarized these false documents, falsely attesting to the purported identities of the law firm employees.

283. For example, Cheryl Samons, the office manager for the Law Offices of David J. Stern, P.A., often signed mortgage assignments as a corporate officer of MERS or other corporations, lacking any authority and without disclosing her affiliation with the law firm.

284. Erin Cullaro, formerly an attorney employed by Florida Default Law Group, and subsequently an assistant district attorney assigned to the Economic Crimes Unit of the Florida Attorney General's Office in Tampa, Florida, purportedly notarized fraudulent documents in foreclosure cases, often executed by Lisa Cullaro, another employee of the Florida Default Law Group and possibly a relative. These notarizations by Erin Cullaro continued to be prepared even after she changed employers and was hired by the Florida Attorney General's Office. Erin Cullaro's signature is an indecipherable squiggle or mark, or, often, just the letter "E."

285. Caryn A. Graham, who often signed as a corporate officer of MERS on mortgage assignments prepared by the Law Offices of Marshall Watson, is actually an associate in that law firm.

286. In South Carolina, the Korn Law Firm was retained by and acted under the direction of LPS. Employees of the Korn Law Firm signed as officers of MERS, without disclosing that they were associates or support staff in the foreclosing law firms.

287. The Korn Law firm also submitted to the courts forged mortgage assignments prepared by employees at the LPS offices in Dakota County, Minnesota, Alpharetta, Georgia, or Jacksonville, Florida.

288. In all of these cases, LPS or other Defendants paid these law firms to prepare mortgage assignments that were signed by the law firm employees posing as corporate officers of the grantors. The fees charged by these firms were then paid for by the MBS trusts, diminishing the amount of money available to distribute to the investors, including the Government Plaintiffs. Indeed, they were paid significant monthly cash incentives to successfully foreclose on the most properties in the state.

(x)    **Mortgage Assignments Were Signed By Officers Of The Grantee Fraudulently Identifying Themselves As Officers Of The Grantor**

289.    Relator's investigations and analysis also revealed that tens of thousands of mortgage assignments were signed by employees of Defendant BAC and by officers of Defendant BA. These employees and corporate officers fraudulently signed mortgage assignments on behalf of the grantor, when they were actually employees of the grantee. By signing as officers of the grantor, BA officers, lacking any authority, fraudulently created mortgage assignments to be filed in foreclosure actions.

290. For example, Rhonda Weston, a Vice President of defendant BA, signed assignments as an officer of other entities in order to assign mortgages to BA. The titles used by Rhonda Weston were: (i) Assistant Secretary, MERS for American Brokers Conduit, (ii) Authorized Officer, MERS, as Nominee for CTX Mortgage Company, and (iii) Authorized Officer, Wells Fargo as trustee, Banc of America Alternative Loan Trust 2006-8. All of these assignments are fraudulent.

291. On April 16, 2009, MERS purportedly assigned to Morgan Stanley Home Equity Loan Trust 2007-1 a mortgage that had been executed by Mamie R. Washington a/k/a Mamie Ashby. This was two years after the trust closed. Furthermore, the assignment by MERS was signed by Donald Clark, who claimed that he was Assistant Vice President of MERS. He was, in actuality, an employee of COUNTRYWIDE FINANCIAL CORPORATION, which was succeeded by Defendant BA.

292. Employees of Defendant BAC also signed assignments without any authority on behalf of Wachovia Bank, to transfer mortgages to be used by Defendant BA in foreclosures. For example, Mark Bishop signed as Vice President of Wachovia when he was actually affiliated with Defendant BAC.

293. In several cases, the dates of the assignments were two years, or more, after the closing date of the trust in violation of the terms of the agreements as indicated in the Prospectuses and other documents disseminated to the investors. The late assignments caused the MBS Trust to lose their eligibility for tax-exempt status and triggered payment of taxes by the Trusts. Yet not a single trust has lost its tax-exempt status to date.

294. Furthermore, Relator found that numerous assignments used by the Defendants were fabricated within 30 days of the commencement of the foreclosure

actions. Because the mortgage assignments were missing, the Defendants created forged assignments to proceed with foreclosures when needed. Defendant BA created several forged assignments within a few days of the commencement of the foreclosure.

295. For example, an assignment from WELLS FARGO to Defendant BA, as trustee for Lehman XS Trust Series 2007-9 was filed on the same date of the filing of the foreclosure action for which it was fabricated.

296. Likewise, an assignment from Washington Mutual Bank N.A. to BA as trustee for WaMu Series 2007-0A4 Trust, was filed on March 30, 2009 while the foreclosure action was filed on February 27, 2009, more than a month before Defendant BA actually acquired the mortgage.

297. An assignment from JPMorgan Chase to BA, as trustee for the WaMu Series 2006-AR9 Trust, was signed on March 3, 2009, while the foreclosure action was filed prior to that date on February 27, 2009.

298. Another assignment from WELLS FARGO to Defendant BA was signed and notarized on December 29, 2008 but the transfer is said to have taken place more than three years prior to that date "on or before November 23, 2005."

299. The foregoing is just a small sample of the fraudulent documents manufactured and used by Defendants. Relator detected thousands of similar fraudulent assignments filed in foreclosure actions pursued by the Defendants. Additional examples of fraudulent documents are set forth in Exhibit B attached to this complaint.

### A. Defendants' False Statements To The Investors, Including The Government Plaintiffs

300. All of the MBS Trusts, for which false or fraudulent mortgage assignments were created and used, and to which the notes and mortgages were never properly

assigned in the first place, issued false statements to the investors, including the Government Plaintiffs.

**(a)    False Statements In MBS Trust Prospectuses and Related Transaction Documents**

301. False statements and material omissions concerning the notes and mortgage assignments were included in the prospectus for each of the MBS Trusts. Illustrative are the false statements and material omissions included in the filings of the Soundview Home Loan Trust 2007-OPT2 ("Soundview Trust II"), an MBS Trust for which false assignments were prepared and filed in court. On January 29, 2007 Greenwich Capital Acceptance Inc. and Financial Asset Securities Corporation (respectively, the Sponsor and Depositor of Soundview Trust II) filed a Form S-3 (no. 333-140279), amended on March 16, 2007 and March 23, 2007, for the offering of mortgage-backed/asset-backed securities later issued by the Soundview Trust II.

302. On June 18, 2007, Soundview Trust II issued a prospectus supplement, which contains multiple false statements. According to the prospectus, on the closing date (indicated as on or about July 10, 2007) "the trust will acquire a pool of approximately 2,200 first lien, fixed-rate and adjustable-rate mortgage loans having an aggregate principal balance as of the Cut-Off date[6] of approximately $562,080,117 (the "Mortgage Loans")." The prospectus also states that pursuant to the Soundview Trust II's PSA, as of the Cut-Off date, the Depositor (identified as Financial Asset Securities Corporation, a Delaware corporation and an affiliate of Greenwich Capital Markets, Inc.) will cause the Mortgage Loans to be assigned to the trustee (identified as Defendant

---

[6] The Cut-Off date is defined as July 1, 2007.

WELLS FARGO) for the benefit of the certificateholders.   Further, the section titled "Assignment of the Mortgage Loans" in the prospectus states:

> On the closing Date, the Depositor will transfer to the Trust all of its right, title and interest in and to each Mortgage Loan, **the related mortgage note**, Mortgage, **assignment of mortgage in recordable form in blank or to the Trustee and other related documents** ("collectively, the "*Related documents*"), including all scheduled payments with respect to each such Mortgage Loan due after the Cut-Off Date. The Trustee, concurrently with such transfer, will deliver the Certificates to the Depositor. Each Mortgage Loan transferred to the Trust will be identified on a schedule (the "*Mortgage Loan Schedule*") delivered to the Trustee pursuant to the Pooling Agreement. […] The Pooling Agreement will require that, within the time period specified therein, **the Depositor will deliver or cause to be delivered to the Trustee (or the Custodian on behalf of the Trustee) the mortgage notes endorsed to the Trustee on behalf Certificateholders and the Related Documents**. In lieu of delivery of original Mortgages or mortgage notes, if such original is not available or is lost, the Depositor may deliver or cause to be delivered true and correct copies thereof, or, with respect to a lost mortgage note, a lost note affidavit executed by the Originator. […] **On or prior to the Closing Date, the Trustee (or the Custodian on behalf of the Trustee) will review the Mortgage Loans, together with the Related Documents pursuant to the Pooling Agreement** and if any Mortgage Loans or Related Documents is found not to conform to the Trustee's (or the Custodian's) review criteria set forth in the Pooling Agreement and if any material defect is not cured within 90 days following notification thereof to the Originator by the Trustee, the Trustee will enforce the Originator's obligations under the Master Agreement to either: (i) substitute for such Mortgage Loan a Qualified Substitute Mortgage Loan; however, such substitution is permitted only within two years of the Closing Date and may not be made unless an opinion of counsel is provided to the effect that such substitution will not disqualify any of the REMICs (as defined in the Pooling Agreement) as a REMIC or result in a prohibited transaction tax under the Code; or (ii) purchase such Mortgage Loan at a price (the "*Purchase Price*") equal to the outstanding Principal Balance of such Mortgage Loan as of the date of purchase, plus all accrued and unpaid interest thereon, computed at the Mortgage Rate through the end of the calendar month in which the purchase is effected, plus the amount of any unreimbursed Advances and Servicing Advances (each as defined herein) made by the Servicer, plus any costs and damages incurred by the Trust in connection with any violation by such loan of any predatory-or abusive-lending law.…

(Emphasis added)

303.  The prospectus further states that Defendant WELLS FARGO would also be

acting as custodian of the mortgage loan files pursuant to the Pooling Agreement.  In that capacity, Wells Fargo is responsible to hold and safeguard the mortgage notes and other contents of the mortgage files on behalf of the Trustee and the Certificateholders. Wells Fargo Bank maintains each mortgage loan file in a separate file folder marked with a unique bar code to assure loan-level file integrity and to assist in inventory management.  Files are segregated by transaction or investor.

304.  These statements are false in that the mortgage notes were never delivered and are not included among the files maintained by Defendant WELLS FARGO.

305.  The PSA, also filed with the SEC and incorporated by reference into the prospectus, contains additional false statements and material omissions.  Section 2.01 of the PSA, entitled "Conveyance of Mortgage Loans," states that, among other things, the following documents for each mortgage were delivered to the trust: (i) the original mortgage note, (ii) the original mortgage, (iii) an original assignment, and (iv) an original of any intervening assignment of mortgage showing a complete chain of assignment. These documents were never transferred and these statements are false and fraudulent.

306.  Furthermore, the PSA required the trustee to certify "that as to each Mortgage Loan listed in the Mortgage Loan Schedule […] it (or its custodian) has received the applicable documents listed in Section 2.01 of the Pooling and Servicing Agreement."   Because the documents were never delivered, this certification by the Trustee (which, in this instance, was also the Custodian) was false.

307.  The foregoing statements, which were disseminated to the investors and are substantially the same in all of the prospectuses, PSAs, and trustee certifications for all the MBS Trusts, are false because those MBS Trusts never acquired most of the mortgage loans.   The trustees and/or custodians never reviewed the assignments, the notes, or any relevant documents or, if they did, they knowingly disregarded the missing

documents. Furthermore, rather than following the prospectus's and PSA's specific procedures to correct the issue, the Defendants created fraudulent assignments and other documents to conceal it. Indeed, the act of fabricating the assignments is evidence that the MBS Trust did not own the notes and/or the mortgage liens for some assets claimed to be in the pool.

308. There were also false statements and material omissions with respect to the prospectus of Merrill Lynch First Franklin Mortgage Loan Trust/Series 2007-1, another MBS Trust. Among the assets of the MBS Trust are 292 properties located in South Carolina. The prospectus,[7] filed on March 27, 2007, states at that "all of the Mortgage Loans[8] will be transferred and assigned to the Depositor on the Closing Date.[9] All the Mortgage Loans were acquired in 2007." The section of the prospectus titled "Assignment of Mortgage Loans" further states, "The Mortgage Loans will be assigned to the Trustee, together with all principal and interest received with respect to the Mortgage Loans on and after the Cut-off Date."[10] The prospectus further identifies the documents that are required to be delivered to the trustee, in accordance with the PSA, including: (1) the related original mortgage note, with any riders thereto, endorsed without recourse to the trustee or in blank, (2) the original mortgage, with any riders thereto, with evidence of recording indicated (or, if the original recorded mortgage has not yet been returned by the recording office, a copy thereof certified to be a true and complete copy of such mortgage sent for recording), and (3) an original assignment of the

---

[7] The filing may be found at http://www.secinfo.com/dsvr4.u4E1.htm.
[8] According to the prospectus, the mortgage loans consisted of approximately 10,755 conventional mortgage loans evidenced by promissory notes having an aggregate principal balance of approximately $2,234,527,127.
[9] The Closing date is defined as March 27, 2007.
[10] The cut-off date is defined as March 1, 2007.

mortgage to the trustee or in blank in recordable form.  Similarly, in a section entitled "Assignment of Assets; Repurchase," the prospectus confirms that "with respect to each Mortgage Loan, the Depositor will deliver or cause to be delivered to the Trustee (or to the Custodian on behalf of the Trustee) certain loan documents, which will include the original Mortgage Note endorsed, without recourse, in blank or to the order of the Trustee, the original Mortgage (or a certified copy thereof) with evidence of recording indicated thereon and an assignment of the Mortgage to the Trustee in recordable form."

309.  According to the prospectus,

The Trustee (or a custodian) will review such Mortgage Loan documents within a specified period of days after receipt thereof, and the Trustee (or a custodian) will hold such documents in trust for the benefit of the Certificateholders.  If any such document is found to be missing or defective in any material respect, the Trustee (or such custodian) shall notify the Master Servicer and the Depositor, and the Master Servicer shall notify the relevant Asset Seller. If the Asset Seller cannot cure the omission or defect within a specified number of days after receipt of such notice, then the Asset Seller will be obligated, within a specified number of days of receipt of such notice, to repurchase the related Mortgage Loan from the Trustee at the Purchase Price or substitute for such Mortgage Loan.

310. LASALLE BANK, whose successor-in-interest is Defendant BA, was the trustee of this MBS Trust.  There was no custodian; rather LASALLE boasted in the prospectus about its "two vault locations [which] can maintain a total of approximately 6 million custody files."  LASALLE BANK never received or reviewed the required documents, and never reported their material defects when fraudulent documents were fabricated.  LASALLE did, however, issue certificates pursuant to the PSA falsely attesting that it had received all of the mortgage documents.

311.  In the PSA for the Morgan Stanley ABS Capital 1 Inc. Trust 2007-HE6, an MBS Trust, LASALLE BANK, succeeded by Defendant BA, as custodian, stated that it would "maintain possession of the related Mortgage Notes."

312.  Similarly, the PSA for the HarborView Mortgage Loan Trust Mortgage Loan Pass−Through Certificates, Series 2006−9, , an MBS Trust as to which Defendant DBNTC was the trustee and Defendant BONY was the Custodian, required DBNTC to submit a "Final Certification of Trustee" stating that DBNTC "certifies that as to each Mortgage Loan listed in the Mortgage Loan Schedule (other than any Mortgage Loan paid in full or listed on the attached Document Exception Report) *it has received all documents required to be delivered to the Trustee* pursuant to Section 2.01 of the Pooling and Servicing Agreement" (emphasis added).

313.  Defendant WELLS FARGO acted as trustee for the Option One Mortgage Loan Trust 2005-4, an MBS Trust.  In that trust's PSA, signed by Darron C. Woodus, Assistant Vice President of WELLS FARGO, the trustee agreed that "it has reviewed . . . each Mortgage File on or prior to the Closing Date, with respect to each Mortgage Loan." Further, WELLS FARGO Bank, N.A. agreed, for the "benefit of the Certificateholders, to certify to the Depositor, the Master Servicer, and the NIMS Insurer . . . that, as to each Mortgage Loan listed in the Mortgage Loan Schedule . . . (i) all documents required to be delivered to it . . . are in its possession, [and] (ii) such documents have been reviewed by it and have not been mutilated, damaged or torn and relate to such Mortgage Loan."

314.   Defendant CITIBANK served as trustee for a number of trusts, including the Bear Stearns Alt A Trust 2007-3, an MBS Trust.   John Hannon, CITIBANK Vice President, signed the PSA on April 30, 2007, in which CITIBANK agreed, as trustee, to

review, or have the Custodian review on its behalf, "each Mortgage File delivered to it and to execute and deliver, or cause to be executed and delivered . . . an Interim Certification." Further, CITIBANK agreed that it would "ascertain whether all required documents have been executed and received, and based on the Mortgage Loan Schedule, whether those documents relate, determined on the basis of the Mortgagor name, original principal balance and loan number, to the Mortgage Loans it has received, as identified in the Mortgage Loan Schedule."

315. Defendant U.S. BANK served as trustee for the Asset Backed Securities Corporation Home Equity Loan Trust Series NC 2006-HE4, an MBS Trust. In Section 2.02 of the PSA, signed by Sheryl Christopherson, Vice President of U.S. BANK, U.S. BANK agreed, "for the benefit of the Certificateholders, to review . . . each Mortgage File and to certify and deliver . . . an initial certification to the Depositor, the Seller, the Servicers, and the Trustee."

316. Defendant HSBC USA, N.A. served as trustee for the ACE Securities Corporation Home Equity Loan Trust Series 2006-OP1, an MBS Trust. In Section 9.01 the PSA, signed by Elena Zheng, Assistant Vice President, for HSBC Bank USA, N.A., dated May 1, 2006, Defendant HSBC USA, N.A. agreed that it would, "upon receipt of all resolutions, certificates, statements, opinions, reports, documents, orders or other instruments furnished to it . . . examine them to determine whether they conform to the requirements of" the PSA.

317. Indeed, the PSA of every one of the MBS Trusts contains similar provisions requiring the trustee or the custodian on behalf of the trustee to certify its receipt and

review of all the documents required to be in each mortgage file. But the documents were neither delivered nor reviewed.

### (b) False Statements In Certifications Filed Pursuant to SEC Regulations

318. SEC regulations also required most of the Defendants to file certificates attesting that they have fulfilled their duties with respect to the MBS Trusts. In particular, 17 C.F.R. § 229.1122(d)(4) required the trustee, custodian, and servicing Defendants to file a report indicating (i) whether " [c]ollateral or security on pool assets is maintained as required by the transaction agreements or related pool asset documents" and (ii) whether "[p]ool assets and related documents are safeguarded as required by the transaction agreements." Similarly, 17 C.F.R. § 229.1123 requires filing a statement that "the servicer has fulfilled all of its obligations under the agreement in all material respects throughout the reporting period or, if there has been a failure to fulfill any such obligation in any material respect, specifying each such failure known to such officer and the nature and status thereof."

319. The certificates filed by Defendants pursuant to these provisions were false, because they failed to state that the notes and mortgage assignments were not safeguarded and, in fact, had not been transferred to the MBS Trusts. In some instances, the Defendants noted non-compliance, but only with reference to minor issues and never disclosed that the mortgage assignments and the notes and the related documents were missing or that forgeries were being submitted in their place. The following examples are but a few of the hundreds of false certifications Relator encountered.

320. On or about March 8, 2007, Ronald M. Faris, the President of Defendant OCWEN, signed a certification that was filed with the SEC. The certification certified

compliance with servicing criteria set forth in 17 C.F.R. § 1122(d), including subparts (d)(4)(i) and (ii), with respect to, *inter alia*, the following MBS Trusts:

- ACE Securities Corp. Home Equity Loan Trust, Series 2006-ASAP2

- ACE Securities Corp. Home Equity Loan Trust, Series 2006-ASAP3

- ACE Securities Corp. Home Equity Loan Trust, Series 2006-ASAP4

- ACE Securities Corp. Home Equity Loan Trust, Series 2006-ASAP5

- ACE Securities Corp. Home Equity Loan Trust, Series 2006-ASAP6

- ACE Securities Corp. Home Equity Loan Trust, Series 2006-HE1

- ACE Securities Corp. Home Equity Loan Trust, Series 2006-HE2

- ACE Securities Corp. Home Equity Loan Trust, Series 2006-HE3

- ACE Securities Corp. Home Equity Loan Trust, Series 2006-HE4

- ACE Securities Corp. Home Equity Loan Trust, Series 2006-SD1

- ACE Securities Corp. Home Equity Loan Trust, Series 2006-SD2

- ACE Securities Corp. Home Equity Loan Trust, Series 2006-SD3

- Citigroup Mortgage Loan Trust Inc. Asset-Backed Pass-Through Certificates, Series 2006-HE3

- Credit Suisse Seasoned Loan Trust 2006-1

- CS Home Equity Mortgage Trust Series 2006-1

- CS Home Equity Mortgage Trust Series 2006-2

- CS Home Equity Mortgage Trust Series 2006-3

- CS Home Equity Mortgage Trust Series 2006-4

- CS Home Equity Mortgage Trust Series 2006-5

- CSFB Home Equity Asset Trust 2006-2

- GSAMP Trust 2006-NC2

- GSAMP Trust 2006-S2

- GSAMP Trust 2006-S4

- GSAMP Trust 2005-S6

- MASTR Asset Backed Securities Trust 2006-AM1

- Nomura Home Equity Loan, Inc., Series 2006-HE1

- Nomura Home Equity Loan, Inc., Series 2006-HE2

- Nomura Home Equity Loan, Inc., Series 2006-HE3

- Renaissance Home Equity Loan Trust 2006-1

- Renaissance Home Equity Loan Trust 2006-2

- Renaissance Home Equity Loan Trust 2006-3

- Renaissance Home Equity Loan Trust 2006-4

- Soundview Home Loan Trust 2006-EQ2

- Soundview Home Loan Trust 2006-NLC1

- Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2006-4.

321. This certification was false with respect to each of the foregoing MBS Trusts because the requirements of 17 C.F.R. § 1122(d)(4)(i) and (ii) were not satisfied: each of these MBS Trusts was missing mortgage notes, mortgage assignments and/or related documents.

322. OCWEN also acted as servicer for the Structured Asset Investment Loan Trust 2004-8, an MBS Trust. On March 11, 2005, Faris, as well as Scott W. Anderson, Senior Vice President of Residential Assets, Brian J. LaForest, Director of Investor Reporting, and Paul E. Neff, Director of Servicing Operations, signed an assertion on compliance that stated that OCWEN "has complied in all material respects with the minimum servicing standards set forth in the Mortgage Bankers Association of America's Uniform Single Attestation Program for Mortgage Bankers," an attestation

attached as an exhibit to the 10-K filed on March 31, 2005 for the Structured Asset Investment Loan Trust 2004-8.

323. This certification was false because the trust was missing mortgage notes, mortgage assignments and/or related documents.

324. Defendant AURORA acted as the master servicer for the BNC Mortgage Loan Trust 2007-3, an MBS Trust. As Master Servicer, AURORA LOAN SERVICES, LLC filed a Rule 13a-14(d)/15d-14(d) certification with the SEC on March 27, 2008, signed by E. Todd Whittemore, AURORA Executive Vice President, which certified that "the servicers have fulfilled their obligations under the servicing agreements in all material respects." Also on March 27, 2008, AURORA's Whittemore signed the Annual Officer's Certification, stating that AURORA had "fulfilled all of its obligations under the [PSA] in all material aspects throughout [Calendar Year 2007]."

325. On or about February 26, 2007, David Lowman, Executive Vice President of Defendant CHASE, signed a certification that was filed with the SEC. The certification certified compliance with servicing criteria set forth in 17 C.F.R, § 1122(d), including subparts (d)(4)(i) and (ii) with respect to the Citigroup Mortgage Loan Trust 2006-HE2, an MBS Trust.

326. This certification falsely asserted that the requirements of 17 C.F.R. § 1122(d)(4)(i) and (ii) were not satisfied because the trust was missing mortgage notes and/or related documents.

327. On February 25, 2008, CHASE's Lowman signed the "Management's Report on Assessment of Compliance with Applicable Servicing Criteria" for the BNC Mortgage Loan Trust 2007-3, an MBS Trust. In this assessment, CHASE asserted that it

"has complied, in all material respects, with the Applicable Servicing Criteria" including Section 1122 (d)(4)(ii). For servicing the BNC Mortgage Loan Trust 2007-3, an MBS Trust.

328. This certification was false because the trust was missing mortgage notes, mortgage assignments, and/or related documents.

329. COUNTRYWIDE FINANCIAL CORPORATION, which was succeeded by Defendant BA, acted as servicer for the Bear Stearns Alt-A II 2007-1 trust, an MBS Trust. In the Assessment of Compliance with Applicable Servicing Criteria signed on February 28, 2008 by Steve Bailey, Senior Managing Director and Chief Executive Officer, Loan Administration, and others, COUNTRYWIDE, on behalf of itself and its subsidiaries, certified that it "complied in all material respects with the Applicable Servicing Criteria," including 1122(d)(4)(ii).

330. This certification was false because the trust was missing mortgage notes, mortgage assignments, and/or related documents.

331. Also on February 28, 2008, COUNTRYWIDE's Bailey, signed a certification filed with the SEC that certified compliance with servicing criteria set forth in 17 C.F.R, § 1122(d), including subparts (d)(4)(i) and (ii) with respect to the Morgan Stanley Home Equity Loan Trust 2007-1, and MBS Trust.

332. This certification was false, because the requirements of 17 C.F.R. § 1122(d)(4)(i) and (ii) were not satisfied for this trust because it was missing mortgage notes, mortgage assignments and/or related documents.

333. For example, on April 16, 2009, MERS purportedly assigned to Morgan Stanley Home Equity Loan Trust 2007-1 a mortgage that had been executed by Mamie R.

Washington a/k/a Mamie Ashby.  This was more than a year after COUNTRYWIDE FINANCIAL CORPORATION certified that all of the assets and pool asset documents of that Trust were safeguarded as required by the transaction agreements.  Furthermore, the assignment by MERS was signed by Donald Clark, who claimed that he was Assistant Vice President of MERS.  He was, in actuality, an Assistant Vice President of COUNTRYWIDE FINANCIAL CORPORATION.

334.    On or about March 1, 2007, H. Randall Chestnut, Senior Vice President of Defendant BA signed a certification that was filed with the SEC.  The certification certified compliance with servicing criteria set forth in 17 C.F.R, § 1122(d), including subparts (d)(4)(i) and (ii), with respect to the Banc of America Alternative Loan Trust 2006-1, an MBS Trust.

335.    This certification was false because the requirements of 17 C.F.R. § 1122(d)(4)(i) and (ii) were not satisfied: the trust was missing mortgage notes, mortgage assignments and/or related documents.

336.  On or about February 28, 2007, Barbara L. Marik, First Vice President of LASALLE BANK N.A. which was succeeded by Defendant BA, signed a certification that was filed with the SEC.  The certification certified compliance with servicing criteria set forth in 17 C.F.R, § 1122(d), including subparts (d)(4)(i) and (ii), with respect to, *inter alia*, the following MBS Trusts:

- Bear Stearns ABS Series 2006-1

- Bear Stearns Mortgage Funding Series 2006-SL1

- Bear Stearns Mortgage Funding Series 2006-SL2

- Bear Stearns Mortgage Funding Series 2006-SL3

- Bear Stearns Mortgage Funding Series 2006-SL4

- Bear Stearns Mortgage Funding Series 2006-SL5

- Bear Stearns Mortgage Funding Series 2006-SL6

- C-BASS Series 2006-CB7

- C-BASS Series 2006-CB9

- First Franklin MLT Series 2006-FF18

- GSAMP Series 2006-HE4

- GSAMP Series 2006-HE5

- Lehman XS Trust Series 2006-8

- Morgan Stanley Mtg Loan Trust Series 2006-2

- Morgan Stanley Mtg Loan Trust Series 2006-7

- Morgan Stanley Mtg Loan Trust Series 2006-11

- Morgan Stanley Mtg Loan Trust Series 2006-1AR

- Morgan Stanley Mtg Loan Trust Series 2006-3AR

- Morgan Stanley Mtg Loan Trust Series 2006-5AR

- Morgan Stanley Mtg Loan Trust Series 2006-6AR

- Morgan Stanley Mtg Loan Trust Series 2006-8AR

- Morgan Stanley Mtg Loan Trust Series 2006-9AR

- Morgan Stanley Mtg Loan Trust Series 2006-13ARX

- Morgan Stanley Mtg Loan Trust Series 2006-10SL

- Morgan Stanley Mtg Loan Trust Series 2006-14SL

- Morgan Stanley Mtg Loan Trust Series 2006-15XS

- Morgan Stanley Mtg Loan Trust Series 2006-17XS

- OWNIT Mortgage Loan Trust Series 2006-3

- OWNIT Mortgage Loan Trust Series 2006-4

- OWNIT Mortgage Loan Trust Series 2006-5

- OWNIT Mortgage Loan Trust Series 2006-7

- SACO I Trust Series 2006-3

- SACO I Trust Series 2006-4

- Thornburg Mtg Securities Trust Series 2006-1

- Thornburg Mtg Securities Trust Series 2006-2

- Thornburg Mtg Securities Trust Series 2006-3

- Thornburg Mtg Securities Trust Series 2006-4

- Thornburg Mtg Securities Trust Series 2006-5

- Thornburg Mtg Securities Trust Series 2006-6

- Washington Mutual WMALT 2006-1

- Washington Mutual WMALT 2006-2

- Washington Mutual WMALT 2006-3

- Washington Mutual WMALT 2006-4

- Washington Mutual WMALT 2006-5

- Washington Mutual WMALT 2006-6

- Washington Mutual WMALT 2006-7

- Washington Mutual WMALT 2006-8

- Washington Mutual WMALT 2006-9

- Washington Mutual WMALT 2006-AR1

- Washington Mutual WMALT 2006-AR2

- Washington Mutual WMALT 2006-AR3

- Washington Mutual WMALT 2006-AR4

- Washington Mutual WMALT 2006-AR5

- Washington Mutual WMALT 2006-AR6

- Washington Mutual WMALT 2006-AR7

- Washington Mutual WMALT 2006-AR8

- Washington Mutual WMALT 2006-AR10.

337.    This certification was false with respect to each of the foregoing MBS Trusts because the requirements of 17 C.F.R. § 1122(d)(4)(i) and (ii) were not satisfied: each of these MBS Trusts was missing mortgage notes, mortgage assignments and/or related documents.

338. On or about March 1, 2007, Shari L. Gillund, Senior Vice President of WELLS FARGO, signed a certification that was filed with the SEC.  The certification certified compliance with servicing criteria set forth in 17 C.F.R, § 1122(d)(4)(i) and (ii) with respect to the RALI Series 2006-QA1 Trust.

339. This certification was false because the requirements of 17 C.F.R. § 1122(d)(4)(i) and (ii) were not satisfied: the Trust was missing mortgage notes and/or related documents.

340. On or about March 1, 2007, WELLS FARGO's Gillund signed a certification that was filed with the SEC.  The certification certified compliance with servicing criteria set forth in 17 C.F.R, § 1122(d) with respect to the Carrington Mortgage Loan Trust, Series 2005-FRE1.

341. This certification was false, because the requirements of 17 C.F.R. § 1122(d)(4)(i) and (ii) were not satisfied because the Trust was missing mortgage notes, mortgage assignments and/or related documents.  For example, on April 21, 2009, MERS purportedly assigned to Carrington Mortgage Loan Trust, Series 2005-FRE1 a mortgage that had been executed by Latdavanh Bozan.  This was more than two years after WELLS FARGO had certified that all of the assets and pool asset documents of that trust were safeguarded as required by the transaction agreements.  Furthermore, the

assignment by MERS was signed by Tom Croft, who was Vice President of Defendant CARRINGTON.

342. On or about March 3, 2008, Elizabeth Folk, Senior Vice President and Chief Financial Officer of Defendant LITTON, signed a certification that was filed with the SEC. The certification certified compliance with servicing criteria set forth in 17 C.F.R, § 1122(d), including subpart (d)(4) (ii), with respect to the C-BASS Mortgage Loan Trust Series 2007-CB4, an MBS Trust.

343. This certification was false because the Trust was missing mortgage notes, mortgage assignments and/or related documents.

344. On March 3, 2008, LITTON's Folk signed a Report on Assessment of Compliance with Regulation AB Servicing Criteria for the C-Bass Mortgage Loan Asset Backed Certificates 2007-CB4, an MBS Trust, which stated that LITTON had "in all material respects" complied with the applicable servicing criteria, including Section 1122 (d)(4)(ii).

345. This certification was false because the Trust was missing mortgage notes, mortgage assignments and/or related documents.

346. On or about March 5, 2008, Samir Pandiri and Patrick J. Tadie signed a certification on behalf of Defendant BONY that was filed with the SEC certifying compliance with servicing criteria set forth in 17 C.F.R, § 1122(d), including subparts (d)(4)(i) and (ii), with respect to the C-BASS Mortgage Loan Trust Series 2007-CB4, an MBS Trust.

347.   This certification was false because the requirements of 17 C.F.R. § 1122(d)(4)(i) and (ii) were not satisfied: the trust was missing mortgage notes, mortgage assignments and/or related documents.

348.   On March 1, 2007, Robert L. Griffin and Patrick J. Tadie signed as officers of BONY a "platform-level assessment of compliance with the servicing criteria specified in Item 1122(d) of Regulation AB on behalf of [BONY], stating that [it] was in material compliance with the applicable servicing criteria," including Section (d)(4)(ii) for the Harborview Mortgage Loan Trust 2006-9, an MBS Trust, as to which it acted as the custodian.

349.   This certification was false because the trust was missing mortgage notes, mortgage assignments and/or related documents.

350.   Defendant WELLS/ASC served as a servicer for the Morgan Stanley IXIS Real Estate Capital Trust 2006-1, an MBS Trust.  For this trust, Executive Vice President Mary C. Coffin, signed the 2006 Certification Regarding Compliance with Applicable Servicing Criteria on behalf of WELLS/ASC.  This certification, dated March 1, 2007, stated that WELLS/ASC "complied, in all material respects, with the applicable servicing criteria as of and for the year ended December 31, 2006."  One of the applicable servicing criteria was 17 C.F.R. 229.1122 (d)(4)(ii), in which WELLS/ASC agreed that "Mortgage Loan and related documents are safeguarded as required by the transaction agreements."

351.   This certification was false because the Trust was missing mortgage notes, mortgage assignments and/or related documents.

352.   On or about February 24, 2007, Matthew L. Hollingsworth, Chief Executive Officer of Defendant SELECT PORTFOLIO, signed a certification filed with the SEC

96

that SELECT PORTFOLIO had acted as Servicer with respect to, *inter alia*, the following trusts and that there had been no default under the pooling and servicing agreements for such trusts:

- ACE Securities Corp. Home Equity Loan Trust, Series 2006-SD1

- ACE Securities Corp. Home Equity Loan Trust, Series 2006-SD2

- ACE Securities Corp. Home Equity Loan Trust, Series 2006-SD3

- CSFB Mortgage-Backed Pass-Through Certificates, Series 2006-3

- CSMC Mortgage-Backed Pass-Through Certificates, Series 2006-1

- CSMC Mortgage-Backed Pass-Through Certificates, Series 2006-2

- CSMC Mortgage-Backed Pass-Through Certificates, Series 2006-3

- CSMC Mortgage-Backed Pass-Through Certificates, Series 2006-4

- CSMC Mortgage-Backed Pass-Through Certificates, Series 2006-5

- CSMC Mortgage-Backed Pass-Through Certificates, Series 2006-6

- CSMC Mortgage-Backed Pass-Through Certificates, Series 2006-7

- CSMC Mortgage-Backed Pass-Through Certificates, Series 2006-8

- CSMC Mortgage-Backed Pass-Through Certificates, Series 2006-9

- Deutsche Alt-A Securities Inc. Mortgage Loan Trust, Series 2006-AF1

- GSAMP Trust 2006-HE3

- GSAMP Trust 2006-HE4

- GSAMP Trust 2006-HE5

- Nomura Home Equity Loan, Inc., Asset-Backed Certificates, Series 2005-HE1

- Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2006-3 - Subservicing Agreement.

353. This certification was false because these Trusts were missing mortgage notes, mortgage assignments and/or related documents.

354. On or about March 14, 2008, David Dill, Chief Executive Officer and President of Defendant SAXON, signed a certification that was filed with the SEC. The certification certified compliance with servicing criteria set forth in 17 C.F.R. § 1122(d), including subparts (d)(4)(i) and (ii) with respect to, *inter alia*, the following MBS Trusts:

- ACE Securities Corp. Home Equity Loan Trust, Series 2006-ASAP1

- ACE Securities Corp. Home Equity Loan Trust, Series 2006-NC1

- GSAA Home Equity Trust 2006-2

- IXIS Real Estate Capital Trust 2007-HE1

- Merrill Lynch Mortgage Investors Trust, 2006-RM3

- Morgan Stanley ABS Capital I Inc. Trust 2006-HE4

- Morgan Stanley ABS Capital I Inc. Trust 2006-HE5

- Morgan Stanley ABS Capital I Inc. Trust 2006-HE6

- Morgan Stanley ABS Capital I Inc. Trust 2006-HE8

- Morgan Stanley ABS Capital I Inc. Trust 2007-HE1

- Morgan Stanley ABS Capital I Inc. Trust 2007-HE2

- Morgan Stanley ABS Capital I Inc. Trust 2007-HE3

- Morgan Stanley ABS Capital I Inc. Trust 2007-HE4

- Morgan Stanley ABS Capital I Inc. Trust 2007-HE5

- Morgan Stanley ABS Capital I Inc. Trust 2007-HE6

- Morgan Stanley ABS Capital I Inc. Trust 2007-HE7

- Morgan Stanley ABS Capital I Inc. Trust 2007-NC1

- Morgan Stanley ABS Capital I Inc. Trust 2007-NC2

- Morgan Stanley ABS Capital I Inc. Trust 2007-NC3

- Morgan Stanley ABS Capital I Inc. Trust 2007-NC4

- Morgan Stanley ABS Capital I Inc. Trust 2007-SEA1

- Morgan Stanley Home Equity Loan Trust 2007-2
- Morgan Stanley IXIS Real Estate Capital Trust 2006-1
- Morgan Stanley IXIS Real Estate Capital Trust 2006-2
- Morgan Stanley Mortgage Loan Trust 2006-11
- Morgan Stanley Mortgage Loan Trust 2006-6AR
- Morgan Stanley Mortgage Loan Trust 2006-16AX
- Morgan Stanley Mortgage Loan Trust 2006-15XS
- Morgan Stanley Mortgage Loan Trust 2007-12
- Morgan Stanley Mortgage Loan Trust 2007-15AR
- Morgan Stanley Structured Trust I 2007-1
- NATIXIS Real Estate Capital Trust 2007-HE2
- NovaStar Mortgage Funding Trust, Series 2006-1
- NovaStar Mortgage Funding Trust, Series 2006-2
- NovaStar Mortgage Funding Trust, Series 2006-3
- NovaStar Mortgage Funding Trust, Series 2006-4
- NovaStar Mortgage Funding Trust, Series 2006-5
- NovaStar Mortgage Funding Trust, Series 2006-6
- NovaStar Mortgage Funding Trust, Series 2006-MTA1
- NovaStar Mortgage Funding Trust, Series 2007-1
- NovaStar Mortgage Funding Trust, Series 2007-2
- Saxon Asset Securities Trust 2006-1
- Saxon Asset Securities Trust 2006-2
- Saxon Asset Securities Trust 2006-3
- Saxon Asset Securities Trust 2007-1
- Saxon Asset Securities Trust 2007-2

- Saxon Asset Securities Trust 2007-3

- Saxon Asset Securities Trust 2007-4

- Soundview Home Loan Trust 2006-EQ1.

355. This certification was false because the requirements of 17 C.F.R. § 1122(d)(4)(i) and (ii) were not satisfied for these Trusts because each of the foregoing Trusts was missing mortgage notes, mortgage assignments and/or other related documents.

356. For example, on November 16, 2009, MERS purportedly assigned to the Morgan Stanley ABS Capital I Inc. Trust 2007-HE5 a mortgage that had been executed by Carl J. Earley and Debra J. Earley. This was more than two years after Dill, SAXON's CEO and President, certified that all of the assets and pool asset documents of that Trust were safeguarded as required by the transaction agreements.

357. A March 15, 2007 certification signed by Dill for Defendant SAXON with respect to the Merrill Lynch First Franklin Mortgage Loan Trust/Series 2007-1 disclosed that "in regard to Items 1122(d)(4) and 1122(d)(1)(ii),[11] based on a review of a sample of 45 loans, it was determined that 36 lien releases were not sent to consumers or to the recording jurisdiction, as appropriate." However, SAXON failed to inform the investors that, in violation of the SEC regulation 17 C.F.R. § 229.1122, the collateral was not maintained as required by the applicable agreements and that the relevant documentation was missing.

358. SAXON also served as servicer for the Soundview Home Loan Trust 2006-EQ1, an MBS Trust. In its Certification Regarding Compliance with Applicable Servicing Criteria for that trust, dated March 15, 2007 and signed by Dill, SAXON stated

that it "has complied, in all material respects, with the applicable servicing criteria as of and for the period ended December 31, 2006." One of the servicing criteria that SAXON agreed was applicable was Section 1122 (d)(4)(ii).

359. This certification was false because the Trust was missing mortgage notes, mortgage assignments and/or related documents.

360. On or about February 29, 2008, Gary R. Vaughn, Managing Director of Defendant DBNTC, Kevin C. Weeks, Managing Director of DBNTC, and others signed a certification that was filed with the SEC with respect to the Accredited Mortgage Loan Trust 2007-1, an MBS Trust.

361. This certification falsely asserted that the requirements of 17 C.F.R. § 1122(d)(4)(i) and (ii) were satisfied as the trust was missing mortgage notes and/or related documents.

362. DBNTC acted as custodian for the WaMu Asset-Backed Certificates, WaMu Series 2007-HE3, an MBS Trust. DBNTC certified that it had "complied, in all material respects, with the Applicable Servicing Criteria," including 1122(d)(4)(ii), in the Management's Assertion of Compliance for calendar year 2007 signed by Gary R. Vaughan, DBNTC's Managing Director and others.

363. This certification was false as the trust was missing mortgage notes and/or related documents.

364. Defendant DBTCA acted as the custodian for the Morgan Stanley ABS Capital 1 Inc. Trust 2007-HE2, an MBS Trust. On February 29, 2008, Kevin C. Weeks, DBTCA Managing Director, and Jenna Kaufman, DBTCA Director, signed a "Management's Assertion of Compliance" on behalf of DBTCA certifying that it had

---

[11] This item requires policies and procedures to be instituted if material servicing activities are outsourced.

accepted responsibility for compliance with servicing criteria 1122(d)(4)(ii) and that based on its assessment of its vendors, that it had "complied, in all material respects," with all applicable criteria, including 1122(d)(4)(ii).

365.    This certification was false as mortgage assignments and/or related documents were missing from the trust files in DBTCA's possession.

366.    On or about February 29, 2008, Michael T. Stilb, Senior Vice President of Defendant HSBC signed a certification that was filed with the SEC.  The certification certified compliance with servicing criteria set forth in 17 C.F.R, § 1122(d), including subparts (d)(4)(i) and (ii) with respect to the HSI Asset Loan Obligation Trust 2007-1, an MBS Trust. Defendant AMERICAN HOME MORTGAGE SERVICING, INC. acted as a servicer, for example, for Mastr Adjustable Rate Mortgages Trust 2007-1.  As a servicer, AMERICAN HOME MORTGAGE SERVICING, INC. completed a Management Assertion of Compliance, dated March 10, 2008 and signed by David M. Friedman, Executive Vice President and Director of Servicing, which stated that AMERICAN HOME MORTGAGE SERVICING, INC. had complied with most of the criteria set forth in paragraph (d) of Item 1122 of Regulation AB, including 1122(d)(4)(ii), but excluding 1122(d)(2)(i) and 1122(d)(4)(iii).

367.    This certification falsely asserted that the requirements of 17 C.F.R. § 1122(d)(4)(i) and (ii) were satisfied because the Trust was missing mortgage notes and/or related documents.

368.    Defendant BARCLAY'S acted as servicer for the Morgan Stanley ABS Capital 1 Inc. Trust 2005-HE1, an MBS Trust.  On March 15, 2006, Arthur Q. Lyon, BARCAY'S President, certified that HOMEQ "has complied with the Pooling and

Servicing Agreement in all material respects, and to the best of [his] knowledge, based on such review, [HOMEQ] has materially fulfilled all of its obligations under the Pooling and Servicing Agreement throughout [the 2005 calendar year]" in its annual certification filed with the SEC with the 10-K for the Morgan Stanley ABS Capital 1 Inc. Trust 2005-HE1.

369. False certifications such as the foregoing were filed by the trustees, custodians, and servicers of all of the MBS Trusts.

370. The trustees of the MBS Trusts also filed monthly distribution reports that included details on the foreclosures, among other information. The reports omit to state that notes and mortgage assignments were missing and fail to disclose the fraudulent activities conducted by the Defendants to pursue foreclosures.

371. Defendants knowingly issued these false statements and omissions to the investors. The Defendants knew, or should have known, that among the investors were the Government Plaintiffs. The Government Plaintiffs had routinely purchased MBS securities and their future purchases of securities of MBS Trusts including false or fraudulent representations and omission was foreseeable. The Defendants' false statements violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) and state and municipal False Claims Acts cited herein.

### B.    Defendants Submitted False Claims To Investors For Services That Were Not Provided Or Were Provided Fraudulently

372. The monthly statements prepared and sometimes filed by Defendants did set forth some of the fees and expenses that the Defendants collected from the MBS Trusts, and, therefore, from the Government Plaintiffs, for the services they were either not providing, such as reviewing all the documents that were supposed to be delivered to the

MBS Trust, or were provided fraudulently by way of forging documents or using forged documents in foreclosures.

373. Trustees are allotted compensation or fees under the MBS Trust PSAs, usually a percentage of each mortgage payment and/or some or all of the float income earned by the deposited mortgage payments prior to being distributed to the investors, including the Government Plaintiffs. For example, the Soundview Trust PSA provides, "On each Distribution Date, prior to making any distributions to Certificateholders, the Trustee [Defendant DBNTC] shall withdraw from the Distribution Account and pay to itself the Trustee Compensation payable on such Distribution Date consisting of all income earned on amounts on deposit in the Distribution Account." The withdrawal of these fees diminishes the amount of money available to distribute to the certificateholders, including the Government Plaintiffs.

374. Custodians are also paid fees, usually as set forth in the Custodial Agreement for the MBS Trust, but sometimes also set forth in the MBS Trust's prospectus or PSA. For example, LASALLE BANK, succeeded by Defendant BA, acted as custodian for the Morgan Stanley ABS Capital 1 Inc. Trust 2007-HE6, an MBS Trust. According to the PSA for that trust, LASALLE BANK received a fee for its services as custodian, charged to the trust, but funneled through the Master Servicer.

375. The custodian's fees are deducted from the MBS Trust's account prior to distribution of the funds to the certificateholders, including the Government Plaintiffs. The payment of these fees diminishes the amount of money available to distribute to the certificateholders, including the Government Plaintiffs.

376.    For example, the December 19, 2006, Form 10-D distribution report filed with the SEC for the Harborview Home Equity Loan Trust Series 2006-9, an MBS Trust, discloses that $1436.94 was withdrawn from the trust's deposited funds, which included funds due and owing to the Government Plaintiffs, for "Custodian Fees" in the prior month.

377. The trustees and custodians were paid these fees for, among other things, reviewing all of the mortgage files and certifying that they are complete.  Obtaining these fees from the MBS Trusts when the trustee or custodian failed to perform its function of reviewing all of the mortgage files transferred to the MBS Trust and falsely certified receipt of all of the required documents constitutes a false claim for payment from the Government Plaintiffs in violation of 31 U.S.C. § 3129(a)(1)(A), (D), and (G) and similar provisions of the state and municipal False Claims Acts cited herein.

378. The servicers were also paid fees, usually a percentage of the payment for each mortgage loan, by the MBS Trust and, therefore, by the Government Plaintiffs, for providing the services required by the PSA.  These fees are far from insubstantial.

379.    Thus, for example, the December 19, 2006, Form 10-D distribution report filed for the Harborview Home Equity Loan Trust Series 2006-9, an MBS Trust, discloses that its servicer, Defendant BAC's former incarnation, COUNTRYWIDE HOME LOANS SERVICING LP was owed a total of $898,086.33 in servicing fees, which included funds that otherwise would have been due and owing to the Government Plaintiffs.

380.    COUNTRYWIDE FINANCIAL CORPORATION, which was succeeded by Defendant BA, received a portion of the $334,619.13 servicing fee paid to the seven

servicers for the Bear Stearns Alt-A II 2007-1 trust according to the 10-D filed on December 26, 2007 with the SEC.

381.    Defendant SAXON was the servicer for the Soundview Home Loan Trust 2006−EQ1, an MBS Trust, which reported total servicing fees of $704,430.73 as of December 26, 2006.

382.    In a Form 10-D filed with the SEC on January 7, 2008, signed by Elizabeth Folk, Senior Vice President and CFO, Defendant LITTON listed that it received $58,760.32 in servicing fees. This followed the 10-D filed on May 27, 2007, in which LITTON listed that it had received $62,232.26 in servicing fees.

383.    Defendant HSBC acted as servicer, for example, for Bear Stearns Alt A Mortgage Pass-Through Certificates Series 2006-2. For the trusts it serviced, it received a portion of the $406,302.99 monthly servicing fee listed in the 10-D filed for this trust on December 26, 2006.

384.    Similarly, Defendant AHMS received a portion of the $658,095.45 monthly servicing fees paid to the servicers for the Mastr Adjustable Rate Mortgages Trust 2007-1, as disclosed in the 10-D filed on December 26, 2007 with the SEC.

385.    Defendant CHASE received part of the $214,035.70 monthly servicing fee assessed on the interest accumulated by the BNC Mortgage Loan Trust 2007-3, an MBS Trust, as listed in a Form 10-D filed with the SEC on December 26, 2007.

386.    Servicers, as well as trustees and custodians, that participated in creating and using false mortgage documents in connection with the foreclosures they pursued and then submitted claims to the trust for the payment of fees, filed false claims for payment

from the Government Plaintiffs in violation of 31 U.S.C. § 3129(a)(1)(A), (D), and (G) and similar provisions of the state and municipal False Claims Acts cited herein.

387. In addition, as set forth in the PSA, the Defendant trustee, custodian, and servicer expenses were also deducted from the trust's funds, which included funds due and owing to the Government Plaintiffs. The fees and expenses collected by the Defendant trustees, custodians, and servicers include false claims, in violation of 31 U.S.C. § 3729(a)(1)(A), (D) and (G) and the state and municipal False Claims Acts cited herein because the Government Plaintiffs paid for services that they did not receive or that were performed fraudulently.

388. In addition, the submission of invoices and bills by the Defendant foreclosure managers/document preparers on behalf of themselves and the law firms they hired to handle the foreclosures were false claims because these Defendants knew, or should have known, that the Government Plaintiffs were owners of MBS Trusts and, therefore, would be paying those invoices and bills.

## VII. THE U.S. GOVERNMENT PURCHASED MORTGAGE-BACKED SECURITIES MADE UP OF MORTGAGES WITH MISSING OR FORGED ASSIGNMENTS FROM ORIGINATING BANKS TO THE SECURITIES TRUSTS SUFFERING SUBSTANTIAL FINANCIAL HARM

389. The U.S. government has purchased securities in MBS Trusts with missing or forged assignments through several avenues. These include: (1) Federal Reserve funding to purchase MBS through two limited liability companies, titled "Maiden Lane" and "Maiden Lane II"; (2) Treasury and other agency funding to purchase MBS through public-private partnership investment funds; and (3) Federal Reserve direct purchases of MBS.

A.    **MBS Purchases by Federal Reserve Funding of Maiden Lane Transactions**

390. In 2008, to respond to the financial crisis, the Federal Reserve Board authorized the Federal Reserve Bank of New York ("New York Fed") to facilitate the formation of three limited liability companies.  Two of these companies purchased securities in MBS Trusts. (The third company formed does not hold MBS).

391. The first of these companies, Maiden Lane LLC ("ML"), was formed to facilitate the merger of the Bear Stearns Companies, Inc., and Defendant CHASE.  The New York Fed extended credit to ML to acquire certain assets of Bear Stearns.

392. The U.S. government provided the funds to ML to purchase the MBS; according to statement of the New York Fed:

> ML LLC was formed in the second quarter of 2008.  ML LLC borrowed approximately $28.8 billion from the New York Fed in the form of a senior loan (Senior Loan), which, together with funding from [CHASE] of approximately $1.15 billion in the form of a subordinate loan . . .  was used to purchase the Asset Portfolio from Bear Stearns.  The Asset Portfolio had an estimated fair value as of March 14, 2008, of approximately $30 billion.  The New York Fed has all material control rights over the Asset Portfolio and is the sole and managing member of ML LLC.

New York Fed Web site (*available at* http://www.newyorkfed.org/markets/ maidenlane.html).

393. As of December 31, 2011, ML had purchased and held $11.7 billion in securities from 97 of the MBS Trusts that Relator found had missing or forged assignments.  According to the published lists of ML it held or holds numerous securities of MBS Trusts, as set forth in Table 2, below.

Table 2.  Maiden Lane LLC Holdings, as of March 31, 2010 and December 31, 2011, which included forged assignments

| # | Maiden Lane LLC Holding | Government Funding |
|---|---|---|
| | Bear Stearns ALT-A II, 2007-1 | |

| 1 | [a/k/a Structured Asset Mort. Investments II, Inc., Bear Stearns ALT-A Trust II, Series 2007-1] | $1,148,679,970 |
| 2 | Harborview MTG LN TR 2006-9 [a/k/a HarborView Mort. Loan Trust, Series 2006-9] | $17,289,000 |
| 3 | Morgan Stanley ABS 2007-HE2 [a/k/a Morgan Stanley ABS Capital 1, Inc., MSAC 2007-HE2] | $738,000 |
| 4 | SOUNDVIEW HM LN 2007-OPT2 [a/k/a Soundview Home Loan Trust 2007-OPT2] | $6,650,000 |
| 5 | STRUCTURED ASSET MTG 2007-AR2 [a/k/a Structured Asset Mort. Investments II Trust 2007-AR2] | $58,506,154 |
| 6 | STRUCTURED ASSET MTG 2007-AR5 [a/k/a Structured Asset Mort. Investments II Trust 2007-AR5] | $8,735,000 |
| 7 | STRUCTURED ASSET MTG 2007-AR6 [a/k/a Structured Asset Mort. Investments II Trust 2007-AR6] | $819,668,268 |
| 8 | AMSI 2005-R3 M8, M9 [a/k/a Ameriquest Mort. Securities Trust 2005-R3] | $800,000 |
| 9 | AMSI 2005-R7 M8 [a/k/a Ameriquest Mort. Securities Trust 2005-R7] | $10,000,000 |
| 10 | CARR 2006-OPT1 M9 [a/k/a Carrington Mort. Loan Trust, Series 2006-OPT1] | $2,000,000 |
| 11 | MSAC 2005-HE1 B3 [a/k/a Morgan Stanley ABS Capital 1, Inc., Series 2005 HE1] | $2,093,798 |
| 12 | SVHE 2006-EQ1 M5 [a/k/a Soundview Home Loan Trust, Series 2006-EQ1] | $ 5,660,323 |
| 13 | ACE SECS HEQ 2006-FM1 [a/k/a ACE Securities Corp. Home Equity Loan Trust 2006-FM1] | $51,951,285 |
| 14 | ACE SECS HEQ 2006-HE4 [a/k/a ACE Securities Corp. Home Equity Loan Trust 2006-HE4] | $9,235,380 |
| 15 | AEGIS ABS 2005-5 [a/k/a AEGIS Asset-Backed Securities Trust 2005-5] | $5,000,000 |
| 16 | AMERIQUEST MTG SECS 2004-R1 [a/k/a Ameriquest "R" Series Trust 2004-R1] | $25,298 |
| 17 | AMERIQUEST MTG SECS 2004-R2 [a/k/a Ameriquest "R" Series Trust 2004-R2] | $211,686 |
| 18 | AMERIQUEST MTG SECS 2004-R4 | $4,197,863 |

| | | |
|---|---|---|
| | [a/k/a Ameriquest "R" Series Trust 2004-R4] | |
| 19 | AMERIQUEST MTG SECS 2005-R3 [a/k/a Ameriquest "R" Series Trust 2005-R3] | $4,000,000 |
| 20 | AMERIQUEST MTG SECS 2005-R7 [a/k/a Ameriquest "R" Series Trust 2005-R7] | $2,127,059 |
| 21 | ARGENT SECS INC 2005-W1 [a/k/a Argent Securities "W" Series Trust 2005-W1] | $25,533,153 |
| 22 | BEAR STEARNS ABS TR 2006-1 [a/k/a Bear Stearns Asset-Backed Securities Trust 2006-1] | $259,414,594 |
| 23 | BEAR STEARNS ABS TR 2006-2 [a/k/a Bear Stearns Asset-Backed Securities Trust 2006-2] | $6,401,000 |
| 24 | BEAR STEARNS ABS TR 2006-3 [a/k/a Bear Stearns Asset-Backed Securities Trust 2006-3] | $18,968,000 |
| 25 | BEAR STEARNS ABS TR 2006-AC1 [a/k/a Bear Stearns Asset-Backed Securities Trust 2006-AC1] | $132,384,114 |
| 26 | BEAR STEARNS ABS TR 2006-HE10 [a/k/a Bear Stearns Asset-Backed Securities Trust 2006-HE10] | $31,552,000 |
| 27 | BEAR STEANS ABS TR 2006-SD1 [a/k/a Bear Stearns Asset-Backed Securities Trust 2006-SD1] | $15,380,000 |
| 28 | BEAR STEARNS ABS TR 2007-AQ2 [a/k/a Bear Stearns Asset-Backed Securities Trust 2007-AQ2] | $25,079,000 |
| 29 | BEAR STEARNS ABS TR 2007-HE1 [a/k/a Bear Stearns Asset-Backed Securities Trust2007-HE1] | $4,460,049 |
| 30 | BEAR STEARNS ABS TR 2007-HE2 [a/k/a Bear Stearns Asset-Backed Securities Trust 2007-HE2] | $21,653,266 |
| 31 | BEAR STEARNS ABS TR 2007-HE6 [a/k/a Bear Stearns Asset-Backed Securities Trust 2007-HE6] | $55,860,151 |
| 32 | BEAR STEARNS ABS TR 2007-HE7 [a/k/a Bear Stearns Asset-Backed Securities Trust 2007-HE7] | $12,291,000 |
| 33 | BEAR STEARNS ARM TR 2005-3 [a/k/a Bear Stearns Asset-Backed Securities Trust ARM 2005-3] | $118,278 |
| 34 | CWABS INC 2005-16 [a/k/a CWABS Asset-Backed Certificates Trust | $8,000,000 |

| | | |
|---|---|---:|
| | 2005-16] | |
| 33 | CWABS INC 2005-17<br>[a/k/a CWABS Asset-Backed Certificates Trust 2005-17] | $146,000 |
| 34 | CWABS INC 2005-IM2<br>[a/k/a CWABS Asset-Backed Certificates Trust 2005-IM2] | $7,742,000 |
| 35 | CWABS INC 2006-14<br>[a/k/a CWABS Asset-Backed Certificates Trust 2006-14] | $3,000,000 |
| 36 | CWABS INC 2006-2<br>[a/k/a CWABS Asset-Backed Securities Trust 2006-2] | $5,000,000 |
| 37 | CWABS INC 2006-3<br>[a/k/a CWABS Asset-Backed Securities Trust 2006-3] | $3,000,000 |
| 38 | CWABS INC 2007-5<br>[a/k/a CWABS Asset-Backed Securities Trust 2007-5] | $209,942 |
| 39 | CWMBS CHL MTG TR 2006-21<br>[a/k/a CWMBS "CHL" trust 2006-21] | $2,103,143 |
| 40 | CWMBS CHL MTG TR 2007-6<br>[a/k/a CWMBS "CHL" trust 2007-6] | $1,745,030 |
| 41 | CWMBS INC 2004-12<br>[a/k/a CWMBS Asset-Backed Certificates Trust 2004-12] | $26,287,743 |
| 42 | CWMBS INC 2004-25<br>[a/k/a CWMBS trust 2005-25] | $49,311,667 |
| 43 | CWMBS INC 2004-HYB8<br>[a/k/a CWMBS "HYB" Trust 2004-HYB8] | $4,153,094 |
| 44 | CWMBS INC 2005-2<br>[a/k/a CWMBS trust 2005-2] | $60,634,592 |
| 45 | FIRST FRANKLIN MTG 2006-FF11<br>[a/k/a Merril Lynch First Franklin Mortgage Loan Trust 2006-FF11] | $261,000 |
| 46 | FREMONT HM LN TR 2004-A<br>[a/k/a Freemont Home Loan Trust 2004-A] | $2,037,876 |
| 47 | FREMONT HM LN TR 2005-D<br>[a/k/a Freemont Home Loan Trust 2005-D] | $15,000,000 |
| 48 | FREMONT HM LN TR 2006-2<br>[a/k/a Freemont Home Loan Trust 2006-2] | $3,122,000 |
| 49 | FREMONT HM LN TR 2006-B<br>[a/k/a Freemont Home Loan Trust 2006-B] | $4,747,149 |
| 50 | GSAMP TRUST 2004-NC1 | $9,011,566 |
| 51 | GSAMP TRUST 2006-FM1 | $410,358 |
| 52 | HARBORVIEW MTG LN TR 2004-8 | $31,434,116 |

| | | |
|---|---|---|
| | [a/k/a Harborview Mortgage Loan Trust 2004-8] | |
| 53 | HARBORVIEW MTG LN TR 2005-12<br>[a/k/a Harborview Mortgage Loan Trust 2005-12] | $183,979,338 |
| 54 | HARBORVIEW MTG LN TR 2006-5<br>[a/k/a Harborview Mortgage Loan Trust 2006-5] | $20,887,167 |
| 55 | INDYMAC INDX 2007-AR17<br>[a/k/a IndyMac INDX Mortgage Loan Trust 2007-AR1] | $184,407,190 |
| 56 | LONG BEACH MTG LN TR 2006-6<br>[a/k/a Long Beach Mortgage Loan Trust 2006-6] | $1,673,572 |
| 57 | NOMURA ASSET ACCEPT 2005-AP1<br>[a/k/a Normura Asset Acceptance Corp. Trust 2005-AP1] | $730,145 |
| 58 | NOMURA HEQ LN TR 2007-1<br>[a/k/a Nomura Home Equity Loan Trust 2007-1] | $431,834 |
| 59 | OPTION ONE MTG LN TR 2000-5<br>[a/k/a Option One Mortgage Loan Trust 2000-5] | $3,724 |
| 60 | OPTION ONE MTG LN TR 2007-1<br>[a/k/a Option One Mortgage Loan Trust 2007-1] | $7,000,000 |
| 61 | PEOPLES CHOICE HM LN 2005-1<br>[a/k/a Peoples Choice Home Loans Securities Trust 2005-1] | $2,500,000 |
| 62 | RALI SERIES TRUST 2006-QS11<br>[a/k/a Residential Accredit Loans Inc. Trust 2006-QS11] | $324,441,584 |
| 63 | RALI SERIES TRUST 2006-QS18<br>[a/k/a Residential Accredit Loans Inc. Trust 2006-QS18] | $504,899,885 |
| 64 | RALI SERIES TRUST 2006-QS3<br>[a/k/a Residential Accredit Loans Inc. Trust 2006-QS3] | $369,598,589 |
| 65 | RALI SERIES TRUST 2006-QS5<br>[a/k/a Residential Accredit Loans Inc. Trust2006-QS5] | $265,842,587 |
| 66 | RALI SERIES TRUST 2006-QS6<br>[a/k/a Residential Accredit Loans Inc. Trust 2006-QS6] | $312,423,997 |
| 67 | RALI SERIES TRUST 2006-QS7<br>[a/k/a Residential Accredit Loans Inc. Trust 2006-QS7] | $207,675,135 |
| 68 | RALI SERIES TRUST 2007-QS2<br>[a/k/a Residential Accredit Loans Inc. Trust 2007-QS2] | $274,470,444 |
| 69 | RALI SERIES TRUST 2007-QS3<br>[a/k/a Residential Accredit Loans Inc. Trust 2007-QS3] | $457,830,659 |

| 70 | RALI SERIES TRUST 2007-QS4 [a/k/a Residential Accredit Loans Inc. Trust 2007-QS4] | $369,102,735 |
|---|---|---|
| 71 | RALI SERIES TRUST 2007-QS5 [a/k/a Residential Accredit Loans Inc. Trust 2007-QS5] | $245,974,204 |
| 72 | RALI SERIES TRUST 2007-QS6 [a/k/a Residential Accredit Loans Inc. Trust 2007-QS6] | $3,048,054 |
| 73 | RALI SERIES TRUST 2007-QS7 [a/k/a Residential Accredit Loans Inc. Trust 2007-QS7] | $445,035,169 |
| 74 | RALI SERIES TRUST 2007-QS8 [a/k/a Residential Accredit Loans Inc. Trust2007-QS8] | $379,337,239 |
| 75 | RASC SERIES TRUST 2006-EMX9 [a/k/a Residential Asset Securities Corp. Trust 2006-EMX9] | $1,700,000 |
| 76 | RASC SERIES TRUST 2006-KS6 [a/k/a Residential Asset Securities Corp. Trust 2006-KS6] | $31,498,000 |
| 77 | RENAISSANCE HEQ 2004-4 [a/k/a Renaissance Home Equity Loan Trust 2004-4] | $10,826,018 |
| 78 | RENAISSANCE HEQ 2005-4 [a/k/a Renaissance Home Equity Loan Trust 2005-4] | $3,500,000 |
| 79 | RESIDENTIAL ASSET 2006-A14CB [Residential Asset Securitization Trust 2006-A14CB] | $19,266,008 |
| 80 | RESIDENTIAL ASSET 2006-A7CB [Residential Asset Securitization Trust 2006-A7CB] | $7,586,212 |
| 81 | RFMSI SERIES TRUST 2007-S3 [a/k/a Residential Funding Mortgage Securities I Trust 2007-S3] | $3,383,827 |
| 82 | RFMSI SERIES TRUST 2007-S2 [a/k/a Residential Funding Mortgage Securities I Trust 2007-S2] | $38,734,682 |
| 83 | SOUNDVIEW HM LN 2005-OPT2 [a/k/a Soundview Home Loan Trust 2005-OPT2] | $13,114,020 |
| 84 | STRUCTURED ASSET INV 2003-BC7 [a/k/a Structured Asset Investment Loan Trust 2003-BC7] | $5,158,123 |
| 85 | STRUCTURED ASSET INV 2005-11 [a/k/a Structured Asset Investment Loan Trust | $40,785,157 |

| | | |
|---|---|---|
| | 2005-11] | |
| 86 | STRUCTURED ASSET MTG 2005-AR4 [a/k/a Structured Asset Mortgage Investments II, Inc. Trust 2005-AR4] | $1,873,844 |
| 87 | STRUCTURED ASSET MTG 2005-AR7 [a/k/a Structured Asset Mortgage Investments II, Inc. Trust 2005-AR7] | $34,607,008 |
| 88 | STRUCTURED ASSET MTG 2006-AR3 [a/k/a Structured Asset Mortgage Investments II, Inc. Trust 2006-AR3] | $133,620,519 |
| 89 | STRUCTURED ASSET MTG 2006-AR4 [a/k/a Structured Asset Mortgage Investments II, Inc. Trust 2006-AR4] | $117,252,989 |
| 90 | STRUCTURED ASSET MTG 2006-AR5 [a/k/a Structured Asset Mortgage Investments II, Inc. Trust 2006-AR5] | $188,268,660 |
| 91 | STRUCTURED ASSET MTG 2006-AR6 [a/k/a Structured Asset Mortgage Investments II, Inc. Trust 2006-AR6] | $335,271,777 |
| 92 | STRUCTURED ASSET MTG 2006-AR7 [a/k/a Structured Asset Mortgage Investments II, Inc. Trust 2006-AR7] | $908,742,439 |
| 93 | STRUCTURED ASSET MTG 2007-AR1 [a/k/a Structured Asset Mortgage Investments II, Inc. Trust 2007-AR1] | $116,870,310 |
| 94 | STRUCTURED ASSET MTG 2007-AR3 [a/k/a Structured Asset Mortgage Investments II, Inc. Trust 2007-AR3] | $355,007,056 |
| 95 | STRUCTURED ASSET MTG 2007-AR4 [a/k/a Structured Asset Mortgage Investments II, Inc. Trust 2007-AR4] | $937,674,107 |
| 96 | STRUCTURED ASSET MTG 2007-AR7 [a/k/a Structured Asset Mortgage Investments II, Inc. Trust 2007-AR7] | $813,308,666 |
| 97 | WELLS FARGO ALT LN 2005-2 [a/k/a Wells Fargo Alternative Loan Trust 2005-2] | $2,111,000 |
| | **TOTAL** | **$11,685,474,638.00** |

*Source*: Federal Reserve Bank of New York Web site, Maiden Lane Transactions, "Holdings of Maiden Lane LLC as of March 31, 2010" (*available at* http://www.newyorkfed.org/ markets/maidenlane.html).

394. According to the New York Fed, the U.S. government provided the funds to

ML II to purchase the MBS:

ML II LLC was formed in the fourth quarter of 2008. On December 12, 2008, ML II LLC purchased RMBS with an estimated fair value of approximately $20.8 billion, determined as of October 31, 2008 (Asset Portfolio). ML II LLC financed this purchase by borrowing $19.5 billion (Senior Loan) from the New York Fed. The Senior Loan proceeds, after adjustments (totaling $0.3 billion between October 31, 2008, and December 31, 2008) including principal and interest payments received by the AIG Subsidiaries on the RMBS, were used to purchase the $20.8 billion Asset Portfolio. In addition to receiving the cash purchase price on the closing date, AIG Subsidiaries received a contingent right to collect the deferred portion of the total purchase price of $1.0 billion (Fixed Deferred Purchase Price) plus a one-sixth participation in the residual portfolio cash flow, if any, each following ML II LLC's repayment of the Senior Loan and accrued interest thereon to the New York Fed. As of October 31, 2008, the Asset Portfolio had a par value of approximately $39.3 billion. The New York Fed has all material control rights over the Asset Portfolio and is the sole and managing member of ML II LLC.

New York Fed Web site, Maiden Lane II LLC transactions (*available at* http://www.newyorkfed.org/markets/maidenlane2.html).

395. As of December 31, 2011, ML II had purchased and held $4.2 billion in securities from 89 MBS Trusts that Relator found had missing or forged assignments, as set forth in Table 3.

Table 3. Maiden Lane II LLC Holdings, as of March 31, 2010 and December 31, 2011, which included forged assignments

| # | *Maiden Lane II LLC Holding* | *Government Funding* |
|---|---|---|
| 1 | ACE_06-OP1 [a/k/a Ace Securities Corp. Home Equity Loan Trust, Series 2006-OP1] | $7,000,000 |
| 2 | AMIT_05-3 [a/k/a American Home Mort. Investment Trust Series 2005-3] | $35,658,000 |
| 3 | ARMT_07-1 [a/k/a MASTR Adjustable Rate Mortgages Trust 2007-1] | $11,156,000 |
| 4 | ABFC_06-OPT2 [a/k/a ABFC 2006-OPT 2 Trust] | $12,000,000 |
| 5 | BSAA_07-3 [a/k/a Bear Stearns ALT-A Trust, Series 2007-3] | $156,304,497 |

| | | |
|---|---|---|
| 6 | CARR_06-OPT1<br>[a/k/a Carrington Mort. Loan Trust, Series 2006-OPT1] | $28,786,919 |
| 7 | BNCMT_07-3<br>[a/k/a BNC Mortgage Loan Trust 2007-3] | $30,000,000 |
| 8 | MSAC_07-HE6<br>[a/k/a Morgan Stanley ABS Capital 1, Inc., Series 2007-HE6] | $68,000,000 |
| 9 | MSIX_06-1<br>[a/k/a Morgan Stanley IXIS Real Estate Capital Trust, 2006-1] | $43,255,000 |
| 10 | OOMLT_05-4<br>[a/k/a Option One Mort. Loan Trust, Series 2005-4] | $15,151,774 |
| 11 | OOMLT_05-5<br>[a/k/a Option One Mort. Loan Trust, Series 2005-5] | $5,866,603 |
| 12 | OOMLT_06-3<br>[a/k/a Option One Mort. Loan Trust, Series 2006-3] | $23,500,000 |
| 13 | SAST_06-3<br>[a/k/a Saxon Asset Securities Trust 2006-3] | $111,000,000 |
| 14 | SAIL_04-8<br>[a/k/a Structured Asset Investment Loan Trust, 2004-8] | $10,256,786 |
| 15 | WAMU_07_HE3<br>[a/k/a WAMU ABS Series 2007-HE3 Trust] | $12,000,000 |
| 16 | ABSHE_06-HE2<br>[a/k/a Asset Backed Securities Home Equity Loan Trust 2006-HE2] | $2,695,499 |
| 17 | ACE_06-HE1<br>[a/k/a Ace Securities Corp. Home Equity Loan Trust 2006-HE1] | $47,027,432 |
| 18 | ACE_06-NC1<br>[a/k/a Ace Securities Corp. Home Equity Loan Trust 2006-NC1] | $22,537,177 |
| 19 | ACE_2006-OP1<br>[a/k/a Ace Securities Corp. Home Equity Loan Trust 2006-OP1] | $42,759,000 |
| 20 | AHM_07-1<br>[a/k/a American Home Mortgage Assets Trust 2007-1] | $208,272,627 |

| 21 | BAFC_06-G<br>[a/k/a Banc of America Funding Corporation Trust 2006-G] | $180,808,640 |
|----|------|------|
| 22 | BCAP_07-AA1<br>[a/k/a BCAP LLC Trust 2007-AA1] | $30,000,000 |
| 23 | BSABS_06-HE2<br>[a/k/a Bear Stearns Asset-Backed Securities "HE" Trust 2006-HE2] | $15,743,533 |
| 24 | BSABS_06-HE3<br>[a/k/a Bear Stearns Asset-Backed Securities "HE" Trust 2006-HE3] | $26,412,429 |
| 25 | BSABS_07-HE4<br>[a/k/a Bear Stearns Asset-Backed Securities "HE" Trust 2007-HE4] | $63,813,000 |
| 26 | BSABS_07-HE5<br>[a/k/a Bear Stearns Asset-Backed Securities "HE" Trust 2007-HE5] | $32,856,000 |
| 27 | CARR_05-FRE1<br>[a/k/a Carrington Mortgage Loan Trust , Series 2005-FRE1] | $7,192,411 |
| 28 | CARR_06-NC1<br>[a/k/a Carrington Mortgage Loan Trust, Series 2006-NC1] | $77,650,513 |
| 29 | CARR_06-NC4<br>[a/k/a Carrington Mortgage Loan Trust, Series 2006-NC4] | $108,721,000 |
| 30 | CARR_06-OPT1<br>[a/k/a Carrington Mortgage Loan Trust, Series 2006-OPT1] | $20,380,762 |
| 31 | CBASS_06-CB9<br>[a/k/a C-BASS Mortgage Loan Asset-Backed Certificates, Series 2006-CB9] | $1,019,701 |
| 32 | CMLTI_07-AMC1<br>[a/k/a Citigroup Mortgage Loan Trust 2007-AMC1] | $114,517,000 |
| 33 | CMLTI_07-AMC4<br>[a/k/a Citigroup Mortgage Loan Trust 2007-AMC4] | $36,285,000 |
| 34 | GSAA_05-11<br>[a/k/a GSAA Home Equity Trust 2005-11] | $38,247,746 |
| 35 | GSAA_05-15<br>[a/k/a GSAA Home Equity Trust 2005-15] | $114,715,000 |
| 36 | GSAA_06-1<br>[a/k/a GSAA Home Equity Trust 2006-1] | $83,406,927 |

| 37 | GSAA_06-2<br>[a/k/a GSAA Home Equity Trust 2006-2] | $6,055,130 |
| 38 | GSAMP_06-HE1<br>[a/k/a GSAMP Trust 2006-HE1] | $13,102,000 |
| 39 | GSAMP_06-HE2<br>[a/k/a GSAMP Trust 2006-HE2] | $19,094,769 |
| 40 | GSAMP_06-HE8<br>[a/k/a GSAMP Trust 2006-HE8] | $85,335,000 |
| 41 | GSAMP_07-NC1<br>[a/k/a GSAMP Trust 2007-NC1] | $216,189,000 |
| 42 | JPMAC_06-CH1<br>[a/k/a JP Morgan Mortgage Acquisition Trust 2006-CH1] | $20,000,000 |
| 43 | LBMLT_06-11<br>[a/k/a Long Beach Mortgage Loan Trust 2006-11] | $95,274,523 |
| 44 | LBMLT_06-5<br>[a/k/a Long Beach Mortgage Loan Trust 2006-5] | $69,032,984 |
| 45 | LXS_06-11<br>[a/k/a Lehman XS Trust 2006-11] | $185,497,172 |
| 46 | LXS_06-15<br>[a/k/a Lehman XS Trust 2006-15] | $40,000,000 |
| 47 | LXS_07-9<br>[a/k/a Lehman XS Trust 2007-9] | $73,436,860 |
| 48 | MSAC 2007-NC3<br>[a/k/a Morgan Stanley MSAC Trust 2007-NC3] | $52,980,000 |
| 49 | MSAC_07-HE6<br>[a/k/a Morgan Stanley MSAC Trust 2007-HE6] | $68,000,000 |
| 50 | MSAC_06-HE2<br>[a/k/a Morgan Stanley MSAC Trust 2006-HE2] | $69,881,967 |
| 51 | MSAC_06-HE3<br>[a/k/a Morgan Stanley MSAC Trust 2006-HE3] | $19,627,324 |
| 52 | MSHEL_06-2<br>[a/k/a Morgan Stanley Home Equity Loan Trust 2006-2] | $32,000,000 |
| 53 | NCHET_05-4<br>[a/k/a New Century Home Equity Loan Trust 2005-4] | $4,794,475 |
| 54 | NCHET_05-B<br>[a/k/a New Century Home Equity Loan Trust 2005-B] | $103,566,883 |
| 55 | OOMLT_05-4<br>[a/k/a Option One Mortgage Loan Trust 2005-4] | $10,183,843 |

| 56 | OOMLT_06-3 [a/k/a Option One Mortgage Loan Trust 2006-3] | $30,000,000 |
| 57 | POPLR_06-A [a/k/a Popular ABS Mortgage Trust 2006-A] | $40,088,842 |
| 58 | POPLR_06-C [a/k/a Popular ABS Mortgage Trust 2006-C] | $13,598,520 |
| 59 | QUST_06-X1 [a/k/a Quest Trust 2006-X1] | $25,468,656 |
| 60 | RAAC_06-SP3 [a/k/a RAAC Series 2006-SP3 Trust] | $14,941,147 |
| 61 | RAMP_04-RS7 [a/k/a RAMP Series 2004-RS7 Trust] | $17,420,311 |
| 62 | RAMP_05-RS8 [a/k/a RAMP Series 2005-RS8 Trust] | $21,992,139 |
| 63 | RAMP_05-RS9 [a/k/a RAMP Series 2005-RS9 Trust] | $92,486,885 |
| 64 | RAMP_06-RS1 [a/k/a RAMP Series 2006-RS1 Trust] | $25,257,546 |
| 65 | RAMP_06-RS2 [a/k/a RAMP Series 2006-RS2 Trust] | $20,626,625 |
| 66 | RAMP_06-RS4 [a/k/a RAMP Series 2006-RS4 Trust] | $ 45,357,158 |
| 67 | RAMP_06-RZ1 [a/k/a RAMP Series 2006-RZ1 Trust] | $11,676,173 |
| 68 | RASC_03-KS5 [a/k/a Residential Asset Securities Corporation Series 2003-KS5 Home Equity Mortgage Asset-Backed Pass-Through Certificates] | $2,258,967 |
| 69 | RASC_05-AHL3 [a/k/a Residential Asset Securities Corporation Series 2005-AHL3 Home Equity Mortgage Asset-Backed Pass-Through Certificates] | $8,818,670 |
| 70 | RASC_05-KS12 [a/k/a Residential Asset Securities Corporation Series 2005-KS12 Home Equity Mortgage Asset-Backed Pass-Through Certificates] | $2,188,499 |
| 71 | RASC_06-EMX3 [a/k/a Residential Asset Securities Corporation Series 2006-EMX3 Home Equity Mortgage Asset-Backed Pass-Through Certificates] | $54,284,472 |
| 72 | RASC_06-EMX5 [a/k/a Residential Asset Securities Corporation Series 2006-EMX5 Home Equity Mortgage Asset- | $43,614,120 |

| | | |
|---|---|---|
| | Backed Pass-Through Certificates] | |
| 73 | RASC_06-EMX6 [a/k/a Residential Asset Securities Corporation Series 2006-EMX6 Home Equity Mortgage Asset-Backed Pass-Through Certificates] | $40,860,000 |
| 74 | RASC_06-KS4 [a/k/a Residential Asset Securities Corporation Series 2004-KS4 Home Equity Mortgage Asset-Backed Pass-Through Certificates] | $30,297,251 |
| 75 | RASC_06-KS5 [a/k/a Residential Asset Securities Corporation Series 2006-KS5 Home Equity Mortgage Asset-Backed Pass-Through Certificates] | $55,325,843 |
| 76 | RASC_06-KS6 [a/k/a Residential Asset Securities Corporation Series 2006-KS6 Home Equity Mortgage Asset-Backed Pass-Through Certificates] | $26,965,178 |
| 77 | RASC_06-KS7 [a/k/a Residential Asset Securities Corporation Series 2006-KS7 Home Equity Mortgage Asset-Backed Pass-Through Certificates] | $23,076,986 |
| 78 | RASC_07-KS3 [a/k/a Residential Asset Securities Corporation Series 2007-KS3 Home Equity Mortgage Asset-Backed Pass-Through Certificates] | $118,000,000 |
| 79 | SACO_05-10 [a/k/a SACO I Trust 2005-10] | $11,590,852 |
| 80 | SACO_06-2 [a/k/a SACO I Trust 2006-2] | $9,508,290 |
| 81 | SAIL_04-7 [a/k/a Structured Asset Investment Loan Trust 2004-7] | $56,409,691 |
| 82 | SAIL_05-10 [a/k/a Structured Asset Investment Loan Trust 2005-10] | $14,406,768 |
| 83 | SAIL_05-11 [a/k/a Structured Asset Investment Loan Trust 2005-11] | $24,065,747 |
| 84 | SAIL_05-2 [a/k/a Structured Asset Investment Loan Trust 2005-2] | $1,013,130 |
| 85 | SAIL_05-5 [a/k/a Structured Asset Investment Loan Trust 2005-5] | $741,207 |

| 86 | SAIL_05-9<br>[a/k/a Structured Asset Investment Loan Trust 2005-9] | $182,387,986 |
| 87 | SAIL_06-1<br>[a/k/a Structured Asset Investment Loan Trust 2006-1] | $35,378,555 |
| 88 | SAIL_06-2<br>[a/k/a Structured Asset Investment Loan Trust 2006-2] | $4,139,017 |
| 89 | SAIL_06-4<br>[a/k/a Structured Asset Investment Loan Trust 2006-4] | $111,388,662 |
| | **TOTAL** | $4,244,682,799.00 |

*Sources*: Federal Reserve Bank of New York Web site, Maiden Lane Transactions, "Holdings of Maiden Lane II LLC as of March 31, 2010" and "Holdings of Maiden Lane II LLC as of December 31, 2011" (*available at* http://www.newyorkfed.org/markets/maidenlane.html).

396. In total, the ML and ML II entities purchased $15.9 billion of securities from MBS Trusts, as shown in Tables 2 and 3 above.

**B.    MBS Purchases by Treasury Financing of Public-Private Partnership Funds.**

397. In addition to the purchases above, as a part of the government's Financial Stability Plan, on March 23, 2009, the U.S. Treasury, in conjunction with the Federal Deposit Insurance Corporation and the Federal Reserve Bank, announced the creation of the Public-Private Investment Partnership ("PPIP") of 2009 to purchase non-agency RMBS and other securities,.   Under the PPIP, the Treasury provides equity and debt financing to newly-formed public-private investment funds ("PPIFs") established by fund managers with investors for the purpose of purchasing legacy securities from financial institutions.   These securities are commercial MBS and non-agency RMBS.   According to a Treasury press release:

> The PPIP is designed to encourage the transfer of certain illiquid legacy real estate-related assets off of the balance sheets of financial institutions,

restarting the market for these assets and supporting the flow of credit and other capital into the broader economy.  PPIP funds established under the legacy loan program will be established to purchase troubled loans from insured depository institutions and PPIP funds established under the legacy securities program to purchase from financial institutions legacy non-Agency RMBS and newly issued and legacy CMBS that were originally AAA rated.  PPIFs will have access to equity capital from the U.S. Treasury as well as debt financing provided or guaranteed by the U.S. government.

398.  The Treasury selected private fund managers to operate the PPIP funds that would purchase non-agency RMBS through a mix of private and government financing, as listed in Table 4, below ("PPIF Managers").

Table 4.  PPIFs holding non-agency RMBS, as of September 30, 2013

| # Fund | Inception Date |
|---|---|
| 1. AG GECC PPIF Master Fund, L.P. | 11/12/09 |
| 2. AllianceBernstein Legacy Securities Master Fund, L.P. | 10/23/09 |
| 3. Blackrock PPIF, L.P. | 10/16/09 |
| 4. Invesco Legacy Securities Master Fund, L.P. | 10/13/09 |
| 5. Marathon Legacy Securities Public-Private Investment Partnership, L.P. | 12/15/09 |
| 6. Oaktree PPIP Fund, L.P. | 02/19/10 |
| 7. RLJ Western Asset Public/Private Master Fund, L.P. | 11/23/09 |
| 8. UST/TCW Senior Mortgage Securities Fund, L.P. | 9/30/09 |
| 9. Wellington Management Legacy Securities PPIF Master Fund, LP | 10/19/09 |

*Source*: U.S. Treasury, Legacy Securities Public-Private Investment Program – Program Update (quarter ending September 30, 2013), at 7 (*available at* http://www.treasury.gov/initiatives/financial-stability/reports/Documents/External%20Report%2013%20-9%20Final.pdf ).

399. In 2009, the Treasury entered into limited partnership agreements ("PPIP Agreements") with each of the PPIF Managers listed in Table 4 to purchase a portfolio of

122

non-agency RMBS.  *See* U.S. Treasury, Public-Private Investment Program, Program Purpose & Overview (*available at* http://www.treasury.gov/initiatives/financial-stability/TARP-Programs/credit-market-programs/ppip/Pages/purpose-and-overview.aspx).

400.  Under the terms of the PPIP Agreements, the Treasury provided debt and equity financing to the PPIF Managers from the Troubled Asset Relief Fund ("TARP"), created by the Emergency Economic Stabilization Act of 2008 ("EESA"), Pub. L. No. 110-343, 122 Stat. 3765 (2008), *codified at* 12 U.S.C. § 5201 *et seq*.  Congress passed the EESA, which provided the Treasury with the authority to purchase or guarantee up to $700 billion in troubled assets held by financial institutions.  Treasury was directed to exercise this authority to promote the liquidity and stability of the financial system.

401.  "As of December 31, 2012, the PPIFs ha[d] drawn-down approximately $24.9 billion of the total original capital committed (83.2% of total original purchasing power), which [was] invested in Eligible Assets and cash equivalents, of which $18.6 billion represents Treasury's investment in the program." U.S. Treasury, Legacy Securities Public-Private Investment Program – Program Update (quarter ending December September 31, 2012), at 4 (http://www.treasury.gov/initiatives/financial-stability/reports/Documents/PPIP%20Report%20-20130130.pdf).  The vast majority of Eligible Assets purchased were RMBS.  *Id.* at 5.

402.  Upon information and belief, the purchases by the PPIF Managers include securities for the MBS Trusts listed in Exhibt A.

C. **Direct Purchases of securities in MBS Trusts by Federal Reserve and Treasury**

403. Between January 5, 2009 and March 31, 2010, the Federal Reserve purchased approximately $1.25 trillion in MBS guaranteed by Fannie Mae, Freddie Mac and Ginnie Mae in order to "to provide support to mortgage and housing markets and to foster improved conditions in financial markets more generally." MBS purchase program FAQs, N.Y. Federal Reserve Bank (*available at* http://www.newyorkfed.org/markets/mbs_faq.html); *see also* Press Release, Federal Reserve Bank, Dec. 30, 2008 (*available at* http://www.federalreserve.gov/newsevents/press/monetary/20081230b.htm).

404. Upon information and belief, among those purchases were purchases of securities of MBS Trusts.

D. **Damages to the U.S. Government**

(a) **Impaired Value of MBS**

405. Each of the Defendants named herein participates or has participated in MBS Trusts. Prior to the filing of Relator's complaint, the Defendants had not disclosed to investors, including the Treasury and other government-funded entities, that the MBS Trusts' assets were severely impaired because of the missing, forged, and fraudulent assignments.

406. In any foreclosures on assets in the MBS Trusts, the trustee bank Defendants will be unable, or will have to expend significant funds, to prove their allegations that the MBS Trust is the lawful owner of the subject mortgage, in addition to expenses due to the preparation and filing of forged assignments. The amount the trustee bank Defendants will expend to prove their ownership is materially more than they would have spent if

they had complied with the procedures described in the respective prospectus and PSA. In addition, the value of the security must be discounted to account for the risk that a court may not recognize the MBS Trust as the legal owner of the security, and thus deny foreclosure on the collateral. The cost for the trustee bank Defendants to establish the MBS Trust as the owner of each mortgage included in the MBS is, of course, passed on to the MBS Trust itself when the trustee, custodian, and servicer(s) deduct their expenses from the trust corpus. Thus, it is a financial harm to the U.S. government, as a purchaser of securities of the MBS Trust.

407. This harm is not only economic, however. The prevalence of the forged assignments and absence of the original mortgage notes resulting in lost note affidavits shook consumer confidence in investing and in government regulation. The ease with which Defendants were able to cash in on their fraudulent behavior encouraged others in similar situations to attempt similar schemes, multiplying the potential harm and loss of confidence exponentially. As one of the FBI Special Agents involved in the conviction of an LPS executive observed, "Our country is increasingly faced with more pervasive and sophisticated fraud schemes that have the potential to disrupt entire markets and the economy as a whole."[12]

**(b)    Overcharges for fraudulent services and services not provided**

408. Each of the Defendants named herein participates, or has participated, in the MBS Trusts' use of forged instruments that have been substituted for missing mortgage documents. To proceed with foreclosure actions, the Defendants created fraudulent

---

[12] DOJ Press Release, "Former Executive At Florida-Based Lender Processing Services, Inc. Admits Role In Mortgage-Related Document Fraud Scheme," Nov. 20, 2012.

mortgage documents and charged the MBS Trusts for the costs associated with the creation of these documents. Likewise, Defendants charged the MBS Trusts for services that were never provided, including the trustee and custodial services related to notes and related mortgage documents.

409. The distributions to the certificateholders, including the U.S. government, are diminished by the trustee, custodial, and servicing fees paid to the Defendants for their unlawful services or for not providing any service. The cost paid for these services is a financial harm to the U.S. government, as certificateholders of MBS Trusts.

### (c) Fannie Mae and Freddie Mac

410. Both the Federal National Mortgage Association, Inc. ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") paid the Defendants millions of dollars in U.S. government funds to provide services involving mortgage assignments. Fannie Mae and Freddie Mac are government-sponsored enterprises ("GSEs"), which are corporations with public purposes created by the U.S. government. The primary purpose of Fannie Mae and Freddie Mac is to provide funding for the U.S. mortgage market by purchasing mortgages from banks and other direct lenders, to ensure that adequate capital is available to banks and other financial institutions that lend money to home buyers. The two entities provide funding for more than $6.3 trillion of the $11 trillion U.S. mortgage market.

411. The U.S. government has invested substantial sums in MBS through financial support of its GSEs. During the financial crisis, on September 7, 2008, Fannie Mae and Freddie Mac were essentially nationalized to avoid losses and provide financial stability to the mortgage market. They were taken over by the U.S. government in a conservatorship. Since that event, Fannie Mae and Freddie Mac have received nearly

$145 billion in taxpayer support through the Treasury, divided as $83 billion to Fannie Mae and $61 billion to Freddie Mac, according to SEC filings and press releases.  At the time of the conservatorship, former Treasury Secretary Henry Paulson put a ceiling of $100 billion for investments in each company. But in February 2009, his successor, Timothy Geithner, raised the cap to $200 billion each.  In December 2009, the Treasury said it would provide unlimited financial support to ensure the survival and liquidity of Fannie Mae and Freddie Mac for three years.

412.  Fannie Mae and Freddie Mac use mortgage servicing companies, including Defendants AHMS, WELLS/ASC, SAXON and LPS, to service the loans that they acquire.

413.  As part of the services provided to Fannie Mae and Freddie Mac, AHMS, WELLS/ASC, SAXON, and other Defendants prepared and filed forged mortgage assignments and other mortgage documents throughout the United States, assigning mortgages to themselves, and bringing foreclosure actions in the names of the servicing companies.  In thousands of cases, Defendants used LPS, or attorneys hired by LPS, to prepare and file such forged documents.

414.  The documents, particularly assignments, that were prepared and filed by Defendants were fraudulent.  The Defendants failed to obtain valid assignments when the loans were purchased by Fannie Mae and Freddie Mac. The Mortgage Servicing Defendants then tried to secretly substitute "replacement" assignments.  In hundreds of thousands of cases, these replacement assignments were defective for one or more of the following reasons:

> (1)  the individual or individuals signing as officers of the grantor were actually employees of the grantee servicing company;

(2)  employees of the servicing companies often signed several thousand replacement assignments in a single week, at a pace that makes it obvious they did not review what they signed and completely disregarded the veracity of the information on such assignments, including the effective date of the transfer (stated on many such documents as 9/9/999); and

(3)  to expedite the document production, employees of the servicing companies often signed each other's names and also forged the signature of the notary on such documents.

415.  The services of the Mortgage Servicing Defendants, actually provided to Fannie Mae and Freddie Mac, which were paid for with U.S. government funds, were fraudulent and illegal.

### (d)     Federal Taxes From Trusts' Loss of Tax Status due to Assignments Made After the Date of Trust Formation

416.  The most significant reason that trusts do not acquire loans after the closing date of the trust is that such actions may have negative tax consequences for the trusts. MBS trusts are created as Real Estate Mortgage Investment Conduits, or "REMICs" (a type of special purpose vehicle used for the pooling of mortgage loans and issuance of mortgage-backed securities).  REMICS are defined under the U.S. Internal Revenue Code (Tax Reform Act of 1986).

417.  The advantage of REMICs is that income from REMICs is tax exempt from double taxation.  Because of the tax advantages, tax law limits and strictly regulates REMIC transactions.  All contributions, *i.e.*, the delivery of the mortgage loans into the trust, to the REMIC must occur on the "start up date," or at most 90 days after this date, which is also the "cut-off date" specified in the MBS trust prospectus.  All other contributions after the cut-off date are considered under the tax code as prohibited activities.  Therefore, if a mortgage loan has not been identified by the cut-off date (*i.e.*, placed in the securitization pipeline by the originating bank), any transfer of the

borrower's mortgage note and/or mortgage into the MBS trust after the cutoff date triggers a 100% penalty tax on the late contribution.

418. Each of the Defendants has assigned mortgages to their respective MBS Trusts after the cut-off date, triggering taxes owed to the U.S. government, which remain unpaid.

**VIII. THE STATES OF CALIFORNIA, DELAWARE, FLORIDA, HAWAII, ILLINOIS, INDIANA, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, AND RHODE ISLAND, THE COMMONWEALTHS OF MASSACHUSETTS AND VIRGINIA, THE DISTRICT OF COLUMBIA, THE CITY OF CHICAGO, AND THE CITY OF NEW YORK PURCHASED MORTGAGE-BACKED SECURITIES MADE UP OF MORTGAGES WITH MISSING OR FORGED ASSIGNMENTS FROM ORIGINATING BANKS TO THE SECURITIES TRUSTS SUFFERING SUBSTANTIAL FINANCIAL HARM**

419. The quarterly report on the State of California pooled money investment account for the quarter ending March 31, 2009 shows that the State of California purchased RMBS, valued at that date over $1 billion. The report for the following quarter indicated that the State of California still held the RMBS, but they were valued less than $1 billion at the time.[13]

420. The State of New Jersey also invested in RMBS, as indicated in the memorandum to the State Investment Council in May 2008.[17]

421. The State of New Mexico invested in RMBS, as indicated in the State Investment Council's minutes of 2008.[14]

---

[13]     *See*                http://www.treasurer.ca.gov/pmia-laif/reports/quarterly/200903.pdf         and *http://www.treasurer.ca.gov/pmia-laif/reports/quarterly/200906.pdf*.

[17]     *See*     *http://www.state.nj.us/treasury/doinvest/pdf/Real%20Estate%20Investment%20Presented%2005-08.pdf*.

[14] See http://www.sic.state.nm.us/PDF%20files/52708_SIC_Index_Minutes_Final.pdf.

422. The State of North Carolina purchased more than $1 billion of RMBS, according to the 2009 State Treasurer's annual report for the fiscal year 2008-2009.

423. Upon information and belief, among the RMBS purchased by California, New Jersey, New Mexico, and North Carolina were securities in the MBS Trusts.

424. Upon information and belief, the States of Delaware, Florida, Hawaii, Illinois, Indiana, Minnesota, Montana, Nevada, New York, and Rhode Island, the Commonwealths of Massachusetts and Virginia, the District of Columbia, the City of Chicago, and the City of New York also purchased securities issued by MBS Trusts with missing mortgage assignments.

425. Each of the Defendants named herein participates, or has participated, in MBS Trusts. As of the filing of Relator's complaint, the Defendants had not disclosed to investors, including the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, and Rhode Island, the Commonwealths of Massachusetts and Virginia, the District of Columbia, the City of Chicago, and the City of New York that the MBS Trust assets were severely impaired because of the forged and fraudulent assignments.

426. In any foreclosures on assets in the MBS Trusts, the trustee bank Defendants will be unable, or will have to expend significant funds, to prove their allegations that the MBS Trust is the lawful owner of the subject mortgage, in addition to expenses due to the preparation and filing of forged assignments. The amount the trustee bank Defendants will expend to prove their ownership is materially more than they would have spent if they had complied with the procedures described in the respective prospectus and PSA. In addition, the value of the security must be discounted to account for the risk that a

court may not recognize the MBS Trust as the legal owner of the security, and thus deny foreclosure on the collateral.  The cost for the trustee bank Defendants to establish the MBS Trust as the owner of each mortgage included in the MBS is, of course, passed on to the MBS Trust itself when the trustee, custodian, and servicer(s) deduct their expenses from the trust corpus.  Thus, it is a financial harm to the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, and Rhode Island, the Commonwealths of Massachusetts and Virginia, the District of Columbia, the City of Chicago, and the City of New York as certificateholders of MBS Trusts.

427.  This harm is not only economic, however.  The prevalence of the forged assignments and absence of the original mortgage notes resulting in lost note affidavits shook consumer confidence in investing and in government regulation.  The ease with which Defendants were able to cash in on their fraudulent behavior encouraged others in similar situations to attempt similar schemes, multiplying the potential harm and loss of confidence exponentially.

428.  The States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, and Rhode Island, the Commonwealths of Massachusetts and Virginia, the District of Columbia, the City of Chicago and the City of New York purchased securities of the MBS Trusts at inflated prices because the Defendants misrepresented to the purchasers, including the Government Plaintiffs, their compliance with the prospectuses and related documentation.

429. Furthermore, the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, and Rhode Island, the Commonwealths of Massachusetts and Virginia, the District of Columbia, the City of Chicago, and the City of New York suffered financial harm caused by each payment made by the MBS Trusts to the Defendants for creating false assignments or for services that were never provided, including the trustee and custodial services related to notes and mortgage assignments.

430. The distributions to the certificateholders, including the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, and Rhode Island, the Commonwealths of Massachusetts and Virginia, the District of Columbia, the City of Chicago, and the City of New York are diminished by the fees paid to the Defendants for their unlawful services or for not providing any service. The cost paid for these services is a financial harm to the States of California, Delaware, District of Columbia, Florida, Hawaii, Illinois, Indiana, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, and Rhode Island, the Commonwealths of Massachusetts and Virginia, the District of Columbia, the City of Chicago, and the City of New York as certificateholders of the MBS Trusts.

## IX.    DEFENDANTS FILED FALSE CLAIMS FOR PAYMENT OF FEDERAL MORTGAGE GUARANTEES

431. The Defendants also used the false assignments and/or related documents described above in Section VI in connection with foreclosures of properties that became the subject of applications to HUD for payments pursuant to the mortgage insurance program administered by the FHA. By submitting claims based on false documentation

to the federal government for the purpose of obtaining payment on mortgage guarantees, Defendants violated the False Claims Act, 31 U.S.C. 3729(a)(1)(A) and (B).

432. HUD's Lender Insurance Program provides insurance to approved lenders as an incentive to give FHA loans to qualifying borrowers. When an FHA-insured loan defaults, HUD will pay the mortgage holder the balance of the loan and assume ownership and possession of the property, which it then proceeds to resell. In order to make a claim, the claimant must certify the loss to HUD by submitting valid documents evidencing that the claimant holds the mortgage and has the right to recover on the note.

433. FHA is the largest mortgage insurer in the world, insuring approximately one-third of all new residential mortgages in the United States. The proportion is even greater with respect to RMBS, because RMBS sponsors usually seek to include a large proportion of subprime mortgages in RMBS. Because subprime borrowers tend to have poor credit, the interest rates on the mortgages tend to be higher than on other mortgages, and hence the potential return to investors would be expected to be higher as well. Yet, since the borrowers have poor credit, lenders often will not make subprime loans absent FHA insurance. For example, when Moody's Investors Service rated the certificates issued by Structured Asset Securities Corporation, Series 2005-RF4, an MBS Trust, it noted that about 80% of the mortgage loans in the pool were insured by the FHA.

434. The prospectuses filed for the MBS Trusts contain information about FHA-insurance and its effect on the trust. For example, the prospectus and prospectus supplement filed for the HSI Asset Securitization Corporation Trust 2007-OPT1, an MBS Trust, explains that insurance claims, and specifically "FHA Insurance," are deposited as trust proceeds. While "HUD has the option, in most cases, to pay insurance claims in

cash or in debentures …[,] [c]urrently, claims are being paid in cash, and claims have not been paid in debentures since 1965." Furthermore, the insurable loss is also significant since "these loans are insured up to an amount equal to 90% of the sum of the unpaid principal of the FHA loan."

435. The conduct described in Section VI, above, has resulted in the submission of tens of thousands of false claims by the Defendants in connection with the FHA insurance program. In fact, subsequent to the filing of the original complaints in this action in 2010, and prompted at least in part by the Relators allegations in those complaints, HUD's Inspector General conducted an investigation and issued five memoranda of review detailing its findings with respect to five banks. These memoranda provide some quantification of the number of claims potentially at issue here. With respect to the five banks that the Inspector General investigated, the OIG reports determined that between October 1, 2008, through September 30, 2010 (federal fiscal years 2009 and 2010), the number of FHA claims and the total amount of such claims were as follows:

| Bank | Number of FHA claims | Dollar amount of FHA Claims |
|---|---|---|
| Citibank | 19,189 | $2.4 billion |
| Wells Fargo | 14,420 | $1.7 billion |
| Bank of Am. | 36,095 | $5.0 billion |
| JP Morgan Chase | 16,223 | $2.0 billion |
| Ally | 6,808 | $ .9 billion |
| TOTAL | 92,735 | $12.0 billion |

436. Those memoranda detail extensive noncompliance with HUD regulations, *see* 24 C.F.R. § 203.366(a) and HUD Handbook 4330.4, ¶¶ 2-6 and 2-23, and an institutional effort by those Defendants to falsify legal documents for the purpose of

obtaining foreclosures and collecting FHA insurance. The Inspector General concluded that each Defendant's practices resulted in the misrepresentation of claims to HUD and may have exposed the Defendants to False Claims Act liability. Significantly, the Inspector General's reports reached these conclusions based upon a review of only a sampling of the Defendants' foreclosure documents. For example, with respect to Bank of America, the Inspector General reached his conclusions based upon a sampling of just 118 foreclosure loans.

437. These five banks that were the subject of the Inspector General's memoranda had been named in Relator's complaint long before the Inspector General issued the memoranda and are the banks that paid $95 million in settlement of Relator's claims relating to the insurance claims submitted to HUD. The Inspector General's memoranda validate the claims that Relator had previously asserted relating to the HUD insurance claims.

438. In addition to basing claims for insurance payments on false documentation, Defendants have also improperly charged HUD for the costs of filing the improper mortgage assignments.

439. For example, FHA Case No. 093-6036744 involves a September 13, 2006, mortgage on a property purchased by Niurka de la Rosa. Defendant U.S. BANK brought a foreclosure action in Florida state court on January 26, 2009, but an assignment of the mortgage to U.S. Bank was not executed until February 11, 2009. The assignment from MERS to U.S. BANK was signed on behalf of MERS by Gregg W. Speer, who purported to be a Vice President of MERS but who, on information and belief, was actually employed by U.S. BANK. On July 1, 2010, a judgment of foreclosure was entered by the

court, and the judgment included a charge of $18.50 representing the recording fee for filing the assignment of the mortgage. This amount for filing the false and untimely assignment was thereafter improperly passed on to HUD as part of the insurance claim.

440. Similarly, FHA Case No. 093-6369462-703 involves a May 22, 2008, mortgage on a property purchased by Ralph A. Della Pia and Donna M. Della Pia. Defendant U.S. BANK brought a foreclosure action in Florida state court on March 30, 2009, but an assignment of the mortgage to U.S. BANK was not executed until April 8, 2009. The assignment from MERS to U.S. BANK was signed on behalf of MERS by Lori Edwards, who purported to be a Vice President of MERS but who, on information and belief, was actually employed by U.S. BANK. On November 19, 2010, a judgment of foreclosure was entered by the court, and the judgment included a charge of 10.00 representing the recording fee for filing the assignment of the mortgage. This amount for filing the false and untimely assignment was thereafter improperly passed on to HUD as part of the insurance claim.

441. FHA Case No. 093-6018655-734 involves a July 19, 2006, mortgage on a property purchased by Ana Herron. Defendant U.S. BANK brought a foreclosure action in Florida state court on December 13, 2007, but an assignment of the mortgage to U.S. BANK was not executed until December 26, 2007. The assignment from MERS to U.S. BANK was signed on behalf of MERS by Speer, who again purported to be a Vice President of MERS but who, on information and belief, was actually employed by U.S. BANK. On February 18, 2009, a judgment of foreclosure was entered by the court, and the judgment included a charge of 10.00 representing the recording fee for filing the

assignment of the mortgage.  This amount for filing the false and untimely assignment was thereafter improperly passed on to HUD as part of the insurance claim.

442.  Claims based on the submission of requests for FHA insurance payments are not being pursued in this case against Ally Financial f/k/a GMAC, Inc. and Defendants BA, BAC, BAMS, CHASE, CHASE HOME, CRC, CITIBANK, AMC/CITI, WELLS/ASC, and WELLS FARGO because those claims have been settled for $95 million.

443.  Such settlement does not eliminate the liability of other Defendants who were involved in the submission of claims to HUD, even those who did so on behalf of the foregoing entities.  Liability on the HUD claim extends not only to the Defendants who submitted false claims to HUD but also to the Defendants who were involved in creating the false documents underlying the submissions.

444.    The foregoing examples are set forth for illustrative purposes.  Thousands of claims for payment on FHA insurance were submitted by Defendants, and except as set forth above, Relator asserts claims against every Defendant for submitting, or causing to be submitted, false claims to HUD relating to insurance payments.

## X.  CAUSES OF ACTION

### COUNT I
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)
### Against all Defendants

445.  Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 444 of this Complaint.

446.  This is a claim for civil penalties and treble damages under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

447. As alleged in paragraphs 1-444, the Defendants created, serviced, or participated in the MBS Trusts.

448. Defendants submitted claims to government entities, including HUD, for the payment of mortgage guarantees based on fraudulent documents in order to falsely assert entitlement to the mortgage guarantees. Defendants received millions of dollars in payments on federal government guarantees of mortgages based on foreclosure proceedings utilizing false assignments of notes and mortgages. In addition, they improperly charged HUD for the cost of filing with the courts the false documents. Accordingly, the Defendants and their agents and employees knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the government entity that paid the mortgage guarantee claim.

449. As further alleged in paragraphs 1-444, the MBS Trusts lacked the requisites necessary for the mortgages to be transferred to the MBS Trusts issuing MBS, namely: (1) the legally binding assignments from the originating bank to the MBS Trusts and, finally, to the foreclosure agent; (2) the recording of title in the county recorder's office; and (3) the original note and mortgage, signed by both borrower and lender. The prospectus for each MBS Trust listed in Exhibit A, and other public statements, falsely represented that the trust had possession of these documents and held good title to the mortgages and notes underlying the securities.

450. As further alleged in paragraphs 1-444, the Defendants created false mortgage documents and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including,

but not limited to, trustee and custodial services relating to the notes and mortgage assignments.

451. By virtue of the wrongful conduct alleged here, the value of each of the MBS Trusts that was purchased by the U.S. government or government-funded entity was impaired.

452. Defendants received millions of dollars in U.S. government funds to provide services for MBS Trusts held by the Treasury or other government-funded entity. Defendants falsely represented that they had performed the services paid for. Accordingly, the Defendants and their agents and employees knowingly presented or caused to be presented a false or fraudulent claim for payment or approval to the government entity that purchased MBS Trusts.

453. The United States or government-funded entity, unaware of the falsity or fraudulent nature of the claims presented or caused to be presented by the Defendants, approved, paid, and participated in payments made by the United States' fiscal intermediaries for claims that otherwise would not have been paid.

454. By reason of the payments and approvals of these false and fraudulent claims, the United States has been damaged, and continues to be damaged, in an amount yet to be determined.

## COUNT II
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)
### Against all Defendants

455. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 444 of this Complaint.

456. This is a claim for civil penalties and treble damages under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

457. As alleged in paragraphs 1-444, the Defendants created, serviced, or participated in the MBS Trusts.

458. Defendants submitted claims to government entities, including HUD, for the payment of mortgage guarantees based on fraudulent documents in order to falsely assert entitlement to the mortgage guarantees. Defendants received millions of dollars in payments on federal government guarantees of mortgages based on foreclosure proceedings utilizing false assignments of notes and mortgages. In addition, they improperly charged HUD for the cost of filing with the courts the false documents. Accordingly, the Defendants and their agents and employees knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the government entity that paid the mortgage guarantee claim.

459. As further alleged in paragraphs 1-444, the MBS Trusts lacked the requisites necessary for the mortgages to be transferred to the MBS Trusts issuing MBS, namely: (1) the legally binding assignments from the originating bank to the MBS Trusts and, finally, to the foreclosure agent; (2) the recording of title in the county recorder's office; and (3) the original note and mortgage, signed by both borrower and lender. The prospectus for each MBS Trust listed in Exhibit A, and other public statements, falsely represented that the trust had possession of these documents and held good title to the mortgages and notes underlying the securities.

460. As further alleged in paragraphs 1-444, the Defendants created false mortgage documents and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including,

but not limited to, trustee and custodial services relating to the notes and mortgage documents.

461. By virtue of the wrongful conduct alleged here, the value of each of the MBS Trusts that was purchased by the U.S. government or government-funded entity was impaired.

462. Defendants received millions of dollars in U.S. government funds to provide services for MBS Trusts held by the Treasury or other government-funded entity. Defendants falsely represented that they had performed the services paid for. Accordingly, the Defendants and their agents and employees knowingly presented or caused to be presented a false or fraudulent claim for payment or approval to the government entity that purchased MBS Trusts.

463. In connection with the submission of these false or fraudulent claims, each of the Defendants knowingly made, used, or caused to be made or used, false records or statements material to the false or fraudulent claims.

464. The United States or government-funded entity, unaware of the false records or statements made or caused to be made by the Defendants, approved, paid, and participated in payments made by the United States' fiscal intermediaries for claims that otherwise would not have been paid.

465. By reason of the Defendants' false records and statements, the United States has been damaged, and continues to be damaged, in an amount yet to be determined.

### COUNT III
**Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(D)**
**Against all Defendants**

466. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 444 of this Complaint.

141

467. This is a claim for civil penalties and treble damages under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

468. As alleged in paragraphs 1-444, the Defendants created, serviced, or participated in the MBS Trusts.

469. Defendants submitted claims to government entities, including HUD, for the payment of mortgage guarantees based on fraudulent documents in order to falsely assert entitlement to the mortgage guarantees. Defendants received millions of dollars in payments on federal government guarantees of mortgages based on foreclosure proceedings utilizing false assignments of notes and mortgages. In addition, they improperly charged HUD for the cost of filing with the courts the false documents. Accordingly, the Defendants and their agents and employees knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the government entity that paid the mortgage guarantee claim.

470. As further alleged in paragraphs 1-444, the MBS Trusts lacked the requisites necessary for the mortgages to be transferred to the MBS Trusts issuing MBS, namely: (1) the legally binding assignments from the originating bank to the MBS Trusts and, finally, to the foreclosure agent; (2) the recording of title in the county recorder's office; and (3) the original note and mortgage, signed by both borrower and lender. The prospectus for each MBS Trust listed in Exhibit A, and other public statements, falsely represented that the trust had possession of these documents and held good title to the mortgages and notes underlying the securities.

471. As further alleged in paragraphs 1-444, the Defendants created false mortgage documents and charged the MBS Trusts for their unlawful services. Likewise,

142

the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, trustee and custodial services relating to the notes and mortgage documents.

472. By virtue of the wrongful conduct alleged here, the value of each of the MBS Trusts that was purchased by the U.S. government or government-funded entity was impaired.

473. Defendants received millions of dollars in U.S. government funds to provide services for MBS Trusts held by the Treasury or other government-funded entity. Defendants falsely represented that they had performed the services paid for. Accordingly, the Defendants and their agents and employees knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the government entity that purchased MBS Trusts.

474. By virtue of the wrongful conduct alleged here, each of the Defendants had possession, custody, or control of property or money used, or to be used, by the Government or government-funded entity and, intending to defraud the government, knowingly delivered, or caused to be delivered, to the U.S. government or government-funded entity less than all of that money or property.

475. By reason of this unlawful conduct, the United States has been damaged, and continues to be damaged in an amount yet to be determined.

**COUNT IV**
**Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(G)**
**Against all Defendants**

476. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 444 of this Complaint.

477.  This is a claim for civil penalties and treble damages under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

478.  As alleged in paragraphs 1-444, the Defendants created, serviced, or participated in the MBS Trusts.

479.  Defendants submitted claims to government entities, including HUD, for the payment of mortgage guarantees based on fraudulent documents in order to falsely assert entitlement to the mortgage guarantees.  Defendants received millions of dollars in payments on federal government guarantees of mortgages based on foreclosure proceedings utilizing false assignments of notes and mortgages.  In addition, they improperly charged HUD for the cost of filing with the courts the false documents. Accordingly, the Defendants and their agents and employees knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the government entity that paid the mortgage guarantee claim.

480.  As further alleged in paragraphs 1-444, the MBS Trusts lacked the requisites necessary for the securities to have good title to the underlying mortgage assets, namely: (1) the legally binding assignments from the originating bank to the MBS Trusts and, finally, to the foreclosure agent; (2) the recording of title in the county recorder's office; and (3) the original note and mortgage, signed by both borrower and lender.  The prospectus for each MBS Trust listed in Exhibit A, and other public statements, falsely represented that the trust had possession of these documents and held good title to the mortgages and notes underlying the securities.

481. As further alleged in paragraphs 1-444, the Defendants created false mortgage documents and charged the MBS Trusts for their unlawful services.  Likewise,

the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, trustee and custodial services relating to the notes and mortgage documents.

482.  By virtue of the wrongful conduct alleged here, the value of each of the MBS Trusts that was purchased by the U.S. government or government-funded entity was impaired.

483.  Defendants received millions of dollars in U.S. government funds to provide services for MBS Trusts held by the Treasury or other government-funded entity. Defendants falsely represented that they had performed the services paid for. Accordingly, the Defendants and their agents and employees knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the government entity that purchased MBS Trusts.

484.  By virtue of the wrongful conduct alleged here, the Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the U.S. government or government-funded entity, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the U.S. government or government-funded entity.

485.  By reason of this unlawful conduct, the United States has been damaged, and continues to be damaged in an amount yet to be determined.

**COUNT V**
**Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(C)**
**Against All Defendants**

486.  Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 444 of this Complaint.

487. This is a claim for civil penalties and treble damages under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

488. As alleged in paragraphs 1-444, the Defendants created, serviced, or participated in the MBS Trusts.

489. Defendants submitted claims to government entities, including HUD, for the payment of mortgage guarantees based on fraudulent documents in order to falsely assert entitlement to the mortgage guarantees. Defendants received millions of dollars in payments on federal government guarantees of mortgages based on foreclosure proceedings utilizing false assignments of notes and mortgages. In addition, they improperly charged HUD for the cost of filing with the courts the false documents. Accordingly, the Defendants and their agents and employees knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the government entity that paid the mortgage guarantee claim.

490. As further alleged in paragraphs 1-444, the MBS Trusts lacked the requisites necessary for the securities to have good title to the underlying mortgage assets, namely: (1) the legally binding assignments from the originating bank to the MBS Trusts and, finally, to the foreclosure agent; (2) the recording of title in the county recorder's office; and (3) the original note and mortgage, signed by both borrower and lender. The prospectus for each MBS Trust listed in Exhibit A, and other public statements, falsely represented that the trust had possession of these documents and held good title to the mortgages and notes underlying the securities.

491. As further alleged in paragraphs 1-444, the Defendants created false mortgage documents and charged the MBS Trusts for their unlawful services. Likewise,

the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, trustee and custodial services relating to the notes and mortgage documents.

492. By virtue of the wrongful conduct alleged here, the value of each of the MBS Trusts that was purchased by the U.S. government or government-funded entity was impaired.

493. Defendants received millions of dollars in U.S. government funds to provide services for MBS Trusts held by the Treasury or other government-funded entity. Defendants falsely represented that they had performed the services paid for. Accordingly, the Defendants and their agents and employees knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the government entity that purchased MBS Trusts.

494. By virtue of the wrongful conduct alleged here, Defendants conspired to violate state and federal laws. Defendants acted in concert to create fraudulent legal documentation. Defendants acted in concert to conceal that the mortgage files for the MBS Trusts had not been reviewed and were missing mortgage documents. Defendants acted in concert to conceal that the MBS Trusts did not hold good title to the assets, thus impairing the value of the securities for the MBS Trusts purchased by the U.S. government or government-funded entity. Defendants also acted in concert to submit claims for mortgage guarantees to government entities, including HUD, that were based on fraudulent documents to falsely establish entitlement to mortgage guarantee proceeds. Defendants acted in concert to knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval. Defendants acted in concert to make, use, or

cause to be made or used, false records or statements material to a false or fraudulent claim.  Defendants acted in concert to knowingly deliver, or cause to be delivered, less money or property, of which they had possession, custody, or control to the U.S. government or government-funded entity.  Defendants acted in concert to knowingly make, use, or cause to be made or used, false records or statements material to an obligation to pay or transmit money or property to the U.S. government or government-funded entity, or knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the U.S. government or government-funded entity.

495. Through the conduct set forth above, Defendants conspired to commit a violation of 31 U.S.C. § 3729(a)(1)(A), § 3729(a)(1)(B), § 3729(a)(1)(D), and § 3729(a)(1)(G).

496. By reason of this unlawful conduct, the United States has been damaged, and continues to be damaged in an amount yet to be determined.

## COUNT VI
### California False Claims Act,
### Cal. Govt. Code §§ 12651(a)(1)- (a)(4), 12651(a)(7)-(a)(8)
### Against all Defendants

497. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 444 of this Complaint.

498. This is a claim for treble damages and civil penalties under the California False Claims Act, Cal. Gov.t Code § 12650 *et seq.*

499. As alleged in paragraphs 1-444, the Defendants created, serviced, or participated in the MBS Trusts.

500.  As further alleged in paragraphs 1-444, the MBS Trusts lacked the requisites necessary for the securities to have good title to the underlying mortgage assets, namely: (1) the legally binding assignments from the originating bank to the MBS Trusts and, finally, to the foreclosure agent; (2) the recording of title in the county recorder's office; and (3) the original note and mortgage, signed by both borrower and lender.  The prospectus for each MBS Trust listed in Exhibit A, and other public statements, falsely represented that the trust had possession of these documents and held good title to the mortgages and notes underlying the securities.

501. As further alleged in paragraphs 1-444, the Defendants created false mortgage documents and charged the MBS Trusts for their unlawful services.  Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, trustee and custodial services relating to the notes and mortgage documents.

502. By virtue of the wrongful conduct alleged here, the value of each of the MBS Trusts that was purchased by the State of California or state-funded entity was impaired.

503. Defendants received millions of dollars in California funds to provide services for MBS Trusts held by the State of California or state-funded entity. Defendants falsely represented that they had performed the services for which they were paid.

504. By virtue of the wrongful conduct alleged here, each of the Defendants knowingly caused, or assisted in causing, the State of California or state-funded entity to pay claims that are false or fraudulent.

505. Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the State of California or state-funded entity that purchased MBS Trusts.  The Defendants benefited from the submission of false claims and, after discovering the falsity of the claim, failed to disclose the falsity to the State within a reasonable time.

506. Further, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims to the State of California or state-funded entity that purchased MBS Trusts.

507. Each of the Defendants had possession, custody, or control of property or money used, or to be used by the State of California and, intending to defraud the State, knowingly delivered, or caused to be delivered, to the State of California less than all of that money or property.

508. The Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State.

509. Defendants acted in concert to create fraudulent legal documentation. Defendants acted in concert to conceal that the mortgage files for the MBS Trusts had not been reviewed and were missing mortgage documents.  Defendants acted in concert to conceal that the MBS Trusts did not hold good title to the assets, thus impairing the value of the securities for the MBS Trusts.  Defendants acted in concert to knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval.  Defendants acted in concert to make, use, or cause to be made or used, false records or statements

material to a false or fraudulent claim. Further, Defendants acted in concert to deliver, or cause to be delivered, less money or property, of which they had possession, custody, or control to the State of California or state-funded entity. Defendants acted in concert to knowingly make, use, or cause to be made or use, false records or statements material to an obligation to pay or transmit money or property to the State of California or state-funded entity or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State of California or state-funded entity.

510. The State of California or state-funded entity, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid, and participated in payments made for claims that otherwise would not have been paid.

511. By reason of this unlawful conduct, the State of California has been damaged, and continues to be damaged, in an amount yet to be determined.

**COUNT VII**
**Delaware False Claims Act,**
**Del. Code Ann. Tit. 6,§§ 1201(a)(1)-(a)(4),1201(a)(7)**
**Against all Defendants**

512. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 444 of this Complaint.

513. This is a claim for treble damages and civil penalties under the Delaware False Claims Act, Del. Code Ann. Tit. 6, § 1201 *et seq.*

514. As alleged in paragraphs 1-444, the Defendants created, serviced, or participated in the MBS Trusts.

515. As further alleged in paragraphs 1-444, the MBS Trusts lacked the requisites necessary for the securities to have good title to the underlying mortgage assets, namely:

(1) the legally binding assignments from the originating bank to the MBS Trusts and, finally, to the foreclosure agent; (2) the recording of title in the county recorder's office; and (3) the original note and mortgage, signed by both borrower and lender. The prospectus for each MBS Trust listed in Exhibit A, and other public statements, falsely represented that the trust had possession of these documents and held good title to the mortgages and notes underlying the securities.

516. As further alleged in paragraphs 1-444, the Defendants created false mortgage documents and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, trustee and custodial services relating to the notes and mortgage documents.

517. By virtue of the wrongful conduct alleged here, the value of each of the MBS Trusts that was purchased by the State of Delaware or state-funded entity was impaired.

518. Defendants received millions of dollars in Delaware funds to provide services for MBS Trusts held by the State of Delaware or state-funded entity. Defendants falsely represented that they had performed the services for which they were paid.

519. By virtue of the wrongful conduct alleged here, each of the Defendants knowingly caused, or assisted in causing, the State of Delaware or state-funded entity to pay claims that are false or fraudulent.

520. Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the State of Delaware or state-funded entity that purchased MBS Trusts. The Defendants benefited from the submission of

false claims and, after discovering the falsity of the claim, failed to disclose the falsity to the State within a reasonable time.

521. Further, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims to the State of Delaware or state-funded entity that purchased MBS Trusts.

522. Each of the Defendants had possession, custody, or control of property or money used, or to be used by the State of Delaware and, intending to defraud the State, knowingly delivered, or caused to be delivered, to the State of Delaware less than all of that money or property.

523. The Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State.

524. Defendants acted in concert to create fraudulent legal documentation. Defendants acted in concert to conceal that the mortgage files for the MBS Trusts had not been reviewed and were missing mortgage documents.  Defendants acted in concert to conceal that the MBS Trusts did not hold good title to the assets, thus impairing the value of the securities for the MBS Trusts.  Defendants acted in concert to knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval.  Defendants acted in concert to make, use, or cause to be made or used, false records or statements material to a false or fraudulent claim.  Further, Defendants acted in concert to deliver, or cause to be delivered, less money or property, of which they had possession, custody, or control to the State of Delaware or state-funded entity.  Defendants acted in concert to

knowingly make, use, or cause to be made or use, false records or statements material to an obligation to pay or transmit money or property to the State of Delaware or state-funded entity or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State of Delaware or state-funded entity.

525. The State of Delaware or state-funded entity, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid, and participated in payments made for claims that otherwise would not have been paid.

526. By reason of this unlawful conduct, the State of Delaware has been damaged, and continues to be damaged, in an amount yet to be determined.

**COUNT VIII**
**District of Columbia False Claims Act,**
**D.C. Code Ann. §§ 2-308.14 (a)(1)-(a)(4),2-308.14 (a)(7)-(a)(8)**
**Against all Defendants**

527. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 444 of this Complaint.

528. This is a claim for treble damages and civil penalties under the District of Columbia False Claims Act, DC. Code Ann. § 2-308.14 *et seq.*

529. As alleged in paragraphs 1-444, the Defendants created, serviced, or participated in the MBS Trusts.

530. As further alleged in paragraphs 1-444, the MBS Trusts lacked the requisites necessary for the securities to have good title to the underlying mortgage assets, namely: (1) the legally binding assignments from the originating bank to the MBS Trusts and, finally, to the foreclosure agent; (2) the recording of title in the county recorder's office; and (3) the original note and mortgage, signed by both borrower and lender. The

prospectus for each MBS Trust listed in Exhibit A, and other public statements, falsely represented that the trust had possession of these documents and held good title to the mortgages and notes underlying the securities.

531. As further alleged in paragraphs 1-444, the Defendants created false mortgage documents and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, trustee and custodial services relating to the notes and mortgage documents.

532. By virtue of the wrongful conduct alleged here, the value of each of the MBS Trusts that was purchased by the District of Columbia or district-funded entity was impaired.

533. Defendants received millions of dollars in District of Columbia funds to provide services for MBS Trusts held by the District of Columbia or district-funded entity. Defendants falsely represented that they had performed the services for which they were paid.

534. By virtue of the wrongful conduct alleged here, each of the Defendants knowingly caused, or assisted in causing, the District of Columbia or district-funded entity to pay claims that are false or fraudulent.

535. Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the District of Columbia or district-funded entity that purchased MBS Trusts. The Defendants benefited from the submission of false claims and, after discovering the falsity of the claim, failed to disclose the falsity to the District within a reasonable time.

536.  Further, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims to the District of Columbia or district-funded entity that purchased MBS Trusts.

537.  Each of the Defendants had possession, custody, or control of property or money used, or to be used by the District of Columbia or district-funded entity and, intending to defraud the District knowingly delivered, or caused to be delivered, to the District of Columbia or district-funded entity less than all of that money or property.

538.  The Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the District, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the District.

539.  Defendants acted in concert to create fraudulent legal documentation. Defendants acted in concert to conceal that the mortgage files for the MBS Trusts had not been reviewed and were missing mortgage documents.  Defendants acted in concert to conceal that the MBS Trusts did not hold good title to the assets, thus impairing the value of the securities for the MBS Trusts.  Defendants acted in concert to knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval.  Defendants acted in concert to make, use, or cause to be made or used, false records or statements material to a false or fraudulent claim.  Further, Defendants acted in concert to deliver, or cause to be delivered, less money or property, of which they had possession, custody, or control to the District of Columbia or district-funded entity.  Defendants acted in concert to knowingly make, use, or cause to be made or use, false records or statements material to an obligation to pay or transmit money or property to the District of Columbia or

district-funded entity or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the District of Columbia or district-funded entity.

540.  The District of Columbia or district-funded entity, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid, and participated in payments made for claims that otherwise would not have been paid.

541.  By reason of this unlawful conduct, the District of Columbia has been damaged, and continues to be damaged, in an amount yet to be determined.

### COUNT IX
### Florida False Claims Act,
### Fla. Stat. Ann. §§ 68.082(2)(a)-(2)(d),68.081 (2)(g)
### Against all Defendants

542.  Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 444 of this Complaint.

543.  This is a claim for treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. Ann. § 68.081 *et seq.*

544.  As alleged in paragraphs 1-444, the Defendants created, serviced, or participated in the MBS Trusts.

545.  As further alleged in paragraphs 1-444, the MBS Trusts lacked the requisites necessary for the securities to have good title to the underlying mortgage assets, namely: (1) the legally binding assignments from the originating bank to the MBS Trusts and, finally, to the foreclosure agent; (2) the recording of title in the county recorder's office; and (3) the original note and mortgage, signed by both borrower and lender.  The prospectus for each MBS Trust listed in Exhibit A, and other public statements, falsely

represented that the trust had possession of these documents and held good title to the mortgages and notes underlying the securities.

546.  As further alleged in paragraphs 1-444, the Defendants created false mortgage documents and charged the MBS Trusts for their unlawful services.  Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, trustee and custodial services relating to the notes and mortgage documents.

547.  By virtue of the wrongful conduct alleged here, the value of each of the MBS Trusts that was purchased by the State of Florida or state-funded entity was impaired.

548.  Defendants received millions of dollars in Florida funds to provide services for MBS Trusts held by the State of Florida or state-funded entity.  Defendants falsely represented that they had performed the services for which they were paid.

549.  By virtue of the wrongful conduct alleged here, each of the Defendants knowingly caused, or assisted in causing, the State of Florida or state-funded entity to pay claims that are false or fraudulent.

550.  Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the State of Florida or state-funded entity that purchased MBS Trusts.  The Defendants benefited from the submission of false claims and, after discovering the falsity of the claim, failed to disclose the falsity to the State within a reasonable time.

551. Further, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims to the State of Florida or state-funded entity that purchased MBS Trusts.

552. Each of the Defendants had possession, custody, or control of property or money used, or to be used by the State of Florida and, intending to defraud the State, knowingly delivered, or caused to be delivered, to the State of Florida less than all of that money or property.

553. The Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State.

554. Defendants acted in concert to create fraudulent legal documentation. Defendants acted in concert to conceal that the mortgage files for the MBS Trusts had not been reviewed and were missing mortgage documents. Defendants acted in concert to conceal that the MBS Trusts did not hold good title to the assets, thus impairing the value of the securities for the MBS Trusts. Defendants acted in concert to knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval. Defendants acted in concert to make, use, or cause to be made or used, false records or statements material to a false or fraudulent claim. Further, Defendants acted in concert to deliver, or cause to be delivered, less money or property, of which they had possession, custody, or control to the State of Florida or state-funded entity. Defendants acted in concert to knowingly make, use, or cause to be made or use, false records or statements material to an obligation to pay or transmit money or property to the State of Florida or state-funded

entity or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State of Florida or state-funded entity.

555. The State of Florida or state-funded entity, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid, and participated in payments made for claims that otherwise would not have been paid.

556. By reason of this unlawful conduct, the State of Florida has been damaged, and continues to be damaged, in an amount yet to be determined.

### COUNT X
### Hawaii False Claims Act,
### Haw. Rev. Stat. §§ 661-21(a)(1)-(a)(4), 661-21(a)(7)-(a)(8)
### Against all Defendants

557. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 444 of this Complaint.

558. This is a claim for treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*

559. As alleged in paragraphs 1-444, the Defendants created, serviced, or participated in the MBS Trusts.

560. As further alleged in paragraphs 1-444, the MBS Trusts lacked the requisites necessary for the securities to have good title to the underlying mortgage assets, namely: (1) the legally binding assignments from the originating bank to the MBS Trusts and, finally, to the foreclosure agent; (2) the recording of title in the county recorder's office; and (3) the original note and mortgage, signed by both borrower and lender. The prospectus for each MBS Trust listed in Exhibit A, and other public statements, falsely

represented that the trust had possession of these documents and held good title to the mortgages and notes underlying the securities.

561. As further alleged in paragraphs 1-444, the Defendants created false mortgage documents and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, trustee and custodial services relating to the notes and mortgage documents.

562. By virtue of the wrongful conduct alleged here, the value of each of the MBS Trusts that was purchased by the State of Hawaii or state-funded entity was impaired.

563. Defendants received millions of dollars in Hawaii funds to provide services for MBS Trusts held by the State of Hawaii or state-funded entity. Defendants falsely represented that they had performed the services for which they were paid.

564. By virtue of the wrongful conduct alleged here, each of the Defendants knowingly caused, or assisted in causing, the State of Hawaii or state-funded entity to pay claims that are false or fraudulent.

565. Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the State of Hawaii or state-funded entity that purchased MBS Trusts. The Defendants benefited from the submission of false claims and, after discovering the falsity of the claim, failed to disclose the falsity to the State within a reasonable time.

566. Further, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims to the State of Hawaii or state-funded entity that purchased MBS Trusts.

567. Each of the Defendants had possession, custody, or control of property or money used, or to be used by the State of Hawaii and, intending to defraud the State, knowingly delivered, or caused to be delivered, to the State of Hawaii less than all of that money or property.

568. The Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State.

569. Defendants acted in concert to create fraudulent legal documentation. Defendants acted in concert to conceal that the mortgage files for the MBS Trusts had not been reviewed and were missing mortgage documents. Defendants acted in concert to conceal that the MBS Trusts did not hold good title to the assets, thus impairing the value of the securities for the MBS Trusts. Defendants acted in concert to knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval. Defendants acted in concert to make, use, or cause to be made or used, false records or statements material to a false or fraudulent claim. Further, Defendants acted in concert to deliver, or cause to be delivered, less money or property, of which they had possession, custody, or control to the State of Hawaii or state-funded entity. Defendants acted in concert to knowingly make, use, or cause to be made or use, false records or statements material to an obligation to pay or transmit money or property to the State of Hawaii or state-funded

entity or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State of Hawaii or state-funded entity.

570. The State of Hawaii or state-funded entity, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid, and participated in payments made for claims that otherwise would not have been paid.

571. By reason of this unlawful conduct, the State of Hawaii has been damaged, and continues to be damaged, in an amount yet to be determined.

### COUNT XI
### Illinois Whistleblower Reward and Protection Act,
### 740 Ill. Comp. Stat. §§175/3 (a)(1)-(a)(4),175/3 (a)-(7)
### Against all Defendants

572. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 444 of this Complaint.

573. This is a claim for treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. § 175/1 *et seq.*

574. As alleged in paragraphs 1-444, the Defendants created, serviced, or participated in the MBS Trusts.

575. As further alleged in paragraphs 1-444, the MBS Trusts lacked the requisites necessary for the securities to have good title to the underlying mortgage assets, namely: (1) the legally binding assignments from the originating bank to the MBS Trusts and, finally, to the foreclosure agent; (2) the recording of title in the county recorder's office; and (3) the original note and mortgage, signed by both borrower and lender.   The prospectus for each MBS Trust listed in Exhibit A, and other public statements, falsely

represented that the trust had possession of these documents and held good title to the mortgages and notes underlying the securities.

576. As further alleged in paragraphs 1-444, the Defendants created false mortgage documents and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, trustee and custodial services relating to the notes and mortgage documents.

577. By virtue of the wrongful conduct alleged here, the value of each of the MBS Trusts that was purchased by the State of Illinois or state-funded entity was impaired.

578. Defendants received millions of dollars in Illinois funds to provide services for MBS Trusts held by the State of Illinois or state-funded entity. Defendants falsely represented that they had performed the services for which they were paid.

579. By virtue of the wrongful conduct alleged here, each of the Defendants knowingly caused, or assisted in causing, the State of Illinois or state-funded entity to pay claims that are false or fraudulent.

580. Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the State of Illinois or state-funded entity that purchased MBS Trusts. The Defendants benefited from the submission of false claims and, after discovering the falsity of the claim, failed to disclose the falsity to the State within a reasonable time.

581. Further, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims to the State of Illinois or state-funded entity that purchased MBS Trusts.

582. Each of the Defendants had possession, custody, or control of property or money used, or to be used by the State of Illinois and, intending to defraud the State, knowingly delivered, or caused to be delivered, to the State of Illinois less than all of that money or property.

583. The Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State.

584. Defendants acted in concert to create fraudulent legal documentation. Defendants acted in concert to conceal that the mortgage files for the MBS Trusts had not been reviewed and were missing mortgage documents. Defendants acted in concert to conceal that the MBS Trusts did not hold good title to the assets, thus impairing the value of the securities for the MBS Trusts. Defendants acted in concert to knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval. Defendants acted in concert to make, use, or cause to be made or used, false records or statements material to a false or fraudulent claim. Further, Defendants acted in concert to deliver, or cause to be delivered, less money or property, of which they had possession, custody, or control to the State of Illinois or state-funded entity. Defendants acted in concert to knowingly make, use, or cause to be made or use, false records or statements material to an obligation to pay or transmit money or property to the State of Illinois or state-funded

entity or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State of Illinois or state-funded entity.

585. The State of Illinois or state-funded entity, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid, and participated in payments made for claims that otherwise would not have been paid.

586. By reason of this unlawful conduct, the State of Illinois has been damaged, and continues to be damaged, in an amount yet to be determined.

### COUNT XII
**Indiana False Claims and Whistleblower Protection Act,
Ind. Code §§ 5-11-5.5-2(b)(1)-(b)(4), 5-11-5.5-2(b)(7)
Against all Defendants**

587. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 444 of this Complaint.

588. This is a claim for treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Indiana Code § 5-11-5.5.

589. As alleged in paragraphs 1-444, the Defendants created, serviced, or participated in the MBS Trusts.

590. As further alleged in paragraphs 1-444, the MBS Trusts lacked the requisites necessary for the securities to have good title to the underlying mortgage assets, namely: (1) the legally binding assignments from the originating bank to the MBS Trusts and, finally, to the foreclosure agent; (2) the recording of title in the county recorder's office; and (3) the original note and mortgage, signed by both borrower and lender. The prospectus for each MBS Trust listed in Exhibit A, and other public statements, falsely

166

represented that the trust had possession of these documents and held good title to the mortgages and notes underlying the securities.

591.  As further alleged in paragraphs 1-444, the Defendants created false mortgage documents and charged the MBS Trusts for their unlawful services.  Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, trustee and custodial services relating to the notes and mortgage documents.

592.  By virtue of the wrongful conduct alleged here, the value of each of the MBS Trusts that was purchased by the State of Indiana or state-funded entity was impaired.

593.  Defendants received millions of dollars in Indiana funds to provide services for MBS Trusts held by the State of Indiana or state-funded entity.  Defendants falsely represented that they had performed the services for which they were paid.

594.  By virtue of the wrongful conduct alleged here, each of the Defendants knowingly caused, or assisted in causing, the State of Indiana or state-funded entity to pay claims that are false or fraudulent.

595.  Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the State of Indiana or state-funded entity that purchased MBS Trusts.  The Defendants benefited from the submission of false claims and, after discovering the falsity of the claim, failed to disclose the falsity to the State within a reasonable time.

596. Further, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims to the State of Indiana or state-funded entity that purchased MBS Trusts.

597. Each of the Defendants had possession, custody, or control of property or money used, or to be used by the State of Indiana and, intending to defraud the State, knowingly delivered, or caused to be delivered, to the State of Indiana less than all of that money or property.

598. The Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State.

599. Defendants acted in concert to create fraudulent legal documentation. Defendants acted in concert to conceal that the mortgage files for the MBS Trusts had not been reviewed and were missing mortgage documents.  Defendants acted in concert to conceal that the MBS Trusts did not hold good title to the assets, thus impairing the value of the securities for the MBS Trusts.  Defendants acted in concert to knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval.  Defendants acted in concert to make, use, or cause to be made or used, false records or statements material to a false or fraudulent claim.  Further, Defendants acted in concert to deliver, or cause to be delivered, less money or property, of which they had possession, custody, or control to the State of Indiana or state-funded entity.  Defendants acted in concert to knowingly make, use, or cause to be made or use, false records or statements material to an obligation to pay or transmit money or property to the State of Indiana or state-funded

entity or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State of Indiana or state-funded entity.

600. The State of Indiana or state-funded entity, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid, and participated in payments made for claims that otherwise would not have been paid.

601. By reason of this unlawful conduct, the State of Indiana has been damaged, and continues to be damaged, in an amount yet to be determined.

## COUNT XIII
### Massachusetts False Claims Act,
### Mass. Ann. Laws Ch. 12, §§ 5(B)(1)-(B)(4),5(B)(8)
### Against all Defendants

602. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 444 of this Complaint.

603. This is a claim for treble damages and civil penalties under the Massachusetts False Claims Act, Mass. Ann. Laws ch. 12, § 5(A)-(0).

604. As alleged in paragraphs 1-444, the Defendants created, serviced, or participated in the MBS Trusts.

605. As further alleged in paragraphs 1-444, the MBS Trusts lacked the requisites necessary for the securities to have good title to the underlying mortgage assets, namely: (1) the legally binding assignments from the originating bank to the MBS Trusts and, finally, to the foreclosure agent; (2) the recording of title in the county recorder's office; and (3) the original note and mortgage, signed by both borrower and lender. The prospectus for each MBS Trust listed in Exhibit A, and other public statements, falsely

represented that the trust had possession of these documents and held good title to the mortgages and notes underlying the securities.

606. As further alleged in paragraphs 1-444, the Defendants created false mortgage documents and charged the MBS Trusts for their unlawful services.  Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, trustee and custodial services relating to the notes and mortgage documents.

607. By virtue of the wrongful conduct alleged here, the value of each of the MBS Trusts that was purchased by the Commonwealth of Massachusetts or state-funded entity was impaired.

608. Defendants received millions of dollars in Massachusetts funds to provide services for MBS Trusts held by the Commonwealth of Massachusetts or state-funded entity.  Defendants falsely represented that they had performed the services for which they were paid.

609. By virtue of the wrongful conduct alleged here, each of the Defendants knowingly caused, or assisted in causing, the Commonwealth of Massachusetts or state-funded entity to pay claims that are false or fraudulent.

610. Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the Commonwealth of Massachusetts or state-funded entity that purchased MBS Trusts.  The Defendants benefited from the submission of false claims and, after discovering the falsity of the claim, failed to disclose the falsity to the Commonwealth within a reasonable time.

611. Further, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims to the Commonwealth of Massachusetts or state-funded entity that purchased MBS Trusts.

612. Each of the Defendants had possession, custody, or control of property or money used, or to be used by the Commonwealth of Massachusetts and, intending to defraud the Commonwealth, knowingly delivered, or caused to be delivered, to the Commonwealth of Massachusetts less than all of that money or property.

613. The Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Commonwealth.

614. Defendants acted in concert to create fraudulent legal documentation. Defendants acted in concert to conceal that the mortgage files for the MBS Trusts had not been reviewed and were missing mortgage documents. Defendants acted in concert to conceal that the MBS Trusts did not hold good title to the assets, thus impairing the value of the securities for the MBS Trusts. Defendants acted in concert to knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval. Defendants acted in concert to make, use, or cause to be made or used, false records or statements material to a false or fraudulent claim. Further, Defendants acted in concert to deliver, or cause to be delivered, less money or property, of which they had possession, custody, or control to the Commonwealth of Massachusetts or state-funded entity. Defendants acted in concert to knowingly make, use, or cause to be made or use, false records or statements material to an obligation to pay or transmit money or property to the

Commonwealth of Massachusetts or state-funded entity or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Commonwealth of Massachusetts or state-funded entity.

615.  The Commonwealth of Massachusetts or state-funded entity, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid, and participated in payments made for claims that otherwise would not have been paid.

616.  By reason of this unlawful conduct, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in an amount yet to be determined.

<u>COUNT XIV</u>
**Minnesota False Claims Act,**
**Minn. Stat. §§ 15C.02(a)(1)-(a)(4),15C.02(a)(7)**
**Against all Defendants**

617.  Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 444 of this Complaint.

618.  This is a claim for treble damages and civil penalties under the Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq.*

619.  As alleged in paragraphs 1-444, the Defendants created, serviced, or participated in the MBS Trusts.

620.  As further alleged in paragraphs 1-444, the MBS Trusts lacked the requisites necessary for the securities to have good title to the underlying mortgage assets, namely: (1) the legally binding assignments from the originating bank to the MBS Trusts and, finally, to the foreclosure agent; (2) the recording of title in the county recorder's office; and (3) the original note and mortgage, signed by both borrower and lender.  The prospectus for each MBS Trust listed in Exhibit A, and other public statements, falsely

represented that the trust had possession of these documents and held good title to the mortgages and notes underlying the securities.

621.  As further alleged in paragraphs 1-444, the Defendants created false mortgage documents and charged the MBS Trusts for their unlawful services.  Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, trustee and custodial services relating to the notes and mortgage documents.

622.  By virtue of the wrongful conduct alleged here, the value of each of the MBS Trusts that was purchased by the State of Minnesota or state-funded entity was impaired.

623.  Defendants received millions of dollars in Minnesota funds to provide services for MBS Trusts held by the State of Minnesota or state-funded entity.  Defendants falsely represented that they had performed the services for which they were paid.

624.  By virtue of the wrongful conduct alleged here, each of the Defendants knowingly caused, or assisted in causing, the State of Minnesota or state-funded entity to pay claims that are false or fraudulent.

625.  Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the State of Minnesota or state-funded entity that purchased MBS Trusts.  The Defendants benefited from the submission of false claims and, after discovering the falsity of the claim, failed to disclose the falsity to the State within a reasonable time.

626. Further, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims to the State of Minnesota or state-funded entity that purchased MBS Trusts.

627. Each of the Defendants had possession, custody, or control of property or money used, or to be used by the State of Minnesota and, intending to defraud the State, knowingly delivered, or caused to be delivered, to the State of Minnesota less than all of that money or property.

628. The Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State.

629. Defendants acted in concert to create fraudulent legal documentation. Defendants acted in concert to conceal that the mortgage files for the MBS Trusts had not been reviewed and were missing mortgage documents. Defendants acted in concert to conceal that the MBS Trusts did not hold good title to the assets, thus impairing the value of the securities for the MBS Trusts. Defendants acted in concert to knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval. Defendants acted in concert to make, use, or cause to be made or used, false records or statements material to a false or fraudulent claim. Further, Defendants acted in concert to deliver, or cause to be delivered, less money or property, of which they had possession, custody, or control to the State of Minnesota or state-funded entity. Defendants acted in concert to knowingly make, use, or cause to be made or use, false records or statements material to an obligation to pay or transmit money or property to the State of Minnesota or state-

funded entity or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State of Minnesota or state-funded entity.

630.  The State of Minnesota or state-funded entity, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid, and participated in payments made for claims that otherwise would not have been paid.

631.  By reason of this unlawful conduct, the State of Minnesota has been damaged, and continues to be damaged, in an amount yet to be determined.

**COUNT XV**
**Montana False Claims Act,**
**Mont. Code Ann. §§ 17-8-403(1)(a)-(1)(d), 17-8-403(1)(g)-(h)**
**Against all Defendants**

632.  Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 444 of this Complaint.

633.  This is a claim for treble damages and civil penalties under the Montana False Claims Act, Mont. Code Ann. § 17-8-401 *et seq.*

634.  As alleged in paragraphs 1-444, the Defendants created, serviced, or participated in the MBS Trusts.

635.  As further alleged in paragraphs 1-444, the MBS Trusts lacked the requisites necessary for the securities to have good title to the underlying mortgage assets, namely: (1) the legally binding assignments from the originating bank to the MBS Trusts and, finally, to the foreclosure agent; (2) the recording of title in the county recorder's office; and (3) the original note and mortgage, signed by both borrower and lender.  The prospectus for each MBS Trust listed in Exhibit A, and other public statements, falsely

175

represented that the trust had possession of these documents and held good title to the mortgages and notes underlying the securities.

636. As further alleged in paragraphs 1-444, the Defendants created false mortgage documents and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, trustee and custodial services relating to the notes and mortgage documents.

637. By virtue of the wrongful conduct alleged here, the value of each of the MBS Trusts that was purchased by the State of Montana or state-funded entity was impaired.

638. Defendants received millions of dollars in Montana funds to provide services for MBS Trusts held by the State of Montana or state-funded entity. Defendants falsely represented that they had performed the services for which they were paid.

639. By virtue of the wrongful conduct alleged here, each of the Defendants knowingly caused, or assisted in causing, the State of Montana or state-funded entity to pay claims that are false or fraudulent.

640. Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the State of Montana or state-funded entity that purchased MBS Trusts. The Defendants benefited from the submission of false claims and, after discovering the falsity of the claim, failed to disclose the falsity to the State within a reasonable time.

641. Further, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims to the State of Montana or state-funded entity that purchased MBS Trusts.

642. Each of the Defendants had possession, custody, or control of property or money used, or to be used by the State of Montana and, intending to defraud the State, knowingly delivered, or caused to be delivered, to the State of Montana less than all of that money or property.

643. The Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State.

644. Defendants acted in concert to create fraudulent legal documentation. Defendants acted in concert to conceal that the mortgage files for the MBS Trusts had not been reviewed and were missing mortgage documents.  Defendants acted in concert to conceal that the MBS Trusts did not hold good title to the assets, thus impairing the value of the securities for the MBS Trusts.  Defendants acted in concert to knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval.  Defendants acted in concert to make, use, or cause to be made or used, false records or statements material to a false or fraudulent claim.  Further, Defendants acted in concert to deliver, or cause to be delivered, less money or property, of which they had possession, custody, or control to the State of Montana or state-funded entity.  Defendants acted in concert to knowingly make, use, or cause to be made or use, false records or statements material to an obligation to pay or transmit money or property to the State of Montana or state-

177

funded entity or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State of Montana or state-funded entity.

645. The State of Montana or state-funded entity, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid, and participated in payments made for claims that otherwise would not have been paid.

646. By reason of this unlawful conduct, the State of Montana has been damaged, and continues to be damaged, in an amount yet to be determined.

### COUNT XVI
### Nevada False Claims Act,
### Nev. Rev. Stat. §§ 357.040 (1)(a)- (1)(d),357.040 (1)(g)-(1)(h)
### Against all Defendants

647. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 444 of this Complaint.

648. This is a claim for treble damages and civil penalties under the Nevada False Claims Act, Nev. Rev. Stat. § 357.010 *et seq.*

649. As alleged in paragraphs 1-444, the Defendants created, serviced, or participated in the MBS Trusts.

650. As further alleged in paragraphs 1-444, the MBS Trusts lacked the requisites necessary for the securities to have good title to the underlying mortgage assets, namely: (1) the legally binding assignments from the originating bank to the MBS Trusts and, finally, to the foreclosure agent; (2) the recording of title in the county recorder's office; and (3) the original note and mortgage, signed by both borrower and lender. The prospectus for each MBS Trust listed in Exhibit A, and other public statements, falsely

represented that the trust had possession of these documents and held good title to the mortgages and notes underlying the securities.

651. As further alleged in paragraphs 1-444, the Defendants created false mortgage documents and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, trustee and custodial services relating to the notes and mortgage documents.

652. By virtue of the wrongful conduct alleged here, the value of each of the MBS Trusts that was purchased by the State of Nevada or state-funded entity was impaired.

653. Defendants received millions of dollars in Nevada funds to provide services for MBS Trusts held by the State of Nevada or state-funded entity. Defendants falsely represented that they had performed the services for which they were paid.

654. By virtue of the wrongful conduct alleged here, each of the Defendants knowingly caused, or assisted in causing, the State of Nevada or state-funded entity to pay claims that are false or fraudulent.

655. Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the State of Nevada or state-funded entity that purchased MBS Trusts. The Defendants benefited from the submission of false claims and, after discovering the falsity of the claim, failed to disclose the falsity to the State within a reasonable time.

656. Further, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims to the State of Nevada or state-funded entity that purchased MBS Trusts.

657. Each of the Defendants had possession, custody, or control of property or money used, or to be used by the State of Nevada and, intending to defraud the State, knowingly delivered, or caused to be delivered, to the State of Nevada less than all of that money or property.

658. The Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State.

659. Defendants acted in concert to create fraudulent legal documentation. Defendants acted in concert to conceal that the mortgage files for the MBS Trusts had not been reviewed and were missing mortgage documents. Defendants acted in concert to conceal that the MBS Trusts did not hold good title to the assets, thus impairing the value of the securities for the MBS Trusts. Defendants acted in concert to knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval. Defendants acted in concert to make, use, or cause to be made or used, false records or statements material to a false or fraudulent claim. Further, Defendants acted in concert to deliver, or cause to be delivered, less money or property, of which they had possession, custody, or control to the State of Nevada or state-funded entity. Defendants acted in concert to knowingly make, use, or cause to be made or use, false records or statements material to an obligation to pay or transmit money or property to the State of Nevada or state-funded

180

entity or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State of Nevada or state-funded entity.

660. The State of Nevada or state-funded entity, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid, and participated in payments made for claims that otherwise would not have been paid.

661. By reason of this unlawful conduct, the State of Nevada has been damaged, and continues to be damaged, in an amount yet to be determined.

**COUNT XVII**
**New Jersey False Claims Act,**
**N.J. Stat. §§ 2A:32 C-3(a)- (d);2A:32 C-3(g)**
**Against all Defendants**

662. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 444 of this Complaint.

663. This is a claim for treble damages and civil penalties under the New Jersey False Claims Act, N.J. Stat. § 2A:32 C-1 *et seq.*

664. As alleged in paragraphs 1-444, the Defendants created, serviced, or participated in the MBS Trusts.

665. As further alleged in paragraphs 1-444, the MBS Trusts lacked the requisites necessary for the securities to have good title to the underlying mortgage assets, namely: (1) the legally binding assignments from the originating bank to the MBS Trusts and, finally, to the foreclosure agent; (2) the recording of title in the county recorder's office; and (3) the original note and mortgage, signed by both borrower and lender. The prospectus for each MBS Trust listed in Exhibit A, and other public statements, falsely

represented that the trust had possession of these documents and held good title to the mortgages and notes underlying the securities.

666. As further alleged in paragraphs 1-444, the Defendants created false mortgage documents and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, trustee and custodial services relating to the notes and mortgage documents.

667. By virtue of the wrongful conduct alleged here, the value of each of the MBS Trusts that was purchased by the State of New Jersey or state-funded entity was impaired.

668. Defendants received millions of dollars in New Jersey funds to provide services for MBS Trusts held by the State of New Jersey or state-funded entity. Defendants falsely represented that they had performed the services for which they were paid.

669. By virtue of the wrongful conduct alleged here, each of the Defendants knowingly caused, or assisted in causing, the State of New Jersey or state-funded entity to pay claims that are false or fraudulent.

670. Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the State of New Jersey or state-funded entity that purchased MBS Trusts. The Defendants benefited from the submission of false claims and, after discovering the falsity of the claim, failed to disclose the falsity to the State within a reasonable time.

671. Further, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims to the State of New Jersey or state-funded entity that purchased MBS Trusts.

672. Each of the Defendants had possession, custody, or control of property or money used, or to be used by the State of New Jersey and, intending to defraud the State, knowingly delivered, or caused to be delivered, to the State of New Jersey less than all of that money or property.

673. The Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State.

674. Defendants acted in concert to create fraudulent legal documentation. Defendants acted in concert to conceal that the mortgage files for the MBS Trusts had not been reviewed and were missing mortgage documents. Defendants acted in concert to conceal that the MBS Trusts did not hold good title to the assets, thus impairing the value of the securities for the MBS Trusts. Defendants acted in concert to knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval. Defendants acted in concert to make, use, or cause to be made or used, false records or statements material to a false or fraudulent claim. Further, Defendants acted in concert to deliver, or cause to be delivered, less money or property, of which they had possession, custody, or control to the State of New Jersey or state-funded entity. Defendants acted in concert to knowingly make, use, or cause to be made or use, false records or statements material to an obligation to pay or transmit money or property to the State of New Jersey or state-

funded entity or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State of New Jersey or state-funded entity.

675. The State of New Jersey or state-funded entity, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid, and participated in payments made for claims that otherwise would not have been paid.

676. By reason of this unlawful conduct, the State of New Jersey has been damaged, and continues to be damaged, in an amount yet to be determined.

**COUNT XVIII**
**New Mexico False Claims Act,**
**N.M. Stat. Ann. §§ 44-9-1 – 44-9-14**
**Against all Defendants**

677. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 444 of this Complaint.

678. This is a claim for treble damages and civil penalties under the New Mexico False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.*

679. As alleged in paragraphs 1-444, the Defendants created, serviced, or participated in the MBS Trusts.

680. As further alleged in paragraphs 1-444, the MBS Trusts lacked the requisites necessary for the securities to have good title to the underlying mortgage assets, namely: (1) the legally binding assignments from the originating bank to the MBS Trusts and, finally, to the foreclosure agent; (2) the recording of title in the county recorder's office; and (3) the original note and mortgage, signed by both borrower and lender. The prospectus for each MBS Trust listed in Exhibit A, and other public statements, falsely

represented that the trust had possession of these documents and held good title to the mortgages and notes underlying the securities.

681. As further alleged in paragraphs 1-444, the Defendants created false mortgage documents and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, trustee and custodial services relating to the notes and mortgage documents.

682. By virtue of the wrongful conduct alleged here, the value of each of the MBS Trusts that was purchased by the State of New Mexico or state-funded entity was impaired.

683. Defendants received millions of dollars in New Mexico funds to provide services for MBS Trusts held by the State of New Mexico or state-funded entity. Defendants falsely represented that they had performed the services for which they were paid.

684. By virtue of the wrongful conduct alleged here, each of the Defendants knowingly caused, or assisted in causing, the State of New Mexico or state-funded entity to pay claims that are false or fraudulent.

685. Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the State of New Mexico or state-funded entity that purchased MBS Trusts. The Defendants benefited from the submission of false claims and, after discovering the falsity of the claim, failed to disclose the falsity to the State within a reasonable time.

686. Further, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims to the State of New Mexico or state-funded entity that purchased MBS Trusts.

687. Each of the Defendants had possession, custody, or control of property or money used, or to be used by the State of New Mexico and, intending to defraud the State, knowingly delivered, or caused to be delivered, to the State of New Mexico less than all of that money or property.

688. The Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State.

689. Defendants acted in concert to create fraudulent legal documentation. Defendants acted in concert to conceal that the mortgage files for the MBS Trusts had not been reviewed and were missing mortgage documents.  Defendants acted in concert to conceal that the MBS Trusts did not hold good title to the assets, thus impairing the value of the securities for the MBS Trusts.  Defendants acted in concert to knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval.  Defendants acted in concert to make, use, or cause to be made or used, false records or statements material to a false or fraudulent claim.  Further, Defendants acted in concert to deliver, or cause to be delivered, less money or property, of which they had possession, custody, or control to the State of New Mexico or state-funded entity.  Defendants acted in concert to knowingly make, use, or cause to be made or use, false records or statements material to an obligation to pay or transmit money or property to the State of New Mexico or state-

funded entity or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State of New Mexico or state-funded entity.

690.  The State of New Mexico or state-funded entity, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid, and participated in payments made for claims that otherwise would not have been paid.

691.  By reason of this unlawful conduct, the State of New Mexico has been damaged, and continues to be damaged, in an amount yet to be determined.

## COUNT XIX
### New York False Claims Act,
### N.Y. State Fin. L. §§ 189.1.(a)-1.(d), 189.1.(g)
### Against all Defendants

692.  Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 444 of this Complaint.

693.  This is a claim for treble damages and civil penalties under the New York False Claims Act, N.Y. St. Fin. L. § 187 *et seq.*

694.  As alleged in paragraphs 1-444, the Defendants created, serviced, or participated in the MBS Trusts.

695.  As further alleged in paragraphs 1-444, the MBS Trusts lacked the requisites necessary for the securities to have good title to the underlying mortgage assets, namely: (1) the legally binding assignments from the originating bank to the MBS Trusts and, finally, to the foreclosure agent; (2) the recording of title in the county recorder's office; and (3) the original note and mortgage, signed by both borrower and lender.  The prospectus for each MBS Trust listed in Exhibit A, and other public statements, falsely

represented that the trust had possession of these documents and held good title to the mortgages and notes underlying the securities.

696. As further alleged in paragraphs 1-444, the Defendants created false mortgage documents and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, trustee and custodial services relating to the notes and mortgage documents.

697. By virtue of the wrongful conduct alleged here, the value of each of the MBS Trusts that was purchased by the State of New York or state-funded entity was impaired.

698. Defendants received millions of dollars in New York funds to provide services for MBS Trusts held by the State of New York or state-funded entity. Defendants falsely represented that they had performed the services for which they were paid.

699. By virtue of the wrongful conduct alleged here, each of the Defendants knowingly caused, or assisted in causing, the State of New York or state-funded entity to pay claims that are false or fraudulent.

700. Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the State of New York or state-funded entity that purchased MBS Trusts. The Defendants benefited from the submission of false claims and, after discovering the falsity of the claim, failed to disclose the falsity to the State within a reasonable time.

701. Further, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims to the State of New York or state-funded entity that purchased MBS Trusts.

702. Each of the Defendants had possession, custody, or control of property or money used, or to be used by the State of New York and, intending to defraud the State, knowingly delivered, or caused to be delivered, to the State of New York less than all of that money or property.

703. The Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State.

704. Defendants acted in concert to create fraudulent legal documentation. Defendants acted in concert to conceal that the mortgage files for the MBS Trusts had not been reviewed and were missing mortgage documents. Defendants acted in concert to conceal that the MBS Trusts did not hold good title to the assets, thus impairing the value of the securities for the MBS Trusts. Defendants acted in concert to knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval. Defendants acted in concert to make, use, or cause to be made or used, false records or statements material to a false or fraudulent claim. Further, Defendants acted in concert to deliver, or cause to be delivered, less money or property, of which they had possession, custody, or control to the State of New York or state-funded entity. Defendants acted in concert to knowingly make, use, or cause to be made or use, false records or statements material to an obligation to pay or transmit money or property to the State of New York or state-

189

funded entity or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State of New York or state-funded entity.

705. The State of New York or state-funded entity, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid, and participated in payments made for claims that otherwise would not have been paid.

706. By reason of this unlawful conduct, the State of New York has been damaged, and continues to be damaged, in an amount yet to be determined.

## COUNT XX
### North Carolina False Claims Act,
### N.C. Gen. Stat. §§ 1-607(a)(1)-(a)(4),1-607 (a)(7)
### Against all Defendants

707. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 444 of this Complaint.

708. This is a claim for treble damages and civil penalties under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 *et seq.*

709. As alleged in paragraphs 1-444, the Defendants created, serviced, or participated in the MBS Trusts.

710. As further alleged in paragraphs 1-444, the MBS Trusts lacked the requisites necessary for the securities to have good title to the underlying mortgage assets, namely: (1) the legally binding assignments from the originating bank to the MBS Trusts and, finally, to the foreclosure agent; (2) the recording of title in the county recorder's office; and (3) the original note and mortgage, signed by both borrower and lender. The prospectus for each MBS Trust listed in Exhibit A, and other public statements, falsely

represented that the trust had possession of these documents and held good title to the mortgages and notes underlying the securities.

711. As further alleged in paragraphs 1-444, the Defendants created false mortgage documents and charged the MBS Trusts for their unlawful services.  Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, trustee and custodial services relating to the notes and mortgage documents.

712. By virtue of the wrongful conduct alleged here, the value of each of the MBS Trusts that was purchased by the State of North Carolina or state-funded entity was impaired.

713. Defendants received millions of dollars in North Carolina funds to provide services for MBS Trusts held by the State of North Carolina or state-funded entity. Defendants falsely represented that they had performed the services for which they were paid.

714. By virtue of the wrongful conduct alleged here, each of the Defendants knowingly caused, or assisted in causing, the State of North Carolina or state-funded entity to pay claims that are false or fraudulent.

715. Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the State of North Carolina or state-funded entity that purchased MBS Trusts.  The Defendants benefited from the submission of false claims and, after discovering the falsity of the claim, failed to disclose the falsity to the State within a reasonable time.

716. Further, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims to the State of North Carolina or state-funded entity that purchased MBS Trusts.

717. Each of the Defendants had possession, custody, or control of property or money used, or to be used by the State of North Carolina and, intending to defraud the government, knowingly delivered, or caused to be delivered, to the State of North Carolina less than all of that money or property.

718. The Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State.

719. Defendants acted in concert to create fraudulent legal documentation. Defendants acted in concert to conceal that the mortgage files for the MBS Trusts had not been reviewed and were missing mortgage documents. Defendants acted in concert to conceal that the MBS Trusts did not hold good title to the assets, thus impairing the value of the securities for the MBS Trusts. Defendants acted in concert to knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval. Defendants acted in concert to make, use, or cause to be made or used, false records or statements material to a false or fraudulent claim. Further, Defendants acted in concert to deliver, or cause to be delivered, less money or property, of which they had possession, custody, or control to the State of North Carolina or state-funded entity. Defendants acted in concert to knowingly make, use, or cause to be made or use, false records or statements material to an obligation to pay or transmit money or property to the State of North Carolina or

state-funded entity or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State of North Carolina or state-funded entity.

720.  The State of North Carolina or state-funded entity, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid, and participated in payments made for claims that otherwise would not have been paid.

721.  By reason of this unlawful conduct, the State of North Carolina has been damaged, and continues to be damaged, in an amount yet to be determined.

**COUNT XXI**
**Rhode Island False Claims Act,**
**R.I. Gen. Laws§§ 9-1.1-3(a)(1)-(a)(4), 9-1.1-3(a)(7)**
**Against all Defendants**

722.  Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 444 of this Complaint.

723.  This is a claim for treble damages and civil penalties under the Rhode Island False Claims Act, R.I. Gen. Laws §9-1.1-1 *et seq.*

724.  As alleged in paragraphs 1-444, the Defendants created, serviced, or participated in the MBS Trusts.

725.  As further alleged in paragraphs 1-444, the MBS Trusts lacked the requisites necessary for the securities to have good title to the underlying mortgage assets, namely: (1) the legally binding assignments from the originating bank to the MBS Trusts and, finally, to the foreclosure agent; (2) the recording of title in the county recorder's office; and (3) the original note and mortgage, signed by both borrower and lender.  The prospectus for each MBS Trust listed in Exhibit A, and other public statements, falsely

represented that the trust had possession of these documents and held good title to the mortgages and notes underlying the securities.

726. As further alleged in paragraphs 1-444, the Defendants created false mortgage documents and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, trustee and custodial services relating to the notes and mortgage documents.

727. By virtue of the wrongful conduct alleged here, the value of each of the MBS Trusts that was purchased by the State of Rhode Island or state-funded entity was impaired.

728. Defendants received millions of dollars in Rhode Island funds to provide services for MBS Trusts held by the State of Rhode Island or state-funded entity. Defendants falsely represented that they had performed the services for which they were paid.

729. By virtue of the wrongful conduct alleged here, each of the Defendants knowingly caused, or assisted in causing, the State of Rhode Island or state-funded entity to pay claims that are false or fraudulent.

730. Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the State of Rhode Island or state-funded entity that purchased MBS Trusts. The Defendants benefited from the submission of false claims and, after discovering the falsity of the claim, failed to disclose the falsity to the State within a reasonable time.

731. Further, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims to the State of Rhode Island or state-funded entity that purchased MBS Trusts.

732. Each of the Defendants had possession, custody, or control of property or money used, or to be used by the State of Rhode Island and, intending to defraud the State, knowingly delivered, or caused to be delivered, to the State of Rhode Island less than all of that money or property.

733. The Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State.

734. Defendants acted in concert to create fraudulent legal documentation. Defendants acted in concert to conceal that the mortgage files for the MBS Trusts had not been reviewed and were missing mortgage documents.  Defendants acted in concert to conceal that the MBS Trusts did not hold good title to the assets, thus impairing the value of the securities for the MBS Trusts.  Defendants acted in concert to knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval.  Defendants acted in concert to make, use, or cause to be made or used, false records or statements material to a false or fraudulent claim.  Further, Defendants acted in concert to deliver, or cause to be delivered, less money or property, of which they had possession, custody or control to the State of Rhode Island or state-funded entity.  Defendants acted in concert to knowingly make, use, or cause to be made or use, false records or statements material to an obligation to pay or transmit money or property to the State of Rhode Island or state-

195

funded entity or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State of Rhode Island or state-funded entity.

735. The State of Rhode Island or state-funded entity, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid, and participated in payments made for claims that otherwise would not have been paid.

736. By reason of this unlawful conduct, the State of Rhode Island has been damaged, and continues to be damaged, in an amount yet to be determined.

**COUNT XXII**
**Virginia Fraud Against Taxpayers Act,**
**Va. Code Ann. §§ 8.01-216.3 (A)(1)- (A-4), 8.01-216.3 (A)(7)**
**Against all Defendants**

737. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 444 of this Complaint.

738. This is a claim for treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216 *et seq.*

739. As alleged in paragraphs 1-444, the Defendants created, serviced, or participated in the MBS Trusts.

740. As further alleged in paragraphs 1-444, the MBS Trusts lacked the requisites necessary for the securities to have good title to the underlying mortgage assets, namely: (1) the legally binding assignments from the originating bank to the MBS Trusts and, finally, to the foreclosure agent; (2) the recording of title in the county recorder's office; and (3) the original note and mortgage, signed by both borrower and lender. The prospectus for each MBS Trust listed in Exhibit A, and other public statements, falsely

represented that the trust had possession of these documents and held good title to the mortgages and notes underlying the securities.

741.  As further alleged in paragraphs 1-444, the Defendants created false mortgage documents and charged the MBS Trusts for their unlawful services.  Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, trustee and custodial services relating to the notes and mortgage documents.

742.  By virtue of the wrongful conduct alleged here, the value of each of the MBS Trusts that was purchased by the Commonwealth of Virginia or state-funded entity was impaired.

743.  Defendants received millions of dollars in Virginia funds to provide services for MBS Trusts held by the Commonwealth of Virginia or state-funded entity. Defendants falsely represented that they had performed the services for which they were paid.

744.  By virtue of the wrongful conduct alleged here, each of the Defendants knowingly caused, or assisted in causing, the Commonwealth of Virginia or state-funded entity to pay claims that are false or fraudulent.

745.  Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the Commonwealth of Virginia or state-funded entity that purchased MBS Trusts.  The Defendants benefited from the submission of false claims and, after discovering the falsity of the claim, failed to disclose the falsity to the Commonwealth within a reasonable time.

746. Further, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims to the Commonwealth of Virginia or state-funded entity that purchased MBS Trusts.

747. Each of the Defendants had possession, custody, or control of property or money used, or to be used by the Commonwealth of Virginia and, intending to defraud the State, knowingly delivered, or caused to be delivered, to the Commonwealth of Virginia less than all of that money or property.

748. The Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Commonwealth, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Commonwealth. Defendants acted in concert to create fraudulent legal documentation.

749. Defendants acted in concert to conceal that the mortgage files for the MBS Trusts had not been reviewed and were missing mortgage documents. Defendants acted in concert to conceal that the MBS Trusts did not hold good title to the assets, thus impairing the value of the securities for the MBS Trusts. Defendants acted in concert to knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval. Defendants acted in concert to make, use, or cause to be made or used, false records or statements material to a false or fraudulent claim. Further, Defendants acted in concert to deliver, or cause to be delivered, less money or property, of which they had possession, custody, or control to the Commonwealth of Virginia or state-funded entity. Defendants acted in concert to knowingly make, use, or cause to be made or use, false records or statements material to an obligation to pay or transmit money or property to

198

the Commonwealth of Virginia or state-funded entity or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Commonwealth of Virginia or state-funded entity.

750. The Commonwealth of Virginia or state-funded entity, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid, and participated in payments made for claims that otherwise would not have been paid.

751. By reason of this unlawful conduct, the Commonwealth of Virginia has been damaged, and continues to be damaged, in an amount yet to be determined.

**COUNT XXIII**
**City of Chicago False Claims Act,**
**Chicago Code of Ordinances §§ 1-22-020(1)-(4), 1-22-020(7)**
**Against all Defendants**

752. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 444 of this Complaint.

753. This is a claim for treble damages and civil penalties under the City of Chicago False Claims Act, Chicago Mun. Code § 1-22 *et seq.*

754. As alleged in paragraphs 1-444, the Defendants created, serviced, or participated in the MBS Trusts.

755. As further alleged in paragraphs 1-444, the MBS Trusts lacked the requisites necessary for the securities to have good title to the underlying mortgage assets, namely: (1) the legally binding assignments from the originating bank to the MBS Trusts and, finally, to the foreclosure agent; (2) the recording of title in the county recorder's office; and (3) the original note and mortgage, signed by both borrower and lender. The prospectus for each MBS Trust listed in Exhibit A, and other public statements, falsely

represented that the trust had possession of these documents and held good title to the mortgages and notes underlying the securities.

756.  As further alleged in paragraphs 1-444, the Defendants created false mortgage documents and charged the MBS Trusts for their unlawful services.  Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, trustee and custodial services relating to the notes and mortgage documents.

757.  By virtue of the wrongful conduct alleged here, the value of each of the MBS Trusts that was purchased by the City of Chicago or city-funded entity was impaired.

758.  Defendants received millions of dollars in Chicago funds to provide services for MBS Trusts held by the City of Chicago or city-funded entity.  Defendants falsely represented that they had performed the services for which they were paid.

759.  By virtue of the wrongful conduct alleged here, each of the Defendants knowingly caused, or assisted in causing, the City of Chicago or city-funded entity to pay claims that are false or fraudulent.

760.  Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the City of Chicago or city-funded entity that purchased MBS Trusts.  The Defendants benefited from the submission of false claims and, after discovering the falsity of the claim, failed to disclose the falsity to the City within a reasonable time.

761. Further, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims to the City of Chicago or city-funded entity that purchased MBS Trusts.

762. Each of the Defendants had possession, custody, or control of property or money used, or to be used by the City of Chicago and, intending to defraud the City, knowingly delivered, or caused to be delivered, to the City of Chicago less than all of that money or property.

763. The Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the City.

764. Defendants acted in concert to create fraudulent legal documentation. Defendants acted in concert to conceal that the mortgage files for the MBS Trusts had not been reviewed and were missing mortgage documents. Defendants acted in concert to conceal that the MBS Trusts did not hold good title to the assets, thus impairing the value of the securities for the MBS Trusts. Defendants acted in concert to knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval. Defendants acted in concert to make, use, or cause to be made or used, false records or statements material to a false or fraudulent claim. Further, Defendants acted in concert to deliver, or cause to be delivered, less money or property, of which they had possession, custody, or control to the City of Chicago or city-funded entity. Defendants acted in concert to knowingly make, use, or cause to be made or use, false records or statements material to an obligation to pay or transmit money or property to the City of Chicago or city-funded

entity or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the City of Chicago or city-funded entity.

765. The City of Chicago or city-funded entity, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid, and participated in payments made for claims that otherwise would not have been paid.

766. By reason of this unlawful conduct, the City of Chicago has been damaged, and continues to be damaged, in an amount yet to be determined.

## COUNT XXIV
### New York City False Claims Act,
### NYC Admin. Code §§ 7-803 (a)(1)-(a)(4), 7-803 (a)(7)
### Against all Defendants

767. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 444 of this Complaint.

768. This is a claim for treble damages and civil penalties under the City of New York False Claims Act, NYC Admin. Code § 7-803.

769. As alleged in paragraphs 1-444, the Defendants created, serviced, or participated in the MBS Trusts.

770. As further alleged in paragraphs 1-444, the MBS Trusts lacked the requisites necessary for the securities to have good title to the underlying mortgage assets, namely: (1) the legally binding assignments from the originating bank to the MBS Trusts and, finally, to the foreclosure agent; (2) the recording of title in the county recorder's office; and (3) the original note and mortgage, signed by both borrower and lender. The prospectus for each MBS Trust listed in Exhibit A, and other public statements, falsely

represented that the trust had possession of these documents and held good title to the mortgages and notes underlying the securities.

771. As further alleged in paragraphs 1-444, the Defendants created false mortgage documents and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, trustee and custodial services relating to the notes and mortgage documents.

772. By virtue of the wrongful conduct alleged here, the value of each of the MBS Trusts that was purchased by the City of New York or city-funded entity was impaired.

773. Defendants received millions of dollars in New York funds to provide services for MBS Trusts held by the City of New York or city-funded entity. Defendants falsely represented that they had performed the services for which they were paid.

774. By virtue of the wrongful conduct alleged here, each of the Defendants knowingly caused, or assisted in causing, the City of New York or city-funded entity to pay claims that are false or fraudulent.

775. Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the City of New York or city-funded entity that purchased MBS Trusts. The Defendants benefited from the submission of false claims and, after discovering the falsity of the claim, failed to disclose the falsity to the City within a reasonable time.

776. Further, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims to the City of New York or city-funded entity that purchased MBS Trusts.

777. Each of the Defendants had possession, custody, or control of property or money used, or to be used by the City of New York and, intending to defraud the City, knowingly delivered, or caused to be delivered, to the City of New York less than all of that money or property.

778. The Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the City.

779. Defendants acted in concert to create fraudulent legal documentation. Defendants acted in concert to conceal that the mortgage files for the MBS Trusts had not been reviewed and were missing mortgage documents. Defendants acted in concert to conceal that the MBS Trusts did not hold good title to the assets, thus impairing the value of the securities for the MBS Trusts. Defendants acted in concert to knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval. Defendants acted in concert to make, use, or cause to be made or used, false records or statements material to a false or fraudulent claim. Further, Defendants acted in concert to deliver, or cause to be delivered, less money or property, of which they had possession, custody, or control to the City of New York or city-funded entity. Defendants acted in concert to knowingly make, use, or cause to be made or use, false records or statements material to an obligation to pay or transmit money or property to the City of New York or city-

funded entity or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the City of New York or city-funded entity.

780.    The City of New York or city-funded entity, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid, and participated in payments made for claims that otherwise would not have been paid.

781.    By reason of this unlawful conduct, the City of New York has been damaged, and continues to be damaged, in an amount yet to be determined.

## XI.    PRAYER FOR RELIEF

**WHEREFORE**, Relator requests that judgment be entered against Defendants, ordering that:

a.    Defendants pay an amount equal to three times the amount of damages the United States, the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, and Rhode Island, the Commonwealths of Massachusetts and Virginia, the District of Columbia, the City of Chicago, and the City of New York have sustained because of Defendants' actions;

b.    Defendant pay a civil penalty of not less than $5,000, and not more than $10,000 for each violation of 31 U.S.C. § 3729 and similar provisions of the State and Commonwealth False Claims Acts, the District of Columbia False Claims Act, the City of Chicago False Claims Act, and the City of New York False Claims Act;

c.    Relator be granted the maximum award allowed pursuant to 31 U.S.C. § 3730(d) and similar provisions of the State and Commonwealth False Claims Acts, the

District of Columbia False Claims Act, the City of Chicago False Claims Act, and the City of New York False Claims Act;

d.    Relator be granted all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d) and similar provisions of the State False Claims Acts, the District of Columbia False Claims Act, the City of Chicago False Claims Act, and the City of New York False Claims Act;

e.    The United States, the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, and Rhode Island, the Commonwealths of Massachusetts and Virginia, the District of Columbia, the City of Chicago, the City of New York, and Relator be granted all such other relief afforded by law as the Court deems appropriate;

## XII.    REQUEST FOR A TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff/Relator hereby demands a trial by jury.

Dated: February 3, 2014

          /s/ Richard A. Harpootlian

**RICHARD A. HARPOOTLIAN P.A.**
Richard A. Harpootlian, Esq.
1410 Laurel Street
Post Office Box 1090
Columbia, SC  29202
Telephone:    (803) 252-4848
Facsimile**:**    (803) 252-4810


**GRANT & EISENHOFER P.A.**
Reuben A. Guttman, Esq. (*pro hac vice*)
1747 Pennsylvania Avenue, N.W.
Suite 875
Washington, DC  20006
Telephone:    (202) 386-9500
Facsimile:    (202) 350-5908


**GRANT & EISENHOFER P.A.**
Jay W. Eisenhofer, Esq. (*pro hac vice*)
James J. Sabella, Esq. (*pro hac vice*)
Elizabeth H. Shofner, Esq. (*pro hac vice* to
be sought)
485 Lexington Avenue
New York, NY  10017
Telephone:    (646) 722-8500
Facsimile:    (646) 722-8501


**GRANT & EISENHOFER P.A.**
Jennifer A. Williams, Esq. (*pro hac vice* to
be sought)
123 Justison Street
Wilmington, DE  19801
Telephone:    (302) 622-7000
Facsimile:    (302) 622-7100

*Attorneys for Relator Lynn E. Szymoniak*